[NOT SCHEDULED FOR ORAL ARGUMENT]

No. 15-5018

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

HOME CARE ASSOCIATION OF AMERICA; INTERNATIONAL FRANCHISE
ASSOCIATION; NATIONAL ASSOCIATION FOR HOME CARE & HOSPICE,

Plaintiffs-Appellees,

v.

DAVID WEIL, Administrator of the Wage and Hour Division, U.S. Department of Labor;
THOMAS E. PEREZ, Secretary of Labor; U.S. DEPARTMENT OF LABOR,

Defendants-Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA (No. 14-cv-967) (Hon. Richard J. Leon)

_____

**BRIEF FOR APPELLANTS**

_____

Of counsel:

M. PATRICIA SMITH
  *Solicitor of Labor*

JENNIFER S. BRAND
  *Associate Solicitor*

PAUL L. FRIEDEN
  *Counsel for Appellate Litigation*

MELISSA A. MURPHY
  *Senior Attorney*

SARAH K. MARCUS
  *Attorney*
  *U.S. Department of Labor*

JOYCE R. BRANDA
  *Acting Assistant Attorney General*

RONALD C. MACHEN, JR.
  *United States Attorney*

BETH S. BRINKMANN
  *Deputy Assistant Attorney General*

MICHAEL S. RAAB
ALISA B. KLEIN
  *(202) 514-1597*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7235*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES
## PURSUANT TO CIR. R. 28(a)(1)

### A.    Parties and *Amici*

Plaintiffs-appellees are Home Care Association of America; International Franchise Association; and National Association for Home Care & Hospice.

Defendants-appellants are David Weil, in his official capacity as Administrator, Wage and Hour Division of the U.S. Department of Labor; Thomas E. Perez, in his official capacity as Secretary of Labor; and the U.S. Department of Labor.

There were no *amici* in district court.

### B.    Ruling Under Review

The government has appealed the December 22, 2014 opinion and order vacating the third-party employment regulation, 29 C.F.R. § 552.109 (Dkt. ## 21, 22), and the January 14, 2015 opinion and order vacating the companionship-services regulation, 29 C.F.R. § 552.6 (Dkt. ## 32, 33).  The rulings were issued by the Honorable Richard J. Leon in No. 1:14-cv-00967-RJL (D.D.C.).

### C.    Related Cases

We are unaware of any pending related cases.

                                                      s/  *Alisa B. Klein*
                                                     Alisa B. Klein
                                                     Counsel for Appellants

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

GLOSSARY

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION...........................................................5

STATEMENT OF THE ISSUE ................................................................6

STATUTES AND REGULATIONS ..........................................................6

STATEMENT OF THE CASE..................................................................6

    A.    Statutory Background...........................................................6

    B.    Regulatory History .............................................................9

        1.  The 1975 regulations ....................................................9

        2.  The 2001 proposed regulations ....................................10

        3.  The Supreme Court's 2007 decision in *Coke*.................12

    C.    The Current Regulations ...................................................13

    D.    District Court Proceedings .................................................23

SUMMARY OF ARGUMENT .................................................................25

STANDARD OF REVIEW .....................................................................27

ARGUMENT ...............................................................................27

    I.    The Third-Party Employment Regulation Is A
          Reasonable Exercise Of The Authority That Congress
          Delegated To The Department Of Labor ...........................................27

        A.    The Supreme Court in *Coke* Held that the
              Department of Labor Has Authority To Decide
              Whether Domestic Service Workers Employed by
              Third Parties Should Be Exempt from the FLSA's
              Protections..................................................................................27

        B.    The District Court Impermissibly Substituted Its
              Assumptions About the Home Care Market for the
              Reasonable Findings Made by the Agency on the Basis
              of the Administrative Record ....................................................34

    II.    The Companionship-Services Regulation Is A
          Reasonable Exercise Of The Authority That Congress
          Delegated To The Department Of Labor ...........................................43

        A.    Because the Third-Party Employment Regulation Is
              Valid, Plaintiffs Lack Standing to Challenge the
              Companionship-Services Regulation........................................43

        B.    The Ruling Vacating Paragraph (b) of the
               Companionship-Services Regulation Rests on the Same
              Mistaken Premises as the Ruling Invalidating the
              Third-Party Employment Regulation........................................44

        C.    The District Court Improperly Invalidated Provisions
              of the Companionship-Services Regulation That Its
              Opinion Did Not Address .........................................................48

CONCLUSION ...........................................................................50

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page**

*Associated Builders & Contractors, Inc. v. Shiu,*
   773 F.3d 257 (D.C. Cir. 2014) ...............................................................27

*Auer v. Robbins,*
   519 U.S. 452 (1997) ...............................................................................29

*Bailey v. Potter,*
   478 F.3d 409 (D.C. Cir. 2007) .................................................................5

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,,*
   467 U.S. 837 (1984) ...................................................................... 5, 13, 42

*\*Long Island Care at Home, Ltd. v. Coke,*
   551 U.S. 158 (2007) ...................................................... 3, 4, 5, 10, 12, 13, 26, 28,
                                                   29, 30, 32, 33, 34, 41, 42, 44, 45

*Morton v. Ruiz,*
   415 U.S. 199 (1974) ...................................................................... 5, 13, 42

*Nat'l Cable & Telecommuns. Ass'n v. Brand X Internet Servs.,*
   545 U.S. 967 (2005) ...............................................................................42

*Nat'l Fuel Gas Supply Corp. v. FERC,*
   811 F.2d 1563 (D.C. Cir. 1987) .............................................................42

*Olmstead v. L.C.,*
   527 U.S. 581 (1999) ...............................................................................37

*Schweiker v. Chilicky,*
   487 U.S. 412 (1988) ...............................................................................33

*United States v. Mead Corp.,*
   533 U.S. 218 (2001) ...............................................................................42

_____

\*  Authorities upon which we chiefly rely are marked with asterisks.

## Statutes:

Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* ...................................4, 6

Fair Labor Standards Amendments of 1974,
Pub. L. No. 93-259, 88 Stat. 55 ................................................................. 1, 7, 28

28 U.S.C. § 1291 ................................................................................................5

28 U.S.C. § 1292(a)(2) .......................................................................................6

28 U.S.C. § 1331 ................................................................................................5

29 U.S.C. § 201 *et seq.* ......................................................................................6

29 U.S.C. § 203(s)(1) (1970) ..............................................................................7

29 U.S.C. § 206(a) (1970) ...................................................................................7

29 U.S.C. § 206(a) .............................................................................................6

29 U.S.C. § 206(f) ..............................................................................................7

29 U.S.C. § 207(a)(1) (1970) ..............................................................................7

29 U.S.C. § 207(a)(1) .........................................................................................6

29 U.S.C. § 207(*l*) .............................................................................................7

29 U.S.C. § 213(a)(1) .........................................................................................29

29 U.S.C. § 213(a)(15) ........................................................... 1, 7, 28, 43, 44

29 U.S.C. § 213(b)(21) .....................................................................................1, 7

29 U.S.C. § 216(b) .................................................................................. 14, 17

29 U.S.C. § 216(c) ..............................................................................................14

29 U.S.C. § 217 ..................................................................................................14

**Regulatory Materials:**

29 C.F.R. pt. 516 .................................................................................16

29 C.F.R. § 552.102 ............................................................................34

29 C.F.R. § 552.109 ............................................... 2, 3, 5, 6, 10, 14, 28, 44

29 C.F.R. § 552.6 ..................................................... 1, 3, 5, 6, 9, 43, 44

29 C.F.R. § 552.6(a) ........................................................... 16, 45

29 C.F.R. § 552.6(b) ........................................................... 16, 17, 46

29 C.F.R. § 552.6(c) ........................................................... 17, 49

29 C.F.R. § 552.6(d) ........................................................... 17, 49

39 Fed. Reg. 35382 (Oct. 1, 1974) ...........................................................10

40 Fed. Reg. 7404 (Feb. 20, 1975) ................................... 1, 2, 9, 10, 34, 43

58 Fed. Reg. 69310 (Dec. 30, 1993) .........................................................10

60 Fed. Reg. 46798 (Sept. 8, 1995) .........................................................10

66 Fed. Reg. 5481 (Jan. 19, 2001) ........................................... 10, 11, 48

67 Fed. Reg. 16668 (Apr. 8, 2002) .........................................................12

76 Fed. Reg. 81190 (Dec. 27, 2011) .........................................................13

78 Fed. Reg. 60454 (Oct. 1, 2013).......................... 4, 13, 14, 15, 16, 17, 18, 19, 20,
21, 22, 28, 37, 38, 39, 40, 41, 46, 47, 48

79 Fed. Reg. 60974 (Oct. 9, 2014).........................................................17

**Legislative Materials:**

119 Cong. Rec. 24801 (1973) ............................................................2, 9, 48

S. Rep. No. 93-690 (1974) ..............................................................8, 9, 36

H.R. Rep. No. 93-913 (1974) ..........................................................8, 9, 36

## GLOSSARY

DOL                 Department of Labor

FLSA                Fair Labor Standards Act

House Report        H.R. Rep. No. 93-913 (1974)

Senate Report       S. Rep. No. 93-690 (1974)

## INTRODUCTION

In 1974, Congress amended the Fair Labor Standards Act (FLSA) to extend the Act's minimum wage and overtime pay requirements to domestic service employees. Congress exempted "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." 29 U.S.C. § 213(a)(15). Congress also exempted from the overtime pay requirement domestic service employees who live in the household. *Id.* § 213(b)(21).

Congress granted the Department of Labor authority to implement the 1974 amendments through legislative rules. In addition to the specific authority to "define[] and delimit[]" the term "companionship services," 29 U.S.C. § 213(a)(15), Congress granted the Department the broad general authority "to prescribe necessary rules, regulations, and orders with regard to the [1974 amendments]." Pub. L. No. 93-259, § 29(b), 88 Stat. 76.

The Department issued implementing regulations in 1975. Those regulations set out the types of activities and duties that may be regarded as companionship services. 40 Fed. Reg. 7404, 7405 (Feb. 20, 1975) (29 C.F.R. § 552.6) (companionship-services regulation). In addition, the 1975 regulations provided that the exemptions for companionship services and live-in domestic

service employees could be claimed not only by an individual (or family member) who hired a worker directly, but also by "third-party employers" such as home care agencies that assign members of their workforce to particular homes. 40 Fed. Reg. at 7407 (29 C.F.R. § 552.109) (third-party employment regulation). Prior to the 1974 amendments, the employees of such third-party employers received FLSA coverage if their employer had more than $250,000 in gross annual sales.

In regulations issued in 2013 after notice and comment rulemaking, the Department amended its 1975 regulations in light of the transformation of the home care industry that had occurred in the decades since those regulations were issued. When Congress enacted the 1974 amendments, the accompanying House and Senate committee reports made clear that the exemptions were not intended to apply to workers who have domestic service as their vocation or who would depend on FLSA coverage for their livelihood. The debates indicated that a "companion" might be "a neighbor" who "comes in and sits with" "an aged father, an aged mother, an infirm father, an infirm mother." 119 Cong. Rec. 24801 (1973) (Sen. Burdick). In the ensuing decades, however, the home care industry has been transformed into a multi-billion dollar business with a professional workforce. Employees in this industry, who have been treated as exempt from FLSA coverage as a result of the 1975 regulations, are among the lowest paid in the service industry. Accordingly, in 2013, the Department amended its third-party employer

regulation, 29 C.F.R. § 552.109, to provide that third-party employers may not

avail themselves of the exemptions for companionship services or live-in domestic

service employees.  In addition, the Department amended its companionship-

services regulation, 29 C.F.R. § 552.6, to narrow the types of activities and duties

that may be regarded as companionship services.

The district court held that the amended regulations are contrary to the

FLSA's plain text and invalidated the regulations at step 1 of the *Chevron* analysis.

These rulings rest on a fundamental misunderstanding of the Supreme Court's

decision in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007).  There,

the Supreme Court upheld the 1975 regulation governing third-party employment

as a reasonable exercise of the authority that Congress delegated to the Department

of Labor.  In so ruling, the Court concluded that "the text of the FLSA does not

expressly answer the third-party-employment question."  *Id*. at 168.  Instead, "[t]he

statutory language refers broadly to 'domestic service employment' and to

'companionship services'" and "expressly instructs the agency to work out the

details of those broad definitions."  *Id*. at 167.  The Court concluded that "whether

to include workers paid by third parties within the scope of the definitions is one of

those details."  *Ibid*.  The Court explained that "whether, or how, the definition

should apply to workers paid by third parties raises a set of complex questions,"

and that "[s]atisfactory answers to such questions may well turn upon the kind of

thorough knowledge of the subject matter and ability to consult at length with affected parties that an agency, such as the DOL, possesses." *Id*. at 167-168. The Court concluded that it is "consequently reasonable to infer (and we do infer) that Congress intended its broad grant of definitional authority to the Department to include the authority to answer these kinds of questions." *Id*. at 168.

The final rule issued in 2013 includes a comprehensive analysis of the economic impact of the regulatory changes on a wide array of constituencies, including consumers, workers, employers, and the public programs (such as Medicare and Medicaid) that pay for the lion's share of home care services. *See* 78 Fed. Reg. 60454 (Oct. 1, 2013). Based on that analysis, the Department rejected industry claims that the amended regulations would harm consumers by reducing access to home care services or the quality of care. Instead, the Department found that FLSA coverage will benefit not only the workers "but also consumers because supporting and stabilizing the direct care workforce will result in better qualified employees, lower turnover, and a higher quality of care." *Id*. at 60459-60.

These determinations have ample support in the administrative record, including data from the fifteen states that already provide minimum wage and overtime protections to all or most home care workers employed by third parties, as well as comments from consumer representatives. The amended regulations thus must be upheld as a reasonable exercise of the Department's authority "to fill

any gap left, implicitly or explicitly, by Congress." *Coke*, 551 U.S. at 165 (quoting

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984)

(quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974))).

## STATEMENT OF JURISDICTION

Plaintiffs challenged two regulations implementing the Fair Labor Standards

Act.  The district court had jurisdiction under 28 U.S.C. § 1331.  By order issued

on December 22, 2014, the court vacated 29 C.F.R. § 552.109 (the third-party

employment regulation).  JA44.  By order issued on January 14, 2015, the court

vacated 29 C.F.R. § 552.6 (the companionship-services regulation).  JA61.  The

government filed a timely notice of appeal on January 22, 2015.  JA65.

The two independent bases for this Court's appellate jurisdiction were

discussed in the government's motion to expedite this appeal, which this Court

granted.  First, this Court has jurisdiction under 28 U.S.C. § 1291 because the

district court's rulings disposed of all claims in this case.  Although the district

court failed to act on the government's unopposed motion for entry of judgment in

a separate document, the requirement of a separate document is not jurisdictional

and should not be applied to delay appeal from a decision that is "tantamount to a

final judgment." *Bailey v. Potter*, 478 F.3d 409, 411-412 (D.C. Cir. 2007).[1]

---

[1] After this Court granted expedition, the district court denied motion for
entry of final judgment as moot.  *See* JA9 (1/29/15 minute order).

Second, this Court also has jurisdiction under 28 U.S.C. § 1292(a)(2) because the district court made clear that its orders are injunctions. *See*, *e.g.*, JA183 (indicating that the district court was not inclined to grant a "stay" of its decision because "it is my decision that actually maintains the status quo").

## STATEMENT OF THE ISSUE

Whether the third-party employment regulation, 29 C.F.R. § 552.109, and the companionship-services regulation, 29 C.F.R. § 552.6, are reasonable exercises of the rulemaking authority that Congress delegated to the Department of Labor in the Fair Labor Standards Act.

## STATUTES AND REGULATIONS

Pertinent provisions of the Fair Labor Standards Act and implementing regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq*., generally requires covered employers to pay a minimum hourly wage and, for hours of work exceeding 40 in a work week, overtime compensation at a rate of one and one-half times the employee's regular rate of pay.  29 U.S.C. §§ 206(a), 207(a)(1).  Before 1974, domestic service employees were not covered by these provisions unless the workers were "employed in an enterprise engaged in commerce or in the

production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a)(1) (1970). At

that time, an employer qualified as an "enterprise" if (*inter alia*) it had more than

$250,000 in gross annual sales. *See* 29 U.S.C. § 203(s)(1) (1970).

The Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259,

88 Stat. 55, extended the FLSA's minimum wage and overtime requirements to

domestic service employees, 29 U.S.C. §§ 206(f), 207(*l*), but exempted "any

employee employed in domestic service employment to provide companionship

services for individuals who (because of age or infirmity) are unable to care for

themselves (as such terms are defined and delimited by regulations of the

Secretary)." 29 U.S.C. § 213(a)(15). Congress also exempted from the Act's

overtime requirements any domestic service employee who lives in the household.

29 U.S.C. § 213(b)(21).

Congress granted the Department of Labor authority to implement the 1974

amendments through legislative rules. In addition to the specific authority to

"define[] and delimit[]" the term "companionship services," 29 U.S.C.

§ 213(a)(15), which Congress did not otherwise define, Congress granted the

Department authority "to prescribe necessary rules, regulations, and orders with

regard to the [1974 amendments]." Pub. L. No. 93-259, § 29(b), 88 Stat. at 76.

The House and Senate committee reports accompanying the

1974 amendments described Congress's expectations with regard to the Act's

coverage of domestic service employees and its exemption for companionship

services.  The committee reports explained that domestic service "includes services

performed by persons employed as cooks, butlers, valets, maids, housekeepers,

governesses, janitors, laundresses, caretakers, handymen, gardeners, footmen,

grooms, and chauffeurs of automobiles for family use."  S. Rep. No. 93-690, at 20

(1974) (Senate Report); H.R. Rep. No. 93-913, at 35-36 (1974) (House Report).  In

identical passages, the reports further explained:

> It is the intent of the committee to include within the coverage of the Act all
> employees whose vocation is domestic service.  However, the exemption
> reflects the intent of the committee to exclude from coverage . . .
> companions for individuals who are unable because of age and infirmity to
> care for themselves.  But it is not intended that trained personnel such as
> nurses, whether registered or practical, shall be excluded.  People who will
> be employed in the excluded categories are not regular bread-winners or
> responsible for their families' support.  The fact that persons performing . . .
> services as companions do some incidental household work does not keep
> them from being . . . companions for purposes of this exclusion.

Senate Report 20; House Report 36.

The House and Senate reports explained that, in extending the FLSA's

protections to domestic service employees generally, Congress sought to foster "an

effective and dignified domestic work force" by requiring "a living wage and

respectable working conditions."  Senate Report 19-20; *see also* House Report 33-

34 (similar).  Because the companionship-services exemption was not intended to

apply to individuals who are domestic service workers as their "vocation" or who

are "regular bread-winners or responsible for their families' support," Senate

-8-

Report 20; House Report 36, the exemption would not undermine that overarching objective.

Senator Williams, Chairman of the Senate Subcommittee on Labor and the Senate floor manager of the 1974 amendments to the FLSA, explained that a "companion" as used in the exemption is someone whose responsibility is "to be there and to watch an older person," "not to do household work." 119 Cong. Rec. 24801 (1973). Senator Burdick, responding to this description, declared: "In other words, an elder sitter." *Ibid*. As an example, he referred to "a neighbor" who "comes in and sits with" "an aged father, an aged mother, an infirm father, an infirm mother." *Ibid*. He noted that although being a "companion" might also involve "making lunch for the infirm person," "[t]his would be incidental to the main purpose of the employment." *Ibid*.

## B.   Regulatory History

### 1. The 1975 regulations

The Department of Labor first implemented the 1974 amendments through regulations issued in 1975. The Department set out the types of activities and duties that may be regarded as "companionship services." 40 Fed. Reg. 7404, 7405 (Feb. 20, 1975) (29 C.F.R. § 552.6). In addition, the Department addressed the question whether the exemption could be claimed not only by an individual (or family member) who hired a worker directly, but also by third-party employers

-9-

such as home care agencies that assign members of their workforce to particular homes.  As proposed in 1974, the regulation would have placed outside the exemption (and hence left subject to FLSA wage and hour rules) individuals employed by third-party employers whom the Act had covered prior to 1974.  *See* 39 Fed. Reg. 35382, 35385 (Oct. 1, 1974) (29 C.F.R. § 552.109, as proposed).  However, in the final regulations, the Department of Labor reversed that proposal and provided that the exemption includes individuals "who are employed by an employer or agency other than the family or household using their services." 40 Fed. Reg. at 7407 (29 C.F.R. § 552.109).  The Department stated that "[t]his interpretation is more consistent with the statutory language and prior practices concerning other similarly worded exemptions."  *Id*. at 7405.

### 2.  The 2001 proposed regulations

In 2001, the Department of Labor issued a notice of proposed rulemaking to revise these regulations.  *See* 66 Fed. Reg. 5481 (Jan. 19, 2001).[2]  The Department explained that, "[d]ue to significant changes in the home care industry over the last 25 years, workers who today provide in-home care to individuals needing assistance with activities of daily living are performing types of duties and working

---

[2] The third-party employment regulation was also the subject of earlier notices of proposed rulemaking.  *See* 58 Fed. Reg. 69310 (Dec. 30, 1993); 60 Fed. Reg. 46798 (Sept. 8, 1995) (discussed in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 163, 170 (2007)).

in situations that were not envisioned when the companionship services regulations were promulgated." *Id*. at 5482. The Department had "reevaluated the regulations and determined that—as currently written—they exempt types of employees far beyond those whom Congress intended to exempt when it enacted" the companionship-services exemption. *Ibid*. Therefore, the Department proposed to amend the regulation that "sets out the duties that a companion must be employed to perform in order to qualify for the exemption," and to "deny the companionship services exemption if the worker is employed by someone other than a member of the family in whose home he or she works." *Ibid*. The Department likewise proposed to "deny the exemption for live-in domestics, who are exempt from the FLSA's overtime requirements pursuant to section 13(b)(21), if they are employed by someone other than a member of the family in whose home they reside and work." *Ibid*.

In the 2001 notice of proposed rulemaking, the Department stated that it did not expect these changes to "produce a significant economic or budgetary impact on affected entities." 66 Fed. Reg. at 5486. "As a result, the Department concluded that a full economic impact and cost/benefit analysis was not required" under Executive Order 12866, which requires agencies to conduct such an analysis for regulatory action that is expected to be "economically significant" as that term is defined in the Executive Order. *Ibid*. During the comment period, however, the

assumption that the changes would have "little economic impact on affected entities" was called into question, including in comments by the Department of Health & Human Services and the Small Business Association.  *See* 67 Fed. Reg. 16668 (Apr. 8, 2002).  Citing these comments, the Department of Labor issued a one-page notice in 2002 indicating that it was withdrawing the proposed regulations, *ibid.*, which left the 1975 regulations in place.

### 3.  The Supreme Court's 2007 decision in *Coke*

In *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007), the Supreme Court upheld the 1975 regulation governing third-party employment as a reasonable exercise of the rulemaking authority that Congress delegated to the Department of Labor.  The Supreme Court concluded that "the text of the FLSA does not expressly answer the third-party-employment question."  *Id.* at 168. Instead, "[t]he statutory language refers broadly to 'domestic service employment' and to 'companionship services'" and "expressly instructs the agency to work out the details of those broad definitions."  The Court concluded that "whether to include workers paid by third parties within the scope of the definitions is one of those details."  *Id.* at 167.  It reasoned that "whether, or how, the definition should apply to workers paid by third parties raises a set of complex questions," and that "[s]atisfactory answers to such questions may well turn upon the kind of thorough knowledge of the subject matter and ability to consult at length with affected

parties that an agency, such as the DOL, possesses." *Id*. at 167-168. The Court held that it is "consequently reasonable to infer (and we do infer) that Congress intended its broad grant of definitional authority to the Department to include the authority to answer these kinds of questions." *Id*. at 168. Recognizing that the third-party employment question raises difficult policy issues and that "the Department has clearly struggled with" the issue, the Supreme Court upheld the 1975 rule as a reasonable exercise of the Department's authority "to fill any gap left, implicitly or explicitly, by Congress." *Id*. at 165 (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984) (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)).

## C.    The Current Regulations

The regulations at issue here are the product of notice and comment rulemaking that began in late 2011. *See* 76 Fed. Reg. 81190 (Dec. 27, 2011). The final regulations issued in October 2013 revised the third-party employment regulation and companionship-services regulation in ways that are similar to the proposals that the Department of Labor made in 2001. *See* 78 Fed. Reg. 60454 (Oct. 1, 2013). Unlike the 2001 proposed rulemaking, the 2013 final rule included a comprehensive analysis of the economic impact of the regulatory changes. *See*, *e.g.*, *id*. at 60497-556.

-13-

*Third-party employment.*  As amended, the regulation provides that third-party employers may not avail themselves of the exemptions for companionship services or live-in domestic service employees.  *See* 78 Fed. Reg. at 60557 (29 C.F.R. § 552.109).  Accordingly, the home care businesses that plaintiffs represent must abide by the same FLSA wage and hour rules that protect employees generally.

First, these businesses must pay their employees a minimum hourly wage, as virtually all of them already do.  *See* 78 Fed. Reg. at 60456 (current wage data suggests that few affected workers, if any, have an hourly rate less than the federal minimum wage per hour).[3]  To fulfill their requirement to pay the minimum wage for all "hours worked," these businesses must comply with longstanding, generally applicable rules for calculating an employee's hours worked, which were unchanged by the final rule.  *See* 78 Fed. Reg. at 60490.  Among other things, these rules require compensation for the time that employees spend traveling during the workday from job site to job site on their employer's behalf.  *See id*. at 60492.  A study conducted by plaintiff National Association of Home Care &

---

[3] Although most home care workers currently receive wages at or above the minimum wage, without the Act's protections they have no recourse if, for example, they are paid for fewer hours than they actually worked or do not receive a pay check at all some weeks.  Where it applies, the FLSA allows the Department to bring enforcement actions, and also provides employees with a private right of action, as mechanisms to collect back wages.  *See* 29 U.S.C. §§ 216(b), (c), 217.

Hospice found that home care nurses, aides, and therapists travel nearly 5 billion miles each year. JA502 (discussing the study). Although many home care agencies already pay their workers for time spent traveling between clients, many do not. A survey conducted on behalf of plaintiff International Franchise Association found that 50 percent of the responding home care employers pay for such travel time. *See* 78 Fed. Reg. at 60493.[4] The home care provider A-1 Health Care, Inc. acknowledged that "over half of its employees spend an average of three hours per day traveling between clients for which they are not currently paid." *Ibid*. The National Employment Law Project explained that "failure to pay for travel time suppresses workers' already low earnings and not infrequently drives their real hourly wages below the minimum wage." *Id*. at 60492-93.

Second, for hours of work exceeding 40 in a work week, these businesses must pay overtime compensation at a rate of one and one-half times an employee's regular rate of pay. Although limited data exist on the amount of overtime that the affected population works, *see* 78 Fed. Reg. at 60528, the survey conducted on behalf of plaintiff International Franchise Association found that, in states without applicable overtime requirements, 18 percent of the responding employers pay

---

[4] The Department noted that the surveys conducted on behalf of industry organizations may reflect selection bias and may not be representative of the industry as a whole. *See* 78 Fed. Reg. at 60500; *see also id*. at 60504 n.50 (noting certain internal inconsistencies in the responses).

overtime premiums for hours worked in excess of 40 hours per week.  *See id.* at

60504 n.50.

Third, the businesses that plaintiffs represent must comply with the FLSA's

longstanding record-keeping requirements.  *See* 29 C.F.R. pt. 516.

*Activities that constitute companionship services*.  The Department also

revised the regulation that sets out the types of activities and duties that may be

regarded as "companionship services."  As amended, the regulation provides that

the term "companionship services" means the provision of fellowship and

protection for an elderly person or person with an illness, injury, or disability who

requires assistance in caring for himself or herself.  29 C.F.R. § 552.6(a) (further

describing fellowship and protection).  The term "companionship services" also

includes the provision of care—defined using the industry-preferred terms of

"activities of daily living" and "instrumental activities of daily living"—although

such work may not exceed 20 percent of the total weekly hours worked and must

be provided in conjunction with fellowship and protection in order for the

exemption to apply.  *Id.* § 552.6(b).  Activities of daily living and instrumental

activities of daily living include dressing, grooming, feeding, bathing, toileting,

transferring, meal preparation, driving, light housework, managing finances,

assistance with the physical taking of medications, and arranging medical care.

*See ibid*.  The term "companionship services" does not include work performed

-16-

primarily for the benefit of other members of the household, *id*. § 552.6(c), or medically related services (as further described in the regulation), *id*. § 552.6(d).

The Department of Labor set an effective date for the final regulations of January 1, 2015, which allowed a 15-month period before compliance was required.  *See* 78 Fed. Reg. at 60494.  The Department also indicated that it would work closely with stakeholders to provide additional guidance and technical assistance during the period before the rule became effective, in order to ensure a successful transition.  *See id.* at 60495.[5]

As in the 2001 proposed rulemaking, the Department of Labor cited the "dramatic expansion and transformation" of the home care industry as the principal basis for revising its 1975 regulations.  78 Fed. Reg. at 60455.  The Department explained that, "[i]n the 1970s, many individuals with significant care needs were served in institutional settings rather than in their homes and their communities." *Ibid*.  "Since that time, there has been a growing demand for long-term home care

---

[5] In a subsequent policy statement, the Department of Labor announced that, for the first six months in which the regulations are effective (through June 30, 2015), it will not bring enforcement actions against an employer as to violations of FLSA obligations resulting from the amended regulations, and that, for the following six months (through December 31, 2015), the Department will exercise prosecutorial discretion in determining whether to bring enforcement actions, with particular consideration given to the extent to which States and other entities have made good faith efforts to bring their home care programs into compliance with the FLSA since promulgation of the final regulations.  79 Fed. Reg. 60974 (Oct. 9, 2014).  This policy statement does not affect the ability of workers to enforce the regulations.  *See* 29 U.S.C. § 216(b) (private right of action).

for persons of all ages, largely due to the rising cost of traditional institutional care and, in response to the disability civil rights movement, the availability of federal funding assistance for home care, reflecting the nation's commitment to accommodate the desire of individuals to remain in their homes and communities." *Ibid*. "As more individuals receive services at home rather than in nursing homes or other institutions, workers who provide home care services, referred to as 'direct care workers' in this Final Rule but employed under titles including certified nursing assistants, home health aides, personal care aides, and caregivers, perform increasingly skilled duties." *Ibid*. "Today, direct care workers are for the most part not the elder sitters that Congress envisioned when it enacted the companionship services exemption in 1974, but are instead professional caregivers." *Ibid*.

In contrast to the 2001 proposed rulemaking, the final rule issued in 2013 included a detailed analysis of the economic impact of the regulatory changes. *See*, *e.g.*, 78 Fed. Reg. at 60497-556. Among other concerns, the Department addressed industry claims that the regulatory changes would, as plaintiffs allege here, "have a deeply destabilizing impact on the entire home care industry"; "adversely affect access to home care services for millions of the elderly and infirm"; "lead to increased institutionalization of those needing home care"; require consumers to "accept care from multiple caregivers instead of one trusted

-18-

individual"; "increase staff turnover to the detriment of consumers"; and "increase the cost of privately paid home care."  Complaint ¶ 4.[6]

For example, the Department examined data from the fifteen states that already provide minimum wage and overtime protections to all or most home care workers employed by third parties.  *See*, *e.g.*, 78 Fed. Reg. at 60482-83, 60503-04.[7] The Department noted that "[t]he existence of these state protections diminishes the force of objections regarding the feasibility and expense of prohibiting third parties from claiming the companionship services and live-in domestic service worker exemptions."  *Id*. at 60483.  The Department found that "firms operating in overtime and non-overtime states already have very similar characteristics," including "a similar percentage of consumers receiving 24-hour care."  *Id*. at 60503.  Because "both the demand for and supply of home care services appear to be inelastic in the largest component of this market, in which public payers

---

[6] The Department received more than 26,000 comments on the proposed regulations, *see* 78 Fed. Reg. at 60460, including comments from plaintiffs. Comments were received from a broad array of constituencies, including direct care workers, consumers of home care services, small business owners and employers, worker advocacy groups and unions, employer and industry advocacy groups, law firms, Members of Congress, state government agencies, federal government agencies, professional associations, the disability community, and other interested members of the public.  *See ibid*.

[7] These states are Colorado, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New York, Pennsylvania, Washington, and Wisconsin.  *See* 78 Fed. Reg. at 60483.  In addition, Maine extends minimum wage and overtime protections to all companions employed by for-profit agencies.  *See ibid.*

reimburse for home care," "the equilibrium quantity of home care services is not very responsive to changes in price." *Id*. at 60456; *see also id*. at 60517 (noting that, "[i]n 2009, Medicare and Medicaid accounted for 73 percent of home care services revenue, followed by 14 percent from private insurance coverage, 4 percent from consumers paying out-of-pocket, and the remaining 8 percent contributed by a mix of other sources").

The Department explained that "the comments received did not point to any reliable data indicating that state minimum wage or overtime laws had led to increased institutionalization or stagnant growth in the home care industry in any state." 78 Fed. Reg. at 60483. "Rather, the Michigan Olmstead Coalition reported 'we have seen no evidence that access to or the quality of home care services are diminished by the extension of minimum wage and overtime protection to home care aides in this state almost six years ago.'" *Ibid*. "[A]s summarized by AARP, there is no strong correlation between states that have minimum wage and overtime protections with expenditures on [home and community-based services] versus institutionalized care." *Ibid*.

The Department also considered and rejected industry claims that the amended regulations would harm consumers by encouraging the use of multiple workers and thereby denying consumers continuity of care. "As the National Association of Area Agencies on Aging points out in its comment, 'providing

-20-

fundamental labor protections of minimum wage and overtime will help reduce turnover, improve continuity of care and help lower costs.'"  78 Fed. Reg. at 60468.  The Department explained that the home care industry "is currently marked by high turnover, which can be very disruptive to consumers."  *Id*. at 60483.  The turnover rate has been estimated to range from 44 to 65 percent per year, and some studies have found turnover rates to be much higher—up to 95 percent and, in some cases, 100 percent annually.  *See id*. at 60543.  "Increased pay for the same amount of work and overtime compensation likely would aid in employee retention and attracting new hires."  *Ibid*. (citing studies).  The Department explained that the amended regulations "will bring more workers under the FLSA's protections, which in turn will create a more stable workforce by equalizing wage protections with other health care workers and reducing turnover."  *Id*. at 60483.  The Department also noted that, as a general matter, "continuity of care does not necessarily require a single direct care worker, but rather can involve a small group of direct care workers intimately familiar with the consumer and his or her needs."  *Id*. at 60503.  "In this way care will not be disrupted if one of those direct care workers is no longer willing or able to provide the needed services."  *Ibid*.  In addition, "with an industry turnover rate apparently exceeding 40 percent, it is likely that many consumers already receive care from more than one worker or

-21-

a combination of direct care workers and family members when other workers are unavailable." *Ibid*.

Summarizing, the Department "recognize[d] that this Final Rule will have an impact on individuals and families who rely on direct care workers for crucial assistance with day-to-day living and community participation." 78 Fed. Reg. at 60459. "Throughout the rulemaking process, the Department has carefully considered the effects of the rule on consumers and has taken into account the perspective of elderly people and people with illnesses, injuries, and disabilities, as well as workers, employers, public agencies, and others." *Ibid*. "In particular," the Department "does not believe, as some commenters have suggested, that the rule will interfere with the growth of home- and community-based caregiving programs and thereby lead to increased institutionalization." *Ibid*. "To the contrary, the Department believes that ensuring minimum wage and overtime compensation will not only benefit direct care workers but also consumers because supporting and stabilizing the direct care workforce will result in better qualified employees, lower turnover, and a higher quality of care." *Id*. at 60459-60. The Department also noted that, "as described in detail throughout this preamble, the Department has modified the proposed regulations in response to comments to make the rule easier for the regulated community to understand and apply." *Id*. at 60460.

## D.    District Court Proceedings

This lawsuit under the Administrative Procedure Act was filed in June 2014, eight months after the final regulations were issued.  Plaintiffs are trade associations representing businesses that employ workers affected by the regulations.  Plaintiffs alleged that the third-party employer regulation and companionship-services regulation are arbitrary and capricious, an abuse of discretion, and/or contrary to law.

On cross-motions for partial summary judgment, the district court declared the third-party employment regulation invalid by order issued on December 22, 2014.  *See* JA44.  The court ruled that the regulation is contrary to the FLSA's plain text, and invalidated the regulation at step 1 of the *Chevron* analysis.  The court declared that "[t]here is no explicit—or implicit—delegation of authority to the Department to parse groups of employees based on the nature of their employer" if the employees otherwise would be covered by the exemptions for companionship services or live-in domestic employees.  JA37.  The court opined that "[t]he language of the exemption provisions is quite clear: '*any* employee' who is employed to provide companionship services, or who resides in the household in which he or she is employed to perform domestic services, is covered by the exemption."  *Ibid*. (court's emphasis).  The district court rejected the

government's argument that the Supreme Court reached the opposite conclusion in *Coke*. *See* JA40-41.

On December 24, plaintiffs filed an emergency motion to enjoin enforcement of the companionship-services regulation, which had not previously been the subject of briefing. The district court issued a temporary restraining order on December 31, *see* JA45, and scheduled a preliminary injunction hearing for January 9. The day before the hearing, the court announced that it was consolidating the preliminary injunction hearing with its consideration of the merits. *See* JA46.

On January 14, the district court issued an order that declared the companionship-services regulation invalid. *See* JA61. As with the third-party employment regulation, the court ruled that the companionship-services regulation is contrary to the FLSA's plain text and invalidated the regulation at *Chevron* step 1. The court recognized that Congress explicitly delegated authority to the Department of Labor to define and delimit the term "companionship services." JA56. Nonetheless, the court opined that companionship "must include, in a meaningful way, the provision of care" and that "[l]imiting that care to only 20 percent of a worker's total hours defies logic, and Congressional intent." JA57 (footnote omitted). Additionally, although the court declared the regulation invalid in its entirety, the court did not discuss the parts of the regulation that exclude

-24-

medically related services and work performed primarily for the benefit of other members of the household.

## SUMMARY OF ARGUMENT

In 1974, Congress extended the FLSA's minimum wage and overtime pay requirements to domestic service employees generally, but included exemptions for "companionship services" and live-in domestic service employees. Congress delegated authority to the Department of Labor to define and delimit the term "companionship services" and also authorized the Department to prescribe necessary rules and regulations with regard to the 1974 amendments. In 2013, after comprehensive notice and comment rulemaking, the Department amended its 1975 implementing regulations in light of the transformation of the home care industry that had occurred over the ensuing decades. The amended regulations are reasonable exercises of the authority that Congress delegated to the agency and thus should be upheld.

**I.** Under the 2013 final rule, the FLSA's exemptions for companionship services and live-in domestic service employees may be claimed by an individual (or family member) who hires a worker directly, but may not be claimed by third-party employers such as home care agencies that assign members of their workforce to particular homes. Thus, the home care businesses that plaintiffs represent must abide by the same FLSA wage and hour rules that protect

employees generally. Although the district court declared that the amended regulation is inconsistent with the FLSA's plain text, that ruling is foreclosed by the Supreme Court's contrary reasoning in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007). There, the Supreme Court held that the FLSA's text does not resolve the question of third-party employment, which, the Court explained, is an interstitial matter for the Department of Labor to decide through rulemaking. The Department's 2013 final rule is based on its comprehensive analysis of the extensive administrative record, and the district court could not properly substitute its assumptions about the economic impact of the rule for the reasonable determinations made by the Department on the basis of that evidence.

**II.** Because the third-party employment regulation is valid, plaintiffs lack standing to challenge the companionship-services regulation. The companionship-services regulation sets out the types of activities and duties that are "companionship services" for purposes of the companionship-services exemption. Plaintiffs represent third-party employers, which may not avail themselves of that exemption regardless of how "companionship services" are defined. In any event, the amended companionship-services regulation is a reasonable exercise of the Department's express delegated authority to define and delimit that term. Thus, the district court's order invalidating that regulation as contrary to the FLSA's

plain text rests on the same mistaken premises as its order invalidating the third-party employment regulation.

## STANDARD OF REVIEW

The district court's orders granting summary judgment for plaintiffs are subject to de novo review in this Court. *Associated Builders & Contractors, Inc. v. Shiu*, 773 F.3d 257, 262 (D.C. Cir. 2014).

## ARGUMENT

### I. The Third-Party Employment Regulation Is A Reasonable Exercise Of The Authority That Congress Delegated To The Department Of Labor

In promulgating the final rule, and thereby extending to home care workers the basic wage protections that most American workers already enjoy, the Department acted pursuant to explicit delegations of statutory authority and on the basis of its thorough consideration of the information in the administrative record. The amended third-party employment regulation is a reasonable exercise of the Department's delegated authority and therefore should be sustained.

#### A. The Supreme Court in *Coke* Held that the Department of Labor Has Authority To Decide Whether Domestic Service Workers Employed by Third Parties Should Be Exempt from the FLSA's Protections

**1.**   Under the final rule, the exemptions for companionship services and live-in domestic service employees can be claimed by an individual (or family member) who hires a worker directly, but not by third-party employers such as

home care agencies that assign members of their workforce to particular homes. *See* 78 Fed. Reg. at 60557 (29 C.F.R. § 552.109). The district court declared that the third-party employment regulation is contrary to the FLSA's plain text and declared the regulation invalid at step 1 of the *Chevron* analysis. The court opined that "[t]here is no explicit—or implicit—delegation of authority to the Department to parse groups of employees based on the nature of their employer." JA37.

The Supreme Court, however, reached the opposite conclusion in *Coke*. The Court held that "the text of the FLSA does *not* expressly answer the third-party-employment question." 551 U.S. at 168 (emphasis added). The Court concluded that, instead, the FLSA "expressly instructs the agency to work out the details of [its] broad definitions," and "whether to include workers paid by third parties within the scope of the definitions is one of those details." *Id*. at 167.

As the Supreme Court observed, Congress delegated broad authority to the Department of Labor to implement the 1974 amendments through legislative rules. The power "'to prescribe necessary rules, regulations, and orders with regard to the" 1974 amendments "provides the Department with the power to fill [statutory] gaps through rules and regulations." *Coke*, 551 U.S. at 165 (citing Pub. L. No. 93-259, § 29(b), 88 Stat. at 76). Furthermore, Congress also granted the Department of Labor authority to "define[] and delimit[]" the term "companionship services," 29 U.S.C. § 213(a)(15), which is an additional source of authority to issue

-28-

legislative rules.  *See Auer v. Robbins*, 519 U.S. 452, 457-58 (1997) (FLSA

provision granting the Department of Labor authority to "define[] and delimit[]"

the Act's exemption for employees employed in an executive, administrative, or

professional capacity, 29 U.S.C. § 213(a)(1), gives the Department broad authority

to issue legally binding rules).

The Supreme Court explained in *Coke* that when the 1974 amendments were

enacted, the FLSA's minimum wage and overtime requirements already applied to

some, but not all, companionship workers paid by third parties.  *See* 551 U.S. at

167.  "The result is that whether, or how, the definition should apply to workers

paid by third parties raises a set of complex questions":

> Should the FLSA cover *all* companionship workers paid by third parties? Or
> should the FLSA cover *some* such companionship workers, perhaps those
> working for some (say, large but not small) private agencies, or those hired
> by a son or daughter to help an aged or infirm mother living in a distant city?
> Should it cover *none*? How should one weigh the need for a simple, uniform
> application of the exemption against the fact that some (but not all) third-
> party employees were previously covered?

*Ibid*. (Court's emphases).  The Court explained that "[s]atisfactory answers to such

questions may well turn upon the kind of thorough knowledge of the subject matter

and ability to consult at length with affected parties that an agency, such as the

DOL, possesses."  *Id*. at 167-68.  Accordingly, the Court held that it is

"consequently reasonable to infer (and we do infer) that Congress intended its

broad grant of definitional authority to the Department to include the authority to answer these kinds of questions." *Id*. at 168.

In light of the Supreme Court's reasoning in *Coke*, it was not open to the district court to hold that the FLSA's text resolves the question of third-party employment. The Supreme Court held that the FLSA's text does *not* answer that question, which is a matter for the agency to decide based on considerations of policy. "The subject matter of the regulation in question concerns a matter in respect to which the agency is expert, and it concerns an interstitial matter, *i.e.*, a portion of a broader definition, the details of which . . . Congress entrusted the agency to work out." *Coke*, 551 U.S. at 165.

**2.** The district court provided no legitimate basis for disregarding the reasoning of *Coke*. The court noted that the validity of the current regulations was not before the Supreme Court. *See* JA40. That observation misses the point of the Supreme Court's reasoning. The Supreme Court held that the FLSA "expressly instructs the agency to work out the details of [its] broad definitions," and "whether to include workers paid by third parties within the scope of the definitions is one of those details." *Coke*, 551 U.S. at 167. And the Court explicitly recognized the agency's discretion to determine that "*none*" of these workers is exempt from the FLSA's protections. *Ibid*.

-30-

The district court also emphasized that, in the modern home care industry, approximately 90% of home health aides and personal care aides work for third-party employers, and suggested that Congress alone can address the transformation of the home care industry that this statistic reflects. JA41. But the Supreme Court in *Coke* was well aware of the dominant role played by third-party employers in the modern home care industry,[8] and the Court made clear that the Department of Labor has authority to amend its third-party employment regulation in light of the home care industry's transformation. Indeed, the petitioner home care agency itself recognized in *Coke* that, if the policy arguments for changing the 1975 rule "have force, the Department is free to engage in new rulemaking proceedings to consider them."[9]

---

[8] *See, e.g.*, Amicus Brief of the Alliance for Retired Americans, *et al.* in Support of Respondent, No. 06-593 (S. Ct.), 2007 WL 951137, at *6 ("Home care agencies employ approximately 70% . . . of home care workers."); Amicus Brief for the United States Supporting Petitioners, No. 06-593 (S. Ct.), 2007 WL 579234, at *24 ("If the companionship services exemption to the FLSA was narrowed to only those employees hired directly by a family member or the head of household, then the exemption would encompass only 2% of employees providing companionship services in private homes.") (citation omitted).

[9] Brief for Petitioners, No. 06-593 (S. Ct.), 2007 WL 549107, at *45; *see also* Reply Brief for Petitioners, No. 06-593 (S. Ct.), 2007 WL 1046713, at *19 ("Respondent is now effectively asking the Court to reweigh the possible pros and cons, substituting its own judgment for that of the agency, an invitation that is directly contrary to the principles of *Chevron*"); Amicus Brief for the United States Supporting Petitioners, No. 06-593 (S. Ct.), 2007 WL 579234, at *11, *12 (explaining that "Congress delegated to the Department of Labor *** the authority to promulgate legislative rules, which carry the force of law," and that the third-

*Continued on next page.*

The Supreme Court emphasized that "[s]atisfactory answers" to the question whether the FLSA should cover all, some, or none of the workers paid by third parties "may well turn upon the kind of thorough knowledge of the subject matter and ability to consult at length with affected parties that an agency, such as the DOL, possesses." *Coke*, 551 U.S. at 167-68.  The Court declared that "it is consequently reasonable to infer (and we do infer) that Congress intended its broad grant of definitional authority to the Department to include the authority to answer these kinds of questions." *Id*. at 168.

**3.**  Despite the clear holding of *Coke*, the district court opined that "Congressional Inaction" had eliminated the Department's discretion to revise its 1975 regulations.  JA41.  The district court emphasized that Congress had amended certain FLSA exemptions "over the years in other ways" but had "*not* altered the exemptions at issue here."  *Ibid*. (court's emphasis) (citing a 1999 provision that concerned fire protection activities and a 1996 provision that concerned computer professionals and credit for tips).  The Supreme Court, however, clearly did not believe that such amendments to other FLSA exemptions had frozen the 1975 regulations in place, and any such inference is implausible.

party employment regulation is an exercise of that authority) (ellipses in original; quotation marks and citation omitted).

The district court also stressed that, "[f]ollowing the *Coke* decision, Congress contemplated adjusting the statutory language of the companionship exemption at least three times, but never did so." JA42. The court noted that "[s]ix bills were introduced—three in the House of Representatives, three in the Senate—over the course of three Congressional sessions, where the sponsors were in the majority party of each, yet there was never sufficient support to get any of them to the floor of either house of Congress." *Ibid.* (footnote omitted). In the district court's view, "[t]his unequivocally represents a lack of Congressional intent to withdraw this exemption from third-party employers." *Ibid.*

But congressional inaction "is a notoriously poor indication of congressional intent." *Schweiker v. Chilicky*, 487 U.S. 412, 440 (1988). That principle applies with particular force in this context because *Coke* made plain that the Department of Labor had discretion to amend the regulations, making action by Congress potentially unnecessary. Indeed, the very purpose of the delegation of legislative rulemaking authority is to allow the expert agency to resolve the third-party employment question in light of its assessment of the home care market and in consultation with affected constituencies. *See Coke*, 551 U.S. at 165 ("[t]he subject matter of the regulation in question concerns a matter in respect to which the agency is expert," which "Congress entrusted the agency to work out"). That

Congress chose to leave this responsibility with the agency is entirely

understandable.

**4.**  The district court also found it significant that the third-party employment

regulation is not framed as a definition, *see* JA40, and found it "notabl[e]" that

Congress did not expressly authorize Labor to define and delimit the term "live-in"

domestic service employee.  JA36.  These observations are irrelevant because the

Department's authority is not limited to defining statutory terms.  As the Supreme

Court emphasized in *Coke*, 551 U.S. at 165, the Department has broad authority

"to prescribe necessary rules, regulations, and orders with regard to" the 1974

amendments.  That authority encompasses the exemption for live-in domestic

service employees.  *See*, *e.g.*, 40 Fed. Reg. 7404, 7405, 7406 (Feb. 20, 1975) (29

C.F.R. § 552.102) (regulation governing live-in domestic service employees).

**B.     The District Court Impermissibly Substituted Its Assumptions
About the Home Care Market for the Reasonable Findings Made
by the Agency on the Basis of the Administrative Record**

**1.**  Although the district court did not purport to analyze the challenged

regulations under step two of the *Chevron* framework, its rulings were animated by

mistaken assumptions about the policy concerns that underlie the 1974

amendments, the considerations that the Department of Labor addressed in the

recent rulemaking, and the impact of the final rule on the home care market.

The district court believed that the Department of Labor was concerned solely with the welfare of the nearly two million workers who will receive FLSA coverage under the final rule, and it believed that Congress was concerned solely with controlling the cost of companionship services for consumers.[10] The court proclaimed that "millions of American families each day struggle financially to care for their loved ones who are either too elderly or infirm to care for themselves." JA181 (1/14/15 Tr. 13). It declared that "[w]hile the Department of Labor's concern about the wages of home care providers is understandable, Congress is the appropriate forum in which to debate and weigh the competing financial interests in this very complex issue affecting so many families." JA182 (1/14/15 Tr. 14).[11]

---

[10] For example, when government counsel made reference to the affected workers, the district court declared (JA155 (1/9/15 Tr. 22)):

> You're looking at the opposite side of the coin. I'm focusing on the side of the coin of the millions and millions of families that Congress was specifically concerned about their ability, those families, to provide home care services for their elderly or infirm family members. You keep talking about the other side of the coin. I know full well what your agency is focusing on. I'm asking you to focus on what Congress focused on.

[11] Although the district court made these pronouncements in addressing the companionship-services regulation, the court emphasized that the practical consequences of the third-party employment regulation are the same. *See*, *e.g.* JA161-62 (1/9/15 Tr. 28-29) (declaring that its order vacating the third-party employment regulation would be a "Pyrrhic victory" for the home care service provider industry unless the court also vacated the companionship-services

*Continued on next page.*

**2.** These pronouncements reflect a series of mistaken premises. The first is that Congress had a single-minded concern to control the cost of home care services, without regard to the impact on workers. When Congress extended the FLSA's protections to domestic-service employees, Congress sought to foster "an effective and dignified domestic workforce" by requiring "a living wage and respectable working conditions." Senate Report 20-21; *see also* House Report 33-34 (similar). The House and Senate committees made clear that the exemptions in the 1974 amendments were consistent with that overarching objective because the exemptions were not intended to cover "employees whose vocation is domestic service." Senate Report 20; House Report 36. To the contrary, the House and Senate committees stressed that "[p]eople who will be employed in the excluded categories are not regular bread-winners or responsible for their families' support." *Ibid*. Given these express congressional reassurances that the exemptions would not cover employees for whom domestic service is a vocation, it is simply incorrect to conclude that Congress had no concern for the welfare of these workers.

Moreover, even a cursory review of the final rule shows that the Department of Labor considered the rule's impact on consumers. Based on its comprehensive

---

regulation, because the overwhelming majority of the industry's workers would not otherwise be exempt from the FLSA's protections).

analysis of the evidence, the Department found that the lack of FLSA protection

harms not only the affected workers, "who depend on wages for their livelihood

and that of their families," but also "the individuals receiving services and their

families, who depend on a professional, trained workforce to provide high-quality

services." 78 Fed. Reg. at 60455.

The Department of Labor explained that, since it published its regulations

implementing the 1974 amendments to the FLSA, the home care industry has

undergone dramatic transformation. *See* 78 Fed. Reg. at 60458. "In the 1970s,

individuals who had significant care needs went into institutional settings." *Ibid*.

"Over time, however, our nation has come to recognize the importance of

providing services in private homes and other community-based settings and of

supporting individuals in remaining in their homes and communities." *Ibid*. The

Department explained that this "shift is in part a result of the rising cost of

traditional institutional care, and has been made possible in significant part by the

availability of government funding assistance for home care under Medicare and

Medicaid." *Ibid*. The growing demand for long-term home care services is also

due to demographic changes, *i.e.*, the significant increase in the percentage of

elderly persons in the United States. *Ibid*. Moreover, the Supreme Court's

decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999), which held that it is a violation

of the Americans with Disabilities Act for public entities to fail to provide services

to persons with disabilities in the most integrated setting appropriate, "further

solidified our country's commitment to decreasing institutionalization and has also

influenced this important trend." 78 Fed. Reg. at 60458.

The Department found, however, that "the growth in demand for home care

and the professionalization of the home care workforce have not resulted in growth

in earnings for direct care workers." 78 Fed. Reg. at 60458. "The earnings of

employees in the home health aide and personal care aide categories remain among

the lowest in the service industry." *Ibid*. Indeed, research cited in the final rule

found that approximately 50% of personal care aides rely on public assistance

(such as food stamps or Medicaid). *See id*. at 60545. Although nearly all home

care workers are paid for providing services at an hourly wage above the minimum

set by the FLSA, *see id*. at 60456, "failure to pay for travel time suppresses

workers' already low earnings and not infrequently drives their real hourly wages

below the minimum wage," *id*. at 60493. And as the Department explained,

studies have found that the low income of these workers impedes efforts to

improve both the circumstances of the workers and the quality of the services they

provide. *See id*. at 60548. Covering these workers under the FLSA is thus "an

important step in ensuring that the home care industry attracts and retains qualified

workers that the sector will need in the future." *Ibid*.

-38-

Summarizing its determinations, the Department "recognize[d] that this Final Rule will have an impact on individuals and families who rely on direct care workers for crucial assistance with day-to-day living and community participation."  78 Fed. Reg. at 60459.  The Department explained that "[t]hroughout the rulemaking process, the Department has carefully considered the effects of the rule on consumers and has taken into account the perspective of elderly people and people with illnesses, injuries, and disabilities, as well as workers, employers, public agencies, and others."  *Ibid*.  "In particular," the Department "does not believe, as some commenters have suggested, that the rule will interfere with the growth of home- and community-based caregiving programs and thereby lead to increased institutionalization."  *Ibid*.  "To the contrary, the Department believes that ensuring minimum wage and overtime compensation will not only benefit direct care workers but also consumers because supporting and stabilizing the direct care workforce will result in better qualified employees, lower turnover, and a higher quality of care."  *Id*. at 60459-60.

The Department's findings have ample support in the administrative record, including data from the fifteen states that already provide minimum wage and overtime protections to all or most home care workers employed by third parties. *See*, *e.g.*, 78 Fed. Reg. at 60482-83, 60503-04.  As the Department observed, "[t]he existence of these state protections diminishes the force of objections regarding the

feasibility and expense of prohibiting third parties from claiming the

companionship services and live-in domestic service worker exemptions." *Id*. at

60483. "Indeed, the comments received did not point to any reliable data

indicating that state minimum wage or overtime laws had led to increased

institutionalization or stagnant growth in the home care industry in any state."

*Ibid*. "Rather, the Michigan Olmstead Coalition reported 'we have seen no

evidence that access to or the quality of home care services are diminished by the

extension of minimum wage and overtime protection to home care aides in this

state almost six years ago.'" *Ibid*. "[A]s summarized by AARP, there is no strong

correlation between states that have minimum wage and overtime protections with

expenditures on [home and community-based services] versus institutionalized

care." *Ibid*. The Department found that firms operating in overtime and non-

overtime states already have very similar characteristics, including a similar

percentage of consumers receiving 24-hour care. *See id*. at 60503.

The Department also considered and rejected industry claims that the

amended regulations would harm consumers by encouraging the use of multiple

workers and thereby denying consumers continuity of care. "As the National

Association of Area Agencies on Aging points out in its comment, 'providing

fundamental labor protections of minimum wage and overtime will help reduce

turnover, improve continuity of care and help lower costs.'" 78 Fed. Reg. at

60468.  The Department explained that the home care industry "is currently marked by high turnover, which can be very disruptive to consumers."  *Id*. at 60483.  The Department concluded that the amended regulations "will bring more workers under the FLSA's protections, which in turn will create a more stable workforce by equalizing wage protections with other health care workers and reducing turnover."  *Ibid*.  Moreover, the Department noted that as a general matter, "continuity of care does not necessarily require a single direct care worker, but rather can involve a small group of direct care workers intimately familiar with the consumer and his or her needs."  *Id*. at 60503.  In this way, the Department explained, care will not be disrupted if one of those workers is no longer willing or able to provide the needed services.  *See ibid*.  In addition, "with an industry turnover rate apparently exceeding 40 percent, it is likely that many consumers already receive care from more than one worker or a combination of direct care workers and family members when other workers are unavailable."  *Ibid*.

**3.**  The district court made no reference to the Department's findings or to the record on which they are based.  The court could not properly substitute its assumptions about the economic impact of the rule for the determinations made by the Department of Labor on the basis of the administrative record.

As the Supreme Court explained in *Coke*, the "'power of an administrative agency to administer a congressionally created . . . program necessarily requires

the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'"  551 U.S. at 165 (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984) (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974))).  When, as here, "an agency fills such a 'gap' reasonably, and in accordance with other applicable (*e.g.*, procedural) requirements, the courts accept the result as legally binding."  *Ibid.* (quoting *Chevron*, 467 U.S. at 843-44, and citing *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)); *see also Nat'l Cable & Telecommuns. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980-82 (2005); *Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1569 (D.C. Cir. 1987).

As discussed above, even the petitioner home care agency in *Coke* recognized that, if the policy arguments in favor of changing the third-party employment regulation have force, "the Department is free to engage in new rulemaking proceedings to consider them."[12]  The Department has since done exactly that, and its amended regulation should be upheld as a reasonable exercise of its delegated authority.

---

[12] Brief for Petitioners, No. 06-593 (S. Ct.), 2007 WL 549107, at *45.

## II.    The Companionship-Services Regulation Is A Reasonable Exercise Of The Authority That Congress Delegated To The Department Of Labor

The FLSA exempts "companionship services" as that term is "defined and delimited by regulations of the Secretary [of Labor]."  29 U.S.C. § 213(a)(15). Since 1975, the Department of Labor has set out by regulation the types of activities and duties that may be regarded as companionship services.  *See* 40 Fed. Reg. 7404, 7405 (Feb. 20, 1975) (29 C.F.R. § 552.6) (companionship-services regulation).  In the 2013 final rule, the Department amended that regulation.  If the Court reaches the issue, it should uphold the amended regulation as a reasonable exercise of the authority delegated to the Department of Labor by Congress.

### A.    Because the Third-Party Employment Regulation Is Valid, Plaintiffs Lack Standing to Challenge the Companionship-Services Regulation

The Court should not reach the issue, however, because the validity of the third-party employment regulation means that plaintiffs lack standing to challenge the companionship-services regulation.  The businesses that plaintiffs represent are all third-party employers.  Therefore, they may not claim the companionship-services exemption, regardless of how the term "companionship services" is delimited and defined.

Although the government did not challenge plaintiffs' standing below, plaintiffs conceded that they lack standing to challenge the companionship-services

regulation if the third-party employment regulation is valid.[13]  The district court

likewise recognized that standing problem in its opinion.  *See* JA53.  Accordingly,

this Court should not address the merits of plaintiffs' challenge to the

companionship-services regulation.  In any event, as explained below, the district

court erred in invalidating that regulation.

### B.   The Ruling Vacating Paragraph (b) of the Companionship-Services Regulation Rests on the Same Mistaken Premises as the Ruling Invalidating the Third-Party Employment Regulation

The district court's analysis of the companionship-services regulation

reflects the same incorrect premises as its analysis of the third-party employment

regulation.  The district court mistakenly believed that the validity of the

companionship-services regulation is dictated by the FLSA's plain text.  The

Supreme Court, however, made clear that the contours of the companionship-

services exemption is not determined by the statutory text but entails "the

formulation of policy."  *Coke*, 551 U.S. at 165 (quotation marks omitted).

Congress provided that the term "companionship services" shall be "defined

*and delimited*" by the Department of Labor.  29 U.S.C. § 213(a)(15) (emphasis

added).  The Supreme Court in *Coke* emphasized that the FLSA "refers broadly to

---

[13] *See* R.23-1, at 9 ("until Plaintiffs established their right to avail
themselves of the statutory exemption, *i.e.*, until this Court correctly vacated
Section 552.109, Plaintiffs lacked standing to seek injunctive relief against Section
552.6, which by the terms of Section 552.109 *did not apply* to Plaintiffs' third-
party employer members") (plaintiffs' emphasis).

'domestic service employment' and to 'companionship services'" and "expressly instructs the agency to work out the details of those broad definitions." 551 U.S. at 167. And as discussed above, the Department's resolution of the policy considerations addressed at length in the rulemaking is a reasonable exercise of its authority "to fill any gap left, implicitly or explicitly, by Congress." *Ibid.* (quotation marks omitted).

Under the 2013 final rule, "companionship services" are defined as "the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself." 29 C.F.R. § 552.6(a). "The provision of fellowship means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events," and "[t]he provision of protection means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being." *Ibid.*

In addition, "companionship services" include care such as dressing, grooming, feeding, bathing, toileting, transferring, meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care, if such work does not exceed 20% of the total weekly

hours worked and is provided in conjunction with fellowship and protection. 29 C.F.R. § 552.6(b).[14]

The district court took issue with paragraph (b) of the amended regulation, opining that "[l]imiting that care to only 20 percent of a worker's total hours defies logic, and Congressional intent." JA57. But contrary to the district court's understanding, the FLSA does not exempt all "care" that an elderly person or person with a disability might need. Indeed, plaintiffs do not contend that the exemption includes medical care that such a person might need. The FLSA exempts "companionship services." The statute vests the Department of Labor with responsibility to delineate the scope of that exemption, and the Department reasonably determined that the provision of fellowship and protection should be the core responsibilities of a companion.

It does not matter that many workers in the modern home care industry devote more than 20% of their time to tasks that, under the amended regulation, are not "companionship services." *See* JA57 & n.6 (district court opinion). The Department explained that the 20% limitation is not meant as a description of the activities in which workers in the home care industry currently engage. *See* 78 Fed. Reg. at 60467-68. To the contrary, the Department amended its regulations in

---

[14] The regulation describes types of care as "activities of daily living" and "instrumental activities of daily living," which are terms used by the industry.

light of the major transformation of the home care industry that has occurred over the decades since its 1975 regulations were issued.

The Department explained that, "as services for elderly people and people with illnesses, injuries, or disabilities who require assistance in caring for themselves (referred to in this Final Rule as consumers) have increasingly been provided in individuals' homes rather than in nursing homes or other institutions, the duties performed in homes have changed as well." 78 Fed. Reg. at 60458. "Most direct care workers are employed to do more than simply sit with and watch over the individuals for whom they work." *Ibid*. "They assist consumers with activities of daily living and instrumental activities of daily living, such as bathing, dressing, housework, or preparing meals." *Ibid*. "They often also provide medical care, such as managing the consumer's medications or performing tracheostomy care, that was previously almost exclusively provided in hospitals, nursing homes, or other institutional settings and by trained nurses." *Ibid*. "This work is far more skilled and professional than that of someone performing 'elder sitting.'" *Ibid*. "Although some direct care workers today still perform the services Congress contemplated, i.e., sit with and watch over individuals in their homes, most do much more." *Ibid*.

The amended companionship-services regulation ensures that fellowship and protection are the core duties to which the companionship-services exemption

applies, and that other activities are incidental to that work. *See* 78 Fed. Reg. at 60466. The approach taken by the Department, which mirrors one of the proposals that the Department made in 2001, *see* 66 Fed. Reg. 5481, 5484 (Jan. 19, 2001), is consistent with Congress's expectation that a companion covered by the exemption would be someone whose primary responsibility is "to be there and to watch an older person." 119 Cong. Rec. 24801 (1973). Although being a companion might also involve "making lunch for the infirm person," "[t]his would be incidental to the main purpose of the employment." *Ibid*.

The district court apparently believed that workers whose primary responsibilities include cooking, bathing, and driving should not earn the minimum wage and overtime that Congress extended to other domestic service workers such as cooks, nannies, and chauffeurs. But the contrary judgment reached by the Department after comprehensive notice and comment rulemaking is a reasonable exercise of the authority delegated to it by Congress, and the district court had no basis to substitute its view for that of the agency charged with responsibility to implement the statute's broad provisions.

### C. The District Court Improperly Invalidated Provisions of the Companionship-Services Regulation That Its Opinion Did Not Address

The current companionship-services regulation also provides that "companionship services" do not include work performed primarily for the benefit

of other members of the household. 29 C.F.R. § 552.6(c). Nor do companionship services include medically related services, *i.e.*, services that typically require and are performed by trained personnel such as registered nurses, licensed practical nurses, or certified nursing assistants. *Id.* § 552.6(d).

The district court purported to invalidate the companionship-services regulation in its entirety, based on the FLSA's plain text. JA56, 60 (opinion); JA61 (order). However, the complaint did not allege that paragraph (c) of the regulation (which concerns work primarily performed for the benefit of other household members) or paragraph (d) of the regulation (which concerns medically related services) are contrary to the FLSA's text. Indeed, in their district court reply brief, plaintiffs confirmed that "Congressional intent not to exempt services performed by 'trained personnel such as nurses'" is "not the issue Plaintiffs are challenging in this case." R.28, at 4. Although the district court quoted paragraphs (c) and (d) of the regulation in its opinion, *see* JA52 n.3, the court did not provide any reason for vacating those provisions, and the order cannot stand.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

Of counsel:

M. PATRICIA SMITH
  *Solicitor of Labor*

JENNIFER S. BRAND
  *Associate Solicitor*

PAUL L. FRIEDEN
  *Counsel for Appellate Litigation*

MELISSA A. MURPHY
  *Senior Attorney*

SARAH K. MARCUS
  *Attorney*
  *U.S. Department of Labor*

JOYCE R. BRANDA
  *Acting Assistant Attorney General*

RONALD C. MACHEN, JR.
  *United States Attorney*

BETH S. BRINKMANN
  *Deputy Assistant Attorney General*

 /s/ Alisa B. Klein
ALISA B. KLEIN
MICHAEL S. RAAB
  *(202) 514-1597*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7235*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

FEBRUARY 2015

-50-

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R.

App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New

Roman, a proportionally spaced font.  I further certify that this brief complies with

the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains

11,463 words, excluding the parts of the brief exempted under Rule

32(a)(7)(B)(iii), according to the count of Microsoft Word.

 /s/ Alisa B. Klein
Alisa B. Klein

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2015, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.


                                         /s/ Alisa B. Klein
                                        Alisa B. Klein

**ADDENDUM**

## Fair Labor Standards Act Provisions

**29 U.S.C. § 206(f)**

(f) Employees in domestic service

Any employee--

> (1) who in any workweek is employed in domestic service in a household shall be paid wages at a rate not less than the wage rate in effect under subsection (b) of this section unless such employee's compensation for such service would not because of section 209(a)(6) of the Social Security Act [42 U.S.C.A. § 409(a)(6) ] constitute wages for the purposes of title II of such Act [42 U.S.C.A. § 401 et seq.], or

> (2) who in any workweek--

>> (A) is employed in domestic service in one or more households, and
>> (B) is so employed for more than 8 hours in the aggregate,

shall be paid wages for such employment in such workweek at a rate not less than the wage rate in effect under subsection (b) of this section.

**29 U.S.C. § 207(*l*)**

(*l*) Employment in domestic service in one or more households

No employer shall employ any employee in domestic service in one or more households for a workweek longer than forty hours unless such employee receives compensation for such employment in accordance with subsection (a) of this section.

**29 U.S.C. § 213(a)(15)**

(a) Minimum wage and maximum hour requirements

The provisions of section 206 (except subsection (d) in the case of paragraph (1) of this subsection) and section 207 of this title shall not apply with respect to--

     \*\*\*

     (15) any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary); or

**29 U.S.C. § 213(b)(21)**

(b) Maximum hour requirements

The provisions of section 207 of this title shall not apply with respect to--

     \*\*\*

     (21) any employee who is employed in domestic service in a household and who resides in such household; or

**Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 29(b), 88 Stat. 55, 76**

[O]n and after the date of the enactment of this Act the Secretary of Labor is authorized to prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act.

## Implementing Regulations

**29 C.F.R. § 552.109     Third party employment**

(a) Third party employers of employees engaged in companionship services within the meaning of § 552.6 may not avail themselves of the minimum wage and overtime exemption provided by section 13(a)(15) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption, if the employee meets all of the requirements of § 552.6.

(b) Employees who are engaged in providing babysitting services and who are employed by an employer or agency other than the family or household using their services are not employed on a "casual basis" for purposes of the section 13(a)(15) exemption. Such employees are engaged in this occupation as a vocation.

(c) Third party employers of employees engaged in live-in domestic service employment within the meaning of § 552.102 may not avail themselves of the overtime exemption provided by section 13(b)(21) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption.

## 29 C.F.R. 552.6    Companionship services

(a) As used in section 13(a)(15) of the Act, the term companionship services means the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself. The provision of fellowship means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events. The provision of protection means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being.

(b) The term companionship services also includes the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek. The provision of care means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care).

(c) The term companionship services does not include domestic services performed primarily for the benefit of other members of the household.

(d) The term companionship services does not include the performance of medically related services provided for the person. The determination of whether services are medically related is based on whether the services typically require and are performed by trained personnel, such as registered nurses, licensed practical nurses, or certified nursing assistants; the determination is not based on the actual training or occupational title of the individual performing the services.