[NOT SCHEDULED FOR ORAL ARGUMENT]

No. 15-5018

===============================================================

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

HOME CARE ASSOCIATION OF AMERICA; INTERNATIONAL
FRANCHISE ASSOCIATION; NATIONAL ASSOCIATION FOR HOME CARE
& HOSPICE,

Plaintiffs-Appellees,

v.

DAVID WEIL, Administrator of the Wage and Hour Division, U.S. Department of
Labor; THOMAS E. PEREZ, Secretary of Labor; U.S. DEPARTMENT OF
LABOR,

Defendants-Appellants.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA (No. 14-cv-967) (Hon. Richard J. Leon)

———————————

**BRIEF FOR *AMICI CURIAE* MEMBERS OF CONGRESS IN SUPPORT OF
APPELLANTS**

———————————

Jonathan S. Massey, Esq.
MASSEY & GAIL LLP
1325 G St., NW, Suite 500
Washington, DC 20005
Tel: (202) 652-4511
Fax: (312) 379-0467
jmassey@masseygail.com

Jeremy G. Mallory
Eli J. Kay-Oliphant
MASSEY & GAIL LLP
50 East Washington St., Suite 400
Chicago, IL 60602
Tel: (312) 283-1590
Fax: (312) 379-0467
jmallory@masseygail.com
ekay-oliphant@masseygail.com

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIR. R. 28(a)(1)

**A.    Parties and *Amici Curiae***

All parties, intervenors, and *amici* appearing in the District Court are listed in the Brief for Defendants-Appellants. Except for the *amici* Members of Congress listed herein, all parties and intervenors in this Court are listed in the Brief for Defendants-Appellants.

**B.    Ruling under Review**

Reference to the rulings at issue appears in the Brief for Defendants-Appellants.

**C.    Related Cases**

None known.

# TABLE OF CONTENTS

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIR. R. 28(a)(1)** ................................................................. i

**TABLE OF CONTENTS** .................................................................. ii

**TABLE OF AUTHORITIES** ............................................................. iii

**GLOSSARY** ....................................................................................... vi

**STATUTES AND REGULATIONS** .................................................. vii

**STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY** .......................... viii

**CERTIFICATION OF NEED TO FILE SEPARATE BRIEF PURSUANT TO CIR. R. 29(d)** ................................................................. x

**STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS** ........... xi

**SUMMARY OF ARGUMENT** ......................................................... xii

**ARGUMENT** ....................................................................................... 1

   **I.**   **The Department of Labor Unequivocally Has the Authority to Define and Delimit the Companionship Services Exemption to the Fair Labor Standards Act.** ............................................................ 1

      A.   The Department of Labor Exercised Statutorily-Granted Powers Guided by Congressional Intent. ............................ 1

      B.   The District Court Applied *Chevron* Incorrectly, Preventing the DOL from Aligning the Meaning of the Exemption with the Intent of the FLSA. .......... 2

  **II.**  **The District Court Erred in Assuming Silence Was a Reason to Reject the Rule.** ............................................................ 10

      A.   *Coke* Acknowledged the Delegation of Authority to Make and Change Regulations Defining and Delimiting "Companionship Services." .............. 11

      B.   The District Court's Inference from Inaction Is Erroneous. ............................ 13

  **III.**  **DOL's Revised Regulations Would Have the Positive Impacts on Workers and Their Clients that Congress Intended.** ............................ 15

**CONCLUSION** ................................................................................... 20

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)** ................................................................. 22

**CERTIFICATE OF SERVICE** .......................................................... 23

# TABLE OF AUTHORITIES

## Cases

*AFL-CIO v. Brock*, 835 F.2d 912 (D.C. Cir. 1987) ........................................14

*Alto Dairy v. Veneman*, 336 F.3d 560 (7th Cir. 2003)..................................14

*Assoc. Bldrs. & Contractors, Inc. v. Shiu*, 30 F. Supp. 3d 25 (D.D.C. 2014) ............................................................................................................14

*Beverly Enters., Inc. v. Herman*, 119 F. Supp. 2d 1 (D.D.C. 2000) .............14

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997) ............................................................................................................15

\* *Chevron U.S.A., Inc., v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ...................................................................................................3, 4, 8, 12

*INS v. Chadha*, 462 U.S. 919 (1983) ............................................................15

\* *Long Island Care at Home, Inc. v. Coke*, 551 U.S. 158 (2007) 1, 3, 5, 6, 12, 13, 15

*Mayo Foundation for Med. Educ. & Rsch v. United States*, 131 S. Ct. 704 (2011) ..............................................................................................................6

*Nat'l Ass'n of Clean Air Agencies v. E.P.A.*, 489 F.3d 1221 (D.C. Cir. 2007) ......................................................................................................................3

*Nat'l Cable & Telecommuns. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ..............................................................................................................7

*Natural Res. Def. Council v. E.P.A.*, No. 12-1321, 2014 WL 7269521 (D.C. Cir. Dec. 23, 2014) ...................................................................................3, 4

*Schweiker v. Chilicky*, 487 U.S. 412 (1988) ...............................................14

*Smiley v. Citibank (S. Dak.), N.A.*, 517 U.S. 735 (1996) ...............................7

\* *Transitional Hosp. Corp. of Louisiana, Inc. v. Shalala*, 222 F.3d 1019 (D.C. Cir. 2000)........................................................................................4, 7, 11

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .......................................3

## Statutes

29 U.S.C. § §207(*l*)...........................................................................................1

29 U.S.C. § 213(a)(15)....................................................................................1, 7

29 U.S.C. §§ 206(f)............................................................................................1

5 U.S.C. § 801 *et seq.*....................................................................................13

\* = Authorities upon which we chiefly rely are marked with asterisks.

## Other Authorities

Bureau of Labor Statistics Occupational Employment Statistics,
Occupational Employment and Wages, May 2010: 39-9021 Personal Care
Aides, http://www.bls.gov/oes/currentloes399O2l.htm (last visited Mar. 9,
2012) ................................................................................................................18

C. Brett Lockard & Michael Wolf, *Occupational Employment Projections to
2020*, Monthly Labor Rev. 84, 100 (table 2) (2012) ......................................20

Cynthia Estlund, *Rebuilding the Law of the Workplace in an Era of Self-
Regulation*, 105 COLUM. L. REV. 319, 347-52 (2005) ...............................19

Dorle Seavey & Abby Marquand, PHI, Caring In America: A
Comprehensive Analysis Of The Nation's Fastest-Growing Jobs 69
(2011), http://phinational.orglpolicy/guide-to-americas-home-care-
workforce/. ....................................................................................................19

Lora Jo Foo, *The Informal Economy: The Vulnerable & Exploitable
Immigrant Workforce & The Need for Strengthening Worker Protective
Legislation*, 103 YALE L.J. 2179, 2182 (1994)...........................................19

News Release, Bureau of Labor Statistics, Nonfatal Occupational Injuries
and Illnesses Requiring Days Away from Work, 2010 at 28 (Nov. 9,
2011), available at http://www.bls.gov/news.release/archives/osh2_1
1092011.pdf ...................................................................................................19

Ruth Milkman *et al.*, Wage Theft and Workplace Violations in Los Angeles:
The Failure Of Employment and Labor Law for Low-Wage Workers
(2010), *available at*
http://www.irle.ucla.edu/Events/2010/pdf/LAwagetheft.pdf ...................19

Tim Devaney, *GOP Moves to Block Union Election Rule*, THE HILL, Feb. 9,
2015 ................................................................................................................15

## Regulations

29 C.F.R. § 552.6 .................................................................................................8
40 Fed. Reg. 7405 .................................................................................................8
* 76 Fed. Reg. 81,197 .....................................................................................17, 18
* 78 Fed. Reg. 60,460 .......................................................................................6, 8

## Public Laws and Statutes at Large

88 Stat. 62, 76 ......................................................................................................1
* Pub. L. No. 93-259 ..........................................................................................1, 9

## Congressional Documents

119 Cong. Rec. 24,801..........................................................................................8
119 Cong. Rec. at S24800 .....................................................................................9

119 Cong. Rec. S24799 ................................................................... 19

119 Cong. Rec. S24801 .................................................................... 9

House Report No. 93-913 ................................................................. 2

\* Senate Report No. 93-690 ...................................................... 9, 20

## GLOSSARY

DOL        Department of Labor

FLSA      Fair Labor Standards Act

## STATUTES AND REGULATIONS

All pertinent statutes and regulatory materials are contained in the

brief for Defendants-Appellants David Weil, *et al*.

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY

United States Senator Patty Murray of Washington is the Ranking Member on the Committee on Health, Education, Labor, and Pensions. Representative Robert C. "Bobby" Scott, Third District of Virginia, is the Ranking Member on the House Committee on Education and the Workforce. In addition, the following Senators and Representatives join Sen. Murray and Rep. Scott in supporting this brief (Members of the respective committees are *italic*):

| **Senators** | **Representatives** |
|---|---|
| *Sen. Patty Murray* | *Rep. Robert C. "Bobby" Scott* |
| *Sen. Tammy Baldwin* | *Rep. Alma S. Adams* |
| Sen. Richard Blumenthal | *Rep. Suzanne Bonamici* |
| Sen. Sherrod Brown | Rep. Judy Chu |
| Sen. Benjamin L. Cardin | *Rep. Katherine M. Clark* |
| *Sen. Robert P. Casey, Jr.* | *Rep. Joe Courtney* |
| *Sen. Al Franken* | *Rep. Susan A. Davis* |
| Sen. Mazie K. Hirono | Rep. Rosa L. DeLauro |
| Sen. Edward J. Markey | *Rep. Mark DeSaulnier* |
| Sen. Jeff Merkley | Rep. Keith Ellison |
| *Sen. Barbara A. Mikulski* | Rep. Sam Farr |
| *Sen. Bernard Sanders* | Rep. Chaka Fattah |
| Sen. Brian Schatz | Rep. Lois Frankel |
| Sen. Sheldon Whitehouse | *Rep. Marcia L. Fudge* |
| Sen. Ron Wyden | *Rep. Raúl M. Grijalva* |
| | Rep. Alan Grayson |
| | Rep. Luis V. Gutierrez |
| | Rep. Alcee L. Hastings |
| | Rep. Michael M. Honda |
| | *Rep. Hakeem S. Jeffries* |
| | Rep. Henry C. "Hank" Johnson, Jr. |
| | Rep. Marcy Kaptur |
| | Rep. John Lewis |

Rep. David Loebsack
Rep. Stephen F. Lynch
Rep. Jim McDermott
Rep. Grace F. Napolitano
*Rep. Mark Pocan*
*Rep. Jared Polis*
Rep. Charles B. Rangel
Rep. Lucille Roybal-Allard
Rep. Linda T. Sánchez
Rep. Janice D. Schakowsky
*Rep. Mark Takano*
*Rep. Frederica S. Wilson*

This case concerns the scope of authority that Congress delegated to the Department of Labor in the Fair Labor Standards Act (29 U.S.C. § 201 *et seq.*). The Members of Congress have a distinctive interest in the proper interpretation of federal law.

Each Member of Congress supporting this *amicus curiae* brief is filing on her or his own authority as a duly elected and qualified member of the United States Congress. Several Members, including Senator Murray and Representative Scott, also hold positions on committees that oversee the Department of Labor and its regulations.

## CERTIFICATION OF NEED TO FILE SEPARATE BRIEF
## PURSUANT TO CIR. R. 29(d)

Undersigned counsel certifies that this separate *amicus curiae brief* is necessary because the intent of Congress is of pivotal importance to the proper resolution of the issues before the Court, and no other party or *amicus curiae* can represent Congress's intentions as fully as Members of Congress themselves can. The Members of Congress also have a distinctive interest in the proper interpretation and enforcement of federal law, especially where it concerns statutory delegation of authority to Executive Branch agencies. The distinctive voice of Members of Congress is both "desirable" and "relevant" to resolution of the issues before this Court. Fed. R. App. P. 29(b)(2); *see also Neonatology Assocs., P.A. v. Comm'r of Internal Revenue*, 293 F.3d 128, 132 (3d Cir. 2002) ("The criterion of desirability set out in Rule 29(b)(2) is open-ended, but a broad reading is prudent.").

x

## STATEMENT OF AUTHORSHIP AND FINANCIAL
## CONTRIBUTIONS

This brief was authored by Massey & Gail LLP, counsel for the

Members of Congress listed *supra*. No party or party's counsel authored this

brief, in whole or in part. No party or party's counsel contributed money that

was intended to fund preparing or submitting the brief. No person

contributed money that was intended to fund preparing or submitting the

brief.

## SUMMARY OF ARGUMENT

Congress, in the Fair Labor Standards Amendments of 1974, extended the minimum-wage and maximum-hours rules of the FLSA to domestic service employees and created a narrow exemption for persons "employed in domestic service employment to provide companionship services for individuals . . . unable to care for themselves." 29 U.S.C. §§ 206(f), 207(*l*), 213(a)(15) (2014). Congress explicitly delegated to the Department of Labor ("DOL") the authority "to prescribe necessary rules, regulations, and orders with regard to" the 1974 amendments and to "define[] and delimit[]" the statutory terms in this companionship services exemption to the FLSA. Pub. L. No. 93-259, §§ 7(3), 29(b); 88 Stat. 62, 76; *Long Island Care at Home, Inc. v. Coke*, 551 U.S. 158, 165 (2007). Congress's intention was to allow the agency to define and delimit the boundaries of the exemption within the guidance given by Congress, namely to narrow exemptions, to broaden protections, and to ensure that "bread-winners" were covered by the FLSA, not exempted. The District Court failed to account for this explicit delegation of authority to fill a statutory gap, thereby committing error in its analysis under the framework of *Chevron U.S.A., Inc., v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

The District Court also drew the wrong inference from congressional inaction. The Supreme Court, in *Coke*, understood that Congress's drafting of the FLSA "provides the Department with the power to fill . . . gaps through rules and regulations. . . ." *Coke*, 551 U.S. at 165. "Congress entrusted the agency," *id*., to define and delimit the boundaries of the exemptions, requiring no further action from Congress. The District Court incorrectly inferred that this inaction was a ratification of *the Department's interpretation*, but it was instead a ratification of *the delegation to the Department*.

The revised regulations would have exactly the positive impacts on the lives of home care workers and their clients that Congress intended to achieve in the 1974 Amendments. Because of the exemption, home care workers have not been provided the protections and dignity that other workers receive, leaving them with median wages below the poverty line, dangerous working conditions, and extremely high turnover. The Department of Labor has recognized the professionalization of the home care over the last 40 years. This recognition is precisely the expert agency assessment that Congress sought to depend on when implementing the FLSA, and is the reason Congress delegated to the DOL the authority to define and delimit the key terms in this provision. The District Court

misread Congress's intention while purporting to adhere to it. Congress

intended for the 1974 Amendments to cover professionalized workers like

those in home care now, not casual "elder sitters."

## ARGUMENT

I. **The Department of Labor Unequivocally Has the Authority to Define and Delimit the Companionship Services Exemption to the Fair Labor Standards Act.**

### A. The Department of Labor Exercised Statutorily-Granted Powers Guided by Congressional Intent.

The Fair Labor Standards Amendments of 1974 extended the minimum-wage and maximum-hours rules of the FLSA to domestic service employees and created an exemption for persons "employed in domestic service employment to provide companionship services for individuals . . . unable to care for themselves." 29 U.S.C. §§ 206(f), 207(*l*), 213(a)(15) (2014). Importantly, however, Congress delegated to the Department of Labor ("DOL") the authority "to prescribe necessary rules, regulations, and orders with regard to" the 1974 amendments and to "define[] and delimit[]" the statutory terms in this companionship services exemption to the FLSA. Pub. L. No. 93-259, §§ 7(3), 29(b); 88 Stat. 62, 76; *Long Island Care at Home, Inc. v. Coke*, 551 U.S. 158, 165 (2007) (citing 29 U.S.C. § 213(a)(15); 1974 Amendments, § 29(b), 88 Stat. at 76) (stating that Congress "explicitly" left gaps in the statute and gave the DOL the power "to fill these gaps through rules and regulations").

Exercising this authority is precisely what Congress intended: Congress gave clear guidance as to what it wished to achieve with the

1

amendments, and the DOL has acted on those wishes. For example, the House Report maintained that "the exemption reflects the intent of the committee to exclude from coverage babysitters for whom domestic service is a casual form of employment," House Report No. 93-913, p. 36, but not the professionalized workforce we see today. It explicitly stated that "[p]eople who will be employed in the excluded categories are not regular bread-winners or responsible for their families support," *id.*, which is, unfortunately, *not at all* the case today. Indeed, the FLSA-exempt workforce has grown to include more and more earners supporting their families. The Supreme Court, in *Coke*, understood that congressional guidance could inform the way the DOL exercises its authority to issue implementing regulations and "define[] and delimit[]" the statutory terms, and DOL has taken the guidance as to Congress's intent to heart. It is the District Court that has forsaken Congress's clear statements of intent and ignored the unequivocal statutory grant of authority and concurrent guidance.

### B. The District Court Applied *Chevron* Incorrectly, Preventing the DOL from Aligning the Meaning of the Exemption with the Intent of the FLSA.

The legal framework for determining the propriety of agency action is well established. The "power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of

policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Coke*, 551 U.S. at 165 (quoting *Chevron U.S.A., Inc., v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)) (internal quotation and citation omitted). Where, as here, "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron*, 467 U.S. at 843-44. "When an agency fills such a 'gap' *reasonably*, and in accordance with other applicable (*e.g.*, procedural) requirements, the courts accept the result as legally binding." *Coke*, 551 U.S. at 165 (emphasis added) (citing *Chevron*, 467 U.S. at 843–844; *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)). In such an instance, the agency's interpretations must be upheld "unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44; *see also Mead Corp.*, 533 U.S. at 227. Such a standard is "highly deferential," and it "presumes the validity of agency action." *Nat'l Ass'n of Clean Air Agencies v. E.P.A.*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (citation and internal quotations omitted).

*Chevron* includes a two-step analysis. *See Natural Res. Def. Council v. E.P.A.*, No. 12-1321, 2014 WL 7269521, at *8 (D.C. Cir. Dec. 23, 2014). If "the statute is silent or ambiguous with respect to the specific issue," the court must not conclude at *Chevron* Step One that "Congress has directly

spoken to the precise question," and must move to Step Two. *Id.* (quoting *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1868 (2013) (quoting *Chevron*, 467 U.S. at 842–43)). Indeed, under *Chevron* Step One, when Congress speaks so clearly that the meaning is unambiguous and can be drawn directly from the statute without reference to extrinsic interpretive aids such as legislative history or canons of construction, the court's analysis is finished. *Chevron*, 467 U.S. at 842. If, and only if, the court determines there is ambiguity, the court then proceeds to *Chevron* step two to assess "whether the agency's answer is based on a permissible construction of the statute." *Natural Res. Def. Council v. E.P.A.*, 2014 WL 7269521, at *8 (citation omitted); *Chevron*, 467 U.S. at 843; *see also id.* at 842-44 (stating that, under Step Two, considered only if the statute is deemed ambiguous, the court must determine whether the agency's statutory interpretation is "reasonable"). Moreover, if there is an explicit delegation using a phrase like "as determined by the Secretary," the statute "takes the case out of the realm of *Chevron* step one's *de novo* review, and into the realm of *Chevron* step two—which asks only whether the agency's interpretation is reasonable." *Transitional Hosp. Corp. of Louisiana, Inc. v. Shalala*, 222 F.3d 1019, 1026 (D.C. Cir. 2000).

4

Here, the district court erred by holding that the amended regulations are contrary to the FLSA's plain text. This was improper under *Chevron* Step One, conflated the Step One inquiry with Step Two, and therefore set a problematic precedent. As stated, Congress unambiguously gave DOL authority to implement the companionship-services exemption and define and delimit its scope. The district court therefore directly contravened the Supreme Court's holding in *Coke*, 551 U.S. at 167-68, in which the Court held that the DOL's regulation governing third-party employment was a reasonable exercise of the authority that Congress delegated to the agency and stated that the FLSA "instructs the agency" to narrow down the "broad definition[]" of "companionship services" in the statute. This is because the DOL's interpretation of key terms in the companionship service exemption to the FLSA "seems to fill a statutory gap" "[o]n its face." *See id*. at 158. Interpretation of the terms therein, as the court below did when it determined that DOL's interpretations were contrary to the language in the FLSA, is forbidden by *Chevron* because Congress expressly delegated that authority to the DOL. *See id*. at 167-68.

The DOL properly exercised its statutory authority to issue regulations implementing the 1974 Amendments and to define and delimit "companionship services." Pursuant to the same statutory authority, it has

5

now properly decided to change the definition of "companionship services" after a deliberate and considered evaluation of the way in which home care has changed in the over 40 years since the FLSA was amended in 1974.

The DOL's change in interpretation was hardly precipitous: A notice-and-comment period was initiated on December 27, 2011, and DOL did not promulgate a final rule until October 1, 2013. In between, over 26,000 comments were filed. *See* Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,460 (Oct. 1, 2013). The challenged regulations are the product of legislative rulemaking by the DOL with a full notice-and-comment period—exactly the deliberation that warrants greater deference from the courts. *Mayo Foundation for Med. Educ. & Rsch v. United States*, 131 S. Ct. 704, 714 (2011) ("The Department issued the [] rule only after notice-and-comment procedures . . . again a consideration identified in our precedents as a 'significant' sign that a rule merits *Chevron* deference.") (*quoting Mead*, 533 U.S. at 230-31). This deliberative process underscores that the change in the regulation here was well within the statutory grant of authority. *See Coke*, 551 U.S. at 170-71.

It matters not that the regulation at issue is longstanding: After *Chevron* all that matters is whether the new regulation is a reasonable interpretation. *Nat'l Cable & Telecommuns. Ass'n v. Brand X Internet*

*Servs.*, 545 U.S. 967, 980-82 (2005). *See also Smiley v. Citibank (S. Dak.), N.A.*, 517 U.S. 735, 742 (1996) ("change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency"); *Barnhart v. Walton*, 535 U.S. 212, 226 (2002) (Scalia, J., concurring) ("I do not believe, to begin with, that particular deference is owed to an agency interpretation of longstanding duration . . . . That notion is an anachronism—a relic of the pre-*Chevron* days, when there was thought to be only one 'correct' interpretation of a statutory text.") (quotation and citation omitted).

As stated, a court's *Chevron* Step One analysis is finished when Congress speaks clearly and without ambiguity. The district court should have concluded its Step One analysis after determining that Congress gave definitional authority to the DOL to define and delimit the exemption.[1] Then, under *Chevron* Step Two, the court should have considered, and recognized, the reasonableness of the agency's interpretation. By considering the reasonableness of the DOL's regulation by interpreting the

---

[1] Alternatively, the District Court should have realized that the wording in this case is not significantly different from that in *Transitional Hosp. Corp.*, setting the terms of the statute "as such terms are defined and delimited by regulations of the Secretary," 29 U.S.C. § 213(a)(15). This wording brings the court's inquiry out of *Chevron* Step One and into *Chevron* Step Two, which asks "only whether the agency's interpretation is reasonable." *Transitional Hosp. Corp.*, 222 F.3d at 1026.

language of the statute during its Step One analysis, the lower court

impermissibly conflated Step One and Step Two. And the lower court then

performed this inappropriate analysis incorrectly, *see* Dkt. 32, Mem. Op., at

9 n.5, because even under *Chevron* Step Two—since the DOL has authority

to issue regulations under the 1974 Amendments and to define and delimit

"companionship services" and "care"—there can be no statutory

contradiction invalidating the agency's regulatory interpretation. The

District Court, by contrast, "impose[d] its own construction on the statute,"

*Chevron*, 467 U.S. at 843, precisely as *Chevron* teaches that it should not. Its

interpretation (Dkt. 32 at 9-10) of the ramifications of the word "care" and

its relationship to "companionship services" is entirely of its own making,

not Congress's and not the agency's.

     And even though the delegation in the statute is crystal clear *without*

*reference to any extrinsic aids*, the discussion in the final rule demonstrates

that Congress only intended to exempt "elder sitters" and similar workers

from FLSA protections. 40 Fed. Reg. 7405; 119 Cong. Rec. 24,801; 78 Fed.

Reg. 60,458-59; 29 C.F.R. § 552.6 (as amended). The 1974 amendments to

the FLSA were done in part to *extend* minimum wage and overtime

protections to all domestic service workers, including those employed by

private households or companies too small to be covered by the Act. *See*

Fair Labor Standards Amendments of 1974, Pub. L. 93-259 Sec. 7, 88 Stat. 55, 62 (1974); *see also* 119 Cong. Rec. at S24800 ("Coverage of domestic employees is a vital step in the direction of insuring that all workers affecting interstate commerce are protected by the Fair Labor Standards Act."); Senate Report No. 93-690 at p. 20 ("The goal of the Amendments embodied in the committee bill is to update the level of the minimum wage and . . . to extend the basic protection of the Fair Labor Standards Act to additional workers and to reduce to the extent practicable at this time the remaining exemptions.").

At the same time, Congress enacted the companionship services exemption, which was meant to apply to "elder sitters"—whose primary responsibility was "to be there and to watch" in a manner similar to how a babysitter watches over children—rather than to workers who perform "household work." 119 Cong. Rec. S24801 (statement of Sen. Williams). The companionship services exemption was not intended to exclude from the FLSA's protections "persons who are domestic services workers as their 'vocation' or … trained personnel such as nurses, whether registered or practical." *See* Senate Report No. 93-690, 93rd Cong., 2d Sess., p. 20 (1974).

9

This is because Congress recognized and continues to recognize the important role those who provide significant assistance have in the lives of their clients as well as their families, and thus intended for people in such a position to be protected by the FLSA. As such, contrary to the district court's conclusory assertion, Dkt. 32, Mem. Op., at 9 n.5 (quotation omitted), DOL's interpretation is not "contrary to the statute." The third party employment regulation and companionship services regulation issued by the DOL brings the regulations—fully under the purview of the DOL—within the statutory intent of the FLSA and its exemptions. Congress did not intend to exclude the professionalized, skilled workforce that gives home care in this modern era from FLSA protections; the DOL merely exercised the authority Congress gave it when it promulgated this rule ensuring the dignity of home care workers.

## II.  The District Court Erred in Assuming Silence Was a Reason to Reject the Rule.

The District Court drew entirely the wrong conclusion from Congress's failure to pass one of the six bills offered to adjust the provision for changing times. The District Court effectively put words in Congress's mouth, interpreting the "silence" as agreeing with the DOL's former interpretation and speaking against the change embodied in the new rule. To

the contrary, however, Congress's silence was based on a clear understanding that *Congress had already left the issue for the DOL to decide*, so no further elaboration was necessary. Especially after *Coke*, when the Supreme Court ratified the understanding that the DOL held authority to define and delimit the exemption, Congress did not *need* to express its further intentions because the most important one had already been actualized: the delegation of authority. In the face of such a clear delegation of authority to define, the inference from congressional silence is weak.

*Transitional Hosp. Corp.*, 222 F.3d at 1025. The district court interpreted Congress's intention precisely wrong.

### A. *Coke* Acknowledged the Delegation of Authority to Make and Change Regulations Defining and Delimiting "Companionship Services."

Congress took *Long Island Care at Home, Inc. v. Coke* seriously. The Supreme Court could not have been clearer:

> [T]he FLSA explicitly leaves gaps, for example, as to the scope and definition of statutory terms such as "domestic service employment" and "companionship services." . . . It provides the Department with the power to fill these gaps through rules and regulations. . . . The subject matter of the regulation in question concerns a matter in respect to which the agency is expert, and it concerns an interstitial matter, *i.e.*, a portion of a broader definition, the details of which, as we said, Congress entrusted the agency to work out.

*Id.* at 165 (citations omitted). Congress *did* entrust the Department of Labor with the authority to work out the scope of the exemption, and left an explicit gap for the agency to fill. Congress is also familiar with the rule from *Chevron*: "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are *given controlling weight* unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44 (emphasis added). In light of an explicit delegation of authority that gives the ensuing regulations controlling weight, there should be nothing more Congress needs to say.

Inherent in Congress's delegation of authority "to elucidate a specific provision," is the delegation of authority to change an interpretation. In *Coke*, the proposed rule changed before it was finalized, *Coke*, 551 U.S. at 174-75, and the DOL proposed changing it after finalization, *id.* at 172-73, with full notice-and-comment procedures. Even so, the Supreme Court viewed all of those changes as falling within the DOL's delegated authority. *Id.* at 172-76. "[A]s long as interpretive changes create no unfair surprise— and the Department's recourse to notice-and-comment rulemaking in an attempt to codify its new interpretation . . . makes any such surprise unlikely

12

here—the change in interpretation alone presents no separate ground for disregarding the Department's present interpretation." *Id*. at 170-71 (citation omitted). Congress understands, and the Supreme Court has ratified, that the DOL holds the authority both to *make* these regulations and to *change* them.

## B. The District Court's Inference from Inaction Is Erroneous.

The District Court misinterpreted congressional inaction, leading it to an erroneous conclusion. For the 40 years the former interpretation had been in force, Congress never enshrined it in statute, nor did Congress act to block the current rule while it was being promulgated.[2] Congress did not need to "cabin[] the definition of companionship services" (Dkt. 32 at 12) *because it had left that task to the DOL*. This inaction was not disinterest, but full interest in the form of an express delegation of authority to the DOL. Congress's "inaction" was a clear endorsement of DOL's authority, not, as the District Court misinterpreted, of the former rule.

---

[2] By contrast, Congress has moved to block rules promulgated by the National Labor Relations Board by using the Congressional Review Act (5 U.S.C. § 801 *et seq*.). *See*, *e.g*., Tim Devaney, *GOP Moves to Block Union Election Rule*, THE HILL, Feb. 9, 2015, *available at* http://thehill.com/regulation/labor/232213-gop-moves-to-block-union-election-rule. The lack of such action while DOL's rule was in the process of finalization, in stark comparison to congressional action on a similar issue, clarifies Congress's intent with respect to DOL's rule: The DOL has the authority to interpret the terms as it determines, and has done so here.

The congressional inaction the District Court relies upon is not a validation of the prior DOL interpretation. Silence is notoriously difficult to interpret. *See Schweiker v. Chilicky*, 487 U.S. 412, 440 (1988). It cannot be the case that "Congress ratifies everything it does not specifically disclaim." *Assoc. Bldrs. & Contractors, Inc. v. Shiu*, 30 F. Supp. 3d 25, 38-39 (D.D.C. 2014). As this Court recognized, "[t]o freeze an agency interpretation, Congress must give a strong affirmative indication that it wishes the present interpretation to remain in place." *AFL-CIO v. Brock*, 835 F.2d 912, 916 (D.C. Cir. 1987). Indeed, "there must be a showing that Congress was aware of, *and expressly approved of*, the prior agency position." *Beverly Enters., Inc. v. Herman*, 119 F. Supp. 2d 1, 9 (D.D.C. 2000) (emphasis added). Absent such a showing, "inferences from congressional silence are treacherous; oversights are common in the hurly-burly of congressional enactment; omissions are not enactments; and even deliberate omissions are often subject to alternative interpretations." *Alto Dairy v. Veneman*, 336 F.3d 560, 566 (7th Cir. 2003). The District Court implicitly acknowledged that there is no such express approval, because all it can point to is inaction. Such inaction is insufficient to freeze an agency interpretation.

Indeed, the District Court's reading of congressional silence would permit exactly the "legislation by default" the Supreme Court warned about

in *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 617 (1997). By giving conclusive effect to Congress's silence regarding the DOL's former definition of "companionship services," the District Court treats it as carrying the same authority as if it were written into the statute—indeed, the District Court concluded that it effectively was. *See* Dkt. 32 at 9-10 (deciding the issue as a matter of statutory interpretation at *Chevron* Step One). But that definition has not gone through the necessary prerequisites to becoming part of a law: bicameral passage and presentment. *Compare INS v. Chadha*, 462 U.S. 919, 951-59 (1983) (emphasizing the requirements of bicameralism and presentment as foundational to legislative action). By overreading congressional inaction, the District Court effectively legislated a statutory definition into existence in a manner Congress steadfastly refused to do.

## III.  DOL's Revised Regulations Would Have the Positive Impacts on Workers and Their Clients that Congress Intended.

With the 1974 amendments, Congress intended to expand, not contract, FLSA coverage. *Coke*, 551 U.S. at 166. That simple fact should guide any court's interpretation of the *exemptions from* the FLSA. Nevertheless, the district court's insistence on ensuring the broadest possible reading of the terms—despite the DOL's best efforts to use its

congressionally granted authority to keep the exemptions properly narrow—would narrow coverage of the FLSA far beyond what Congress intended, with terrible consequences for home care workers and the people they care for.

The home care industry has changed drastically since 1974, and the regulations governing it must be adapted to these new circumstances—as Congress intended. The District Court's short-sighted focus exclusively on the cost of home care overlooks the significant ramifications, including for recipients of services, of having that care delivered by workers who are paid too little, given little respect, and not protected by the FLSA. Unlike the District Court, the DOL considered the full range of ramifications on both the workers who provide the services and their clients, as well as the guidance DOL received from Congress as to how the statutory terms should be "defined and delimited." The statute was intended to exempt "elder sitters," not the professionalized workforce actually delivering that care now—which is still paid and treated as if they were merely "elder sitters."

The home care labor force is not what it was in 1974. The entire enterprise has changed into a professionalized workforce that is exactly the type Congress intended that FLSA cover:

- The median wage ($20,990) falls below the poverty line for a family of four.[3]

- Even so, home care workers are often heads-of-household, the breadwinners who most need protection for their families' sake.[4]

- Home care workers have one of the highest rates of injury and illness, outpacing even correctional officers and firefighters.[5]

- The turnover rate is extraordinarily high, approaching 100% in some places.[6]

- In turn, high turnover means low to no training for difficult or complex care.

_____

[3] Bureau of Labor Statistics Occupational Employment Statistics, Occupational Employment and Wages, May 2010: 39-9021 Personal Care Aides, http://www.bls.gov/oes/currentloes399O2l.htm (last visited Mar. 9, 2012).

[4] Dep't of Labor, Notice of Proposed Rulemaking, 76 Fed. Reg. at 81,197 ("NPRM").

[5] News Release, Bureau of Labor Statistics, Nonfatal Occupational Injuries and Illnesses Requiring Days Away from Work, 2010 at 28 (Nov. 9, 2011), available at http://www.bls.gov/news.release/archives/osh2_1 1092011.pdf.

[6] Dorle Seavey & Abby Marquand, PHI, Caring In America: A Comprehensive Analysis Of The Nation's Fastest-Growing Jobs 69 (2011), http://phinational.orglpolicy/guide-to-americas-home-care-workforce/.

- These factors have all created an exploitative work environment for many home care workers.[7]

- All of these factors impact vulnerable clients, who most need steady, able care from a constant, familiar face.

In its NPRM, the DOL acknowledged that "[t]he home care industry has undergone a dramatic transformation since the Department published the implementing regulations in 1975." NPRM at 81,191. This recognition is precisely the expert agency assessment that Congress sought to depend on when implementing the FLSA, and is the reason Congress delegated to the DOL the authority to define and delimit the key terms in this provision.

Congress has always recognized that the people engaged in these occupations are not merely constituents but dignified human beings who are linchpins for their families and communities, and we cannot simply write them off. What Congress said then is no less true today: "the plain fact is that private household domestic workers are overwhelmingly female and

---

[7] Cynthia Estlund, *Rebuilding the Law of the Workplace in an Era of Self-Regulation*, 105 COLUM. L. REV. 319, 347-52 (2005); Ruth Milkman *et al.*, Wage Theft and Workplace Violations in Los Angeles: The Failure Of Employment and Labor Law for Low-Wage Workers (2010), *available at* http://www.irle.ucla.edu/Events/2010/pdf/LAwagetheft.pdf; Lora Jo Foo, *The Informal Economy: The Vulnerable & Exploitable Immigrant Workforce & The Need for Strengthening Worker Protective Legislation*, 103 YALE L.J. 2179, 2182 (1994).

members of minority groups," and by failing to protect them under the FLSA "we would be turning our backs on these people." 119 Cong. Rec. S24799 (statement of Sen. Williams). The number of home care workers is projected to skyrocket over the next decade, from 1.9 million in 2010 to 3.2 million in 2020—almost doubling in the course of a decade.[8] Such a rapid increase drawing on populations that can be vulnerable to exploitation and discrimination warrants expert guidance from an administrative agency capable of adjusting to the changing demographics of home care as well as the changing industry.

The DOL's reading is the best way to adapt to the changing nature of home care for a new generation. The nature of the work has expanded over the years to include intensive, professionalized tasks. Those tasks and the workers who perform them should not be exempt from the protections of the FLSA. Nevertheless, the District Court failed to give this type of labor its due, relegating it to an exempt category parallel to babysitting. While the District Court professed to be concerned with precisely this issue (Dkt. 32 at 11-12 & n.7), it failed to realize exactly how much the home care industry has changed over the last 40 years. Even while quoting Congress's concern

---

[8] C. Brett Lockard & Michael Wolf, *Occupational Employment Projections to 2020*, Monthly Labor Rev. 84, 100 (table 2) (2012).

for "regular bread-winners [who are] responsible for their families' support," Senate Rep. No. 93-690, p. 20 (1974), the District Court blithely wonders why "a future change in the state of the industry would warrant a change in what services an exempt companion may provide." Dkt. 32 at 11 n.7. The answer, to put it bluntly, is that Congress left the decision of whether and how to adapt to those future changes for the DOL to determine.

## CONCLUSION

The orders of the District Court should be reversed and the regulations reinstated.

Date: February 27, 2015            /s/*Jonathan S. Massey*

Jonathan S. Massey, Esq.
MASSEY & GAIL LLP
1325 G St., NW, Suite 500
Washington, DC 20005
Tel: (202) 652-4511
Fax: (312) 379-0467
jmassey@masseygail.com

Jeremy G. Mallory
Eli J. Kay-Oliphant
MASSEY & GAIL LLP
50 East Washington St., Suite 400
Chicago, IL 60602
Tel: (312) 283-1590
Fax: (312) 379-0467
jmallory@masseygail.com
ekay-oliphant@masseygail.com

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE
## OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 29(c), 32(a)(5) & (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(d), 32(a)(7)(B), and D.C. Cir. R. 32(a)(3) because it contains 5,282 words, excluding the parts of the brief exempted under Fed. R. App. P. Rule 32(a)(7)(B)(iii) and D.C. Cir. R. 32(a)(1), according to the count of Microsoft Word.

/s/ *Jeremy G. Mallory*
Jeremy G. Mallory

Counsel for *Amici* Members of
Congress

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2015, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *Jeremy G. Mallory*
Jeremy G. Mallory

Counsel for *Amici* Members of
Congress