ORAL ARGUMENT SCHEDULED FOR MAY 7, 2015

─────────────

Nos. 15-5018

─────────────

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

─────────────

HOME CARE ASSOCIATION OF AMERICA, *et al.*,

PLAINTIFFS-APPELLEES,

V.

DAVID WEIL, *et al.*,

DEFENDANTS-APPELLANTS.

─────────────

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

─────────────

**BRIEF FOR PLAINTIFFS-APPELLEES**

William A. Dombi
Center For Health Care Law
228 Seventh St, SE
Washington, D.C. 20003
202.547.5262
wad@nahc.org

Maurice Baskin
Littler Mendelson, P.C.
1150 17th Street N.W.
Suite 900
Washington, DC  20036
202.842.3400
mbaskin@littler.com

Attorneys for Plaintiffs-Appellees

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), Plaintiffs-Appellees hereby certify the following information as to Parties, Rulings, and Related Cases:

### A. Parties and *Amici*

Plaintiffs-Appellees are the Home Care Association of America; the International Franchise Association; and the National Association for Home Care & Hospice. Defendants-Appellants are David Weil, in his official capacity as Administrator, Wage and Hour Division of the U.S. Department of Labor; Thomas E. Perez, in his official capacity as Secretary of Labor; and the U.S. Department of Labor. There were no *amici* in the district court.

### B. Rulings Under Review

The rulings under review are the district court's December 22, 2014 Order and Memorandum Opinion vacating the Third Party Employment provision of the Department's October 2013 Final Rule, 29 C.F.R. § 552.109 (JA 26, 44), and the same court's January 14, 2015 Order and Memorandum Opinion vacating the Companionship Services provision of the Final Rule, 29 C.F.R. § 552.6 (JA 48, 61), in case no. 1:14-cv-00967-RJL (D.D.C. Leon, J.).

## C. Related Cases

There are no pending related cases.


*/s/ Maurice Baskin*

Maurice Baskin
Attorney for Plaintiffs-Appellees


## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Circuit Rule 26.1, Plaintiffs-Appellees are all trade associations that do not have any publicly held parent companies owning a 10% or greater ownership interest in the entity.


*/s/ Maurice Baskin*

Maurice Baskin
Attorney for Plaintiffs-Appellees

# TABLE OF CONTENTS

**PAGE**

I.     JURISDICTION ............................................................................. 1

II.    ISSUES PRESENTED ..................................................................... 1

III.   RELEVANT STATUTES AND REGULATIONS ............................ 2

IV.    STATEMENT OF THE CASE ........................................................ 2

    A.   The Statutory Framework Of The FLSA And Its Home Care
       Exemptions ............................................................................... 2

    B.   Legislative History Of The Home Care Exemptions ........................... 4

    C.   The Department's Longstanding Current Regulations ....................... 7

    D.   Previous Challenges To The Department's Current Rules ................. 9

        1.   The Supreme Court's 2007 *Coke* Decision Upholding
            The Department's Longstanding Exemption Of Home
            Caregiver Employees Of Third Party Employers ..................... 9

        2.   Court Decisions Rejecting Previous Challenges To The
            Department's Longstanding Current Definition Of
            "Companionship Services." ..................................................... 11

    E.   Relevant Congressional Activity Subsequent To The 1975 Rule ...... 12

    F.   The Department's New Rule ............................................................. 13

    G.   Proceedings Before the District Court .............................................. 17

V.     SUMMARY OF ARGUMENT ........................................................ 21

VI.    STANDARD OF REVIEW .............................................................. 24

## TABLE OF CONTENTS (Continued)

**PAGE**

VII.   ARGUMENT ...........................................................................27

A.   THE DISTRICT COURT PROPERLY HELD THAT THE
     DEPARTMENT'S  EXCLUSION OF THIRD PARTY
     EMPLOYERS FROM "AVAILING THEMSELVES" OF THE
     STATUTORY EXEMPTIONS EXCEEDS THE DEPARTMENT'S
     STATUTORY AUTHORITY UNDER THE FLSA. .......................27

     1.   Contrary To The Department's Brief, The New Rule
          Conflicts With The Plain Language Of The FLSA. ...............27

     2.   The Department's Reliance On The Supreme Court's
          *Coke* Decision Is Misplaced.......................................31

     3.   The New Rule Conflicts With The Legislative History Of
          The FLSA..........................................................34

     4.   The New Third-Party Employer Exclusion Also Fails To
          Survive Scrutiny Under *Chevron* Step II Or The
          Arbitrary and Capricious Standard. ..........................39

B.   THE DISTRICT COURT ALSO PROPERLY HELD  THAT THE
     DEPARTMENT'S  REDEFINITION OF COMPANIONSHIP
     SERVICES EFFECTIVELY REPEALS THE  STATUTORY
     EXEMPTION. ...................................................................49

     1.   The New Definition Of Companionship Services
          Violates The Act's Plain Language And Legislative
          Intent ...........................................................50

     2.   The New Companionship Definition Is Arbitrary And
          Capricious ......................................................54

VIII.  CONCLUSION.................................................................59

# TABLE OF AUTHORITIES

**Cases**                                                                                            **Page(s)**

*Altman v. SEC*,
   666 F. 3d 1322 (D.C. Cir. 2011) ................................................................38

*American Bar Ass'n v. FTC*,
   430 F. 3d 457 (D.C. Cir. 2005)................................................................25

*American Petroleum Institute v. Environmental Protection Agency*,
   706 F. 3d 474 (D.C. Cir. 2013).................................................................24

*Association of Private Colleges v. Duncan*,
   *681 F.3d 427* (D.C. Cir. 2012)...........................................................40, 55

*Chevron USA, Inc. v. NRDC*,
   467 U.S. 837 (1984) ......................................9, 20, 24, 25, 31, 40, 49, 58

*Colorado River Indian Tribes v. National Indian Gaming Comm'n*,
   466 F.3d 134 (D.C. Cir. 2006)...........................................................25, 29

*Commodity Futures Trading Comm'n v. Schor*,
   478 U.S. 833 (1986) ..........................................................................38, 54

*Consumer Federation of America v. Dept. of Health and Human Services*,
   83 F. 3d 1497 (D.C. Cir. 1996)................................................................32

*Cook v. Diana Hays and Options, Inc.*,
   212 F. Appx. (5th Cir. 2006).............................................................15, 50

*Creekstone Farms Premium Beef, LLC v. Department of Agriculture*,
   539 F. 3d 492 (D.C. Cir. 2008).................................................................39

*Echostar Satellite LLC v. Federal Communications Comm'n*,
   704 F. 3d 992 (D.C. Cir. 2013).................................................................24

*FCC v. Fox TV Stations, Inc.*,
   556 U.S. 502 (2009) ...............................................................26, 41, 54, 55

* Authorities on which we principally rely are marked by an asterisk

- i -

## TABLE OF AUTHORITIES (Continued)

**Cases**                                                                        **Page(s)**

*Fowler v. Incor*,
   279 F. App'x 590 (10th Cir. 2008) ...........................................................................51

*\*Hearth, Patio & Barbecue v. U.S. Dept. of Energy*,
   706 F. 3d 499 (D.C. Cir. 2013) ........................................................................29, 32

*\*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007)............. 3, 8, 9, 10, 11, 13, 14, 19, 22, 31, 32, 33, 36, 37, 38

*McCune v. Oregon Senior Servs. Div.*,
   894 F. 2d 1107 (9th Cir. 1990) ..........................................................................51

*\*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)......................................................................................26, 40, 52

*National Ass'n of Clean Water Agencies v. EPA*,
   734 F. 3d 1115, 1153 (D.C. Cir. 2013)……………………………………...51

*National Association of Manufacturers v. NLRB*,
   717 F. 3d 947 (D.C. Cir. 2013) ...........................................................................25

*Public Citizen, Inc. v. HHS*,
   332 F.3d 654 (D.C. Cir. 2003) ...........................................................................25

*\*Railway Lab. Executives Assn. v. National Mediation Board*,
   29 F. 3d 655 ...................................................................................................24, 31

*\*Sayler v. Ohio Bureau of Workers' Comp.*,
   83 F. 3d 784 (6th Cir. 1996) ......................................................................... 12, 51

*Schweiker v. Chilicky*,
   487 U.S. 412 (1988).............................................................................................38

*\*Sebelius v. Auburn Regional Med. Ctr.*,
   133 S. Ct. 817 (2013) ..........................................................................................38

*\*Welding v. Bios Corp.*,
   353 F. 3d 1214 (10th Cir. 2004) ......................................................................6, 35

## TABLE OF AUTHORITIES (Continued)

**Cases**                                                                 **Page(s)**

STATUTES

28 U.S.C. § 1291 ....................................................................................1

29 U.S.C. 207(i) ..........................................................................6,33, 34

29 U.S.C. § 207 ......................................................................2, 3,27, 28

29 U.S.C. § 213(a)(3)...............................................................6, 33, 34

29 U.S.C. § 213(a)(15)) ................................. 3, 5, 6, 14, 16, 31, 33, 36, 50

29 U.S.C. § 213(b)(3)...............................................................6, 33, 34

29 U.S.C. § 213(b)(21).............................................................3,29, 32

Act of Dec. 9, 1999, ................................................................13, 37

Direct Care Job Quality Improvement Act of 2011, H.R. 2341 and S. 1273
    (112th Cong. 2011)...........................................................14, 38

Direct Care Workforce Empowerment Act of 2013, H.R. 5902 and S. 3696
    (113th Cong. 2013)...........................................................14, 38

Fair Home Health Care Act of 2007, H.R. 3582 and S. 2062 (110th Cong.
    2007)………………………………………………………............14, 38

Fair Labor Standards Act Amendments of 1974, Pub. L. No. 93-259, 88
    Stat. 55 ...................................................................3, 8, 14, 18

Michigan Compiled Laws Section 408.420(2)(a) ...................................7

Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 2105(a),
    110 Stat. 1755 .................................................................13, 37

**TABLE OF AUTHORITIES (Continued)**

**Other Authorities**                                      **Page(s)**

29 C.F.R. § 552.6 ...............................................................................1, 20, 23

29 C.F.R. § 552.109 ........................................................................1, 8,29, 39

40 Fed. Reg. 7404 (Feb. 20, 1975) ........................................................5, 8

76 Fed. Reg. 81190 (Dec. 27, 2011) ...........................................................14

78 Fed. Reg. 60454 (Oct. 13, 2013)................. 14, 16, 17, 18, 23, 29, 41, 42, 43, 51

119 Cong. Rec. 24,797 (1973)........................................................4, 35, 53

119 Cong. Rec. 24,801 (1973) .................................................... 7, 8, 51, 53

H.R. Rep. No. 93-913 (1974)......................................................................5

Op. Ltr. WH-368, 1975 WL 40991 (Nov. 25, 1975)...............................5

S.Rep. No. 93-690 (1974) ..........................................................................5

Wage and Hour Advisory Memorandum No. 2005-1 (Dec. 1, 2005)...........5, 6, 8, 9

**GLOSSARY**

APA: Administrative Procedure Act

ADL: Activities of Daily Living

DOL:  U.S. Department of Labor

FLSA: Fair Labor Standards Act

IADL: Instrumental Activities of Daily Living

NPRM: Notice of Proposed Rulemaking

## I.  JURISDICTION

Plaintiffs-Appellees (hereafter "Plaintiffs") agree that this Court has jurisdiction to hear this appeal under 28 U.S.C. § 1291.

## II.  ISSUES PRESENTED

1.  Whether the Department's Rule excluding third party employers from "availing themselves" of the Fair Labor Standards Act's (FLSA's) statutory exemptions of their employees engaged in companionship services or domestic live-in services, 29 C.F.R. § 552.109, is in excess of statutory authority under the FLSA and/or is otherwise arbitrary and capricious within the meaning of the Administrative Procedure Act (APA), and was therefore properly vacated by the district court.

2.  Whether the Department's Rule redefining the term "companionship services" in the FLSA's statutory exemption so as to effectively exclude the provision of care therefrom, 29 C.F.R. § 552.6, is in excess of statutory authority under the FLSA and/or is otherwise arbitrary and capricious within the meaning of the APA, and was therefore properly vacated by the district court.

## III.  RELEVANT STATUTES AND REGULATIONS

All relevant provisions of the statutes and regulations referenced in this brief are reproduced in the addendum.

- 1 -

## IV.    STATEMENT OF THE CASE

At issue in this appeal is a Department Rule that dramatically departs from the plain language and Congressional intent underlying statutory exemptions from the minimum wage and overtime requirements of the FLSA that have been in place since 1974. The district court vacated the new Rule upon finding that the Department had "gutted" the statutory exemptions in disregard of Congressional intent. (JA 26, 44).  As further explained below, the district court action was plainly correct and should be affirmed by this Court.

### A.    The Statutory Framework Of The FLSA And Its Home Care Exemptions

Under the FLSA, the obligation of employers to pay covered employees overtime for hours worked over 40 in a week derives exclusively from Section 207 of Title 29.  But the obligation of any employer to pay overtime under Section 207 is cancelled by Section 213 of Title 29, with respect to "any employee" identified in one of the several dozen exemption provisions of that Section.  As stated at the outset of Section 213(a) with respect to any such exempt employee, "the provisions of … section 207 of this title *shall not apply*." (emphasis added). An identical provision appears at the outset of Section 213(b) which again nullifies the

- 2 -

provisions of Section 207 as to any employer whose employees are exempted by any provision of Section 213(b).[1]

The 1974 Amendments to the FLSA[2] added a new Section 13(a)(15), 29 U.S.C. § 213(a)(15), which exempts from the overtime compensation requirements of the Act "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)."   Section 13(b)(21) of the Act, 29 U.S.C. § 213(b)(21), also added in the 1974 FLSA Amendments, further exempts from the overtime compensation requirements of the Act "any employee who is employed in domestic service in a household and who resides in such household." Nowhere in these or any other provisions of the Act did Congress authorize the Department

---

[1] The provisions of Section 213(a) also cancel the minimum wage requirements of Section 206 of the Act along with the overtime provisions of Section 207.  Section 213(b) only nullifies the overtime requirements of Section 207 and does not affect minimum wages. Only the overtime provisions are pertinent to this case, in as much as the Department has conceded that "few affected workers, if any, have an hourly rate less than the minimum wage." (Dept. Br. at 14, citing 78 Fed. Reg. at 60456).  Therefore, for ease of reference, Plaintiffs in this brief will focus only on the overtime exemptions in both Sections 213(a) and (b).

[2] Pub. L. No. 93-259, 88 Stat. 55.

- 3 -

to require any employers, "third party" or otherwise, to pay overtime pay to employees who are otherwise exempt from the Act's requirements.

### B.    Legislative History Of The Home Care Exemptions

"Congress created the companionship services exemption in order to enable guardians of the elderly and disabled to financially afford to have their wards cared for in their own private homes as opposed to institutionalizing them." *Welding v. Bios Corp*., 353 F. 3d 1214, 1217 (10th Cir. 2004). Numerous statements in the Congressional Record, largely ignored in the Department's Statement of the Case and its supporting *amici* briefs, confirm this Congressional intent.  *See* 119 Cong. Rec. 24,797 (1973) (statement of Sen. Dominick); *Id*. at 24,798 (statement of Sen. Johnston); *Id*. at 24,801 (statement of Sen. Burdick).[3]  None of these statements, or any others in the legislative history, purport to restrict the issue of affordability solely to caregiving provided by family members as opposed to third party employers.

---

[3] During the Senate floor debate on the 1974 amendment, Senator Dominick approvingly read into the record the following definition of "private household worker" written by the Department in 1973: "The term 'private household workers" includes all workers 14 years and older who work for wages, including pay-in-kind, in or about a private residence and are employed by: (1) a member of the household occupying that residence or (2) by a household **service business** whose services have been requested by a member of the household occupying that residence. 119 Cong. Rec. at 24,796 (emphasis added).

Neither the Senate Report nor the House Report cited in the Department's Statement of the Case (at p.8) indicates that Congress intended to exclude from the exemption any caregivers merely because they are employed by third party employers.[4]  The Department itself has previously conceded as much on numerous occasions. *See* 40 Fed. Reg. 7405 (1975); *see also* Op. Ltr. WH-368, 1975 WL 40991 (Nov. 25, 1975); Wage and Hour Advisory Memorandum No. 2005-1 (Dec. 1, 2005); *see also Long Island Care at Home Ltd. v. Coke*, Brief for the United States as *Amicus Curiae*, Docket No. 06-593 (U.S. 2007).  Also contrary to the Department's Brief (at p. 8), neither Committee Report purports to exclude individuals who perform companionship services as their "vocation;" such a reference appears only with regard to *non*-exempt domestic service workers. Senate Report at 20; House Report at 36.

By contrast, the exemption of babysitters, listed in the same section of the statute, is expressly restricted to those babysitting employees who are "employed on a casual basis."  29 U.S.C. 213(a)(15). As noted by the district court, no such

---

[4] *See* S. Rep. No. 93-690 (1974); H.R. Rep. No. 93-913 (1974). Rather, the above cited Committee Reports make reference only to the exempt employees' level of training (not intended to be that of nurses), level of compensation (not intended to be "bread-winning"), and level of household duties (not intended to be more than "incidental"). *See* Senate Report at 20; House Report at 36.

restriction appears in the companionship portion of the exemption. (JA 38).[5]

Congress's exemption of companionship caregivers further contrasts with several other exemption provisions of Section 213, in which  Congress expressly limited the classes of employers whose employees could fall within the exemption. *See, e.g.*, 29 U.S.C. § 213(a)(3) (exemption for "any employee employed by an establishment which is amusement or recreational establishment, organized camp, or religious or non-profit education conference center"); 29 U.S.C. § 213(b)(3) ("any employee of a carrier by air"); 29 U.S.C. 207(i) ("any employee of a retail or service establishment").   Again, Congress included no similar restriction of the class of employers whose employees are exempt under Section 213(a)(15) or 213(b)(21).

With regard to the definition of the companionship services that Congress intended to be exempt, regardless of the employer, the legislative history shows that "care" for those who are "unable to care for themselves" was an integral part of what was contemplated by Congress in 1974.  As Senator Burdick stated during the debates on the exemption: "When the Senator uses the word "companion," the

---

[5] The plain language of the statute and its omission of the word "casual" as a modifier of companionship services thus belies the claim in the State *Amici* Brief (New York, et al) that Congress intended to limit the latter exemption only to "casual elder sitters." State *Amici* Br. at 7.

Senator does not mean that in the ordinarily accepted sense that they are there to make them feel good. They are there to take care of them, he means when he uses the word "companion." 119 Cong. Rec. 24,801.

The Department's Brief conflates legislative references to incidental "household work" with the unrelated core requirement of "care." Indeed, in virtually every instance in which the Department or its *amici* cite a legislator or committee report referring to an activity as "incidental," and therefore not intended to be exempt, the activity described is "household work" and not the "care" which has long been understood to be a core function of companionship services. *See, e.g.*,119 Cong. Rec. S24801 (statement of Sen. Williams)).[6]

### C.    The Department's Longstanding Current Regulations

The Department issued regulations in 1975 to implement the 1974 FLSA Amendments. 40 Fed. Reg. 7404 (Feb. 20, 1975), codified at 29 C.F.R. Part 552. Those regulations, which remain in force today, have always stated that the statute exempts companion caregivers "who are employed by an employer or agency other

---

[6] This distinction is evident in the colloquy between Senators Burdick and Williams quoted above from the floor debate on the Amendments. 119 Cong. Rec. 24,801. Senator Burdick asks Senator Williams to confirm that "companions" are "to take care of" [the infirm]. To which Senator Williams responds that they are not there to do "housework."

- 7 -

than the family or household using their services." 40 Fed. Reg. at 7407 (the current Section 552.109). The Department declared in 1975, and has reiterated since, that "[t]his interpretation is more consistent with the statutory language and prior practices concerning other similarly worded exemptions." *Id*. at 7405. *See also* Wage and Hour Advisory Memorandum No. 2005-1 (Dec. 1, 2005); *see also Long Island Care at Home Ltd. v. Coke*, Brief for the United States as *Amicus Curiae*, Docket No. 06-593 (U.S. 2007).

The Department's 1975 rule, still in effect, also defined the companionship services that would be considered to be exempt under the Act to mean "those services which provide fellowship, care, and protection" for an elderly or infirm person unable to care for themselves. *See* the current Section 552.6. Consistent with Congressional intent, the longstanding current rule clarifies that exempt companionship services do not include care provided by "trained personnel such as nurses." *Id*. The current rule also allows exempt employees to perform "household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work: *Provided, however,* That such work is incidental, *i.e.,* does not exceed 20 percent of the total weekly hours worked." *Id*.

- 8 -

### D.     Previous Challenges To The Department's Current Rules

#### 1.     The Supreme Court's 2007 *Coke* Decision Upholding The Exemption Of Employees Of Third Party Employers

In 2007, a challenge to the Department's current (since 1975) rule reached the Supreme Court in the case of *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007). In that decision, the Supreme Court expressly rejected the challenge and upheld the Department's 1975 rule with regard to the exempt status of employees of third party employers. [7]

In light of the mischaracterizations of the Court's holding in the current Department's Statement of the Case (Dept. Br. at 12-13) and by several of the Department's *amici* supporters, it is worth quoting the Court's actual holding here: "The question before us is whether, in light of the statute's text and history,…the Department's [1975] regulation is valid and binding. [citation to *Chevron* omitted] We conclude that it is." *Id*. at 158.

---

[7] The Department itself supported this outcome in its 2007 *amicus* brief to the Court. In that brief the Department declared that eliminating the exemption for third party employers would "dramatically increase" the cost of companionship services, contrary to Congressional intent. *Id*., citing public statements of the Small Business Administration and the Department of Health and Human Services. In the same Supreme Court brief, the Department observed that requiring third party employers to pay overtime to companionship employees would in effect eliminate the exemption for the overwhelming majority of employees previously covered by the exemption – as high as 98%. *Id*.

The Supreme Court was not asked to review, and did not consider, the question presented by the new Rule, which is whether the Department is authorized to issue a rule that prevents employers from "availing themselves" of the Act's statutory exemptions of their employees.  Nor did the Court have before it a rule that excluded employees of third party employers from the live-in statutory exemption at all.

Also in the *Coke* decision, the Supreme Court specifically held that the legislative history did not support the Department's current claim that Congress somehow intended to limit the companionship exemption by excluding those employees who are employed by third parties.  Supreme Court Respondent Evelyn Coke made almost exactly the same arguments regarding the legislative history that the Department is now making in support of the new Rule.[8]  But the Supreme Court in *Coke* rejected Coke's (and now the Department's) reading of legislative

---

[8] Respondent Coke's Supreme Court filings pointed to the supposed overall purpose of the 1974 Amendments to extend FLSA coverage, and that the FLSA previously covered companionship workers employed by third party employers large enough to qualify as "enterprises." *Id*. at 2346-7.  Coke likewise highlighted statements made by some members of Congress distinguishing between "professional domestics" and mere family members or neighbors, as well as language in a different statute (the Social Security Act) which defines "domestic service employment" differently from the FLSA.  In addition, numerous amicus briefs asserted that the industry had greatly expanded and been transformed in ways that Congress did not intend.

- 10 -

history, flatly stating: "We do not find these arguments convincing." *Id*., 127 S. Ct. at 2346.

In the limited context of rejecting the respondent's claim (now adopted by the Department) that Congress did not intend to exempt "breadwinning" third party home care employees, the *Coke* Court stated that the statutory language of that provision "instructs the agency to work out the details" of the broad definitions of employees covered by the exemption. The Court added: "And whether to include workers paid by third parties within the scope of the definitions is one of those details." Because it was not confronted with a rule that purported to exclude third parties altogether from "availing themselves" of the statutory exemption, however, the *Coke* Court neither considered nor authorized such a rule as is presented in this case.[9]

### 2. Court Decisions Rejecting Previous Challenges To The Department's Longstanding Current Definition Of "Companionship Services."

Apart from the third party employer question, the Supreme Court in *Coke* did not otherwise address the Department's definition of "companionship

---

[9] The Court posed, but did not answer, a series of questions about the possible scope of the companionship exemption. 511 U.S. at 167. The only question that the Court answered was whether the Department rightly included third party employees within the coverage of the exemption in the current rule. The Court answered that question in the affirmative. *Id*.

services." However, on several occasions following enactment of the 1974 FLSA Amendments and the 1975 rule implementing the companionship exemptions, individual plaintiffs have challenged the Department's current regulatory definition of companionship services.  In every case, the reviewing courts have held that the Department's current rule in this regard is consistent with the plain language of the statute and Congressional intent. *See e.g., Sayler v. Ohio Bureau of Workers' Comp.*, 83 F. 3d 784, 787 (6th Cir. 1996) (holding that a worker who helps an infirm individual dress, bathe, and get around the home is providing companionship services under both the statutory language and the regulation); *Cook v. Diana Hays and Options, Inc.*, 212 F. Appx., 295, 296-7 (5th Cir. 2006) (same as to holding that a direct care worker who assisted in the home with "eating, baths, and teeth brushing, and accompanied the client to doctors and grocery stores was providing exempt services).

### E.     Relevant Congressional Activity Subsequent To The 1975 Rule.

As noted by the district court, Congress has amended the FLSA on numerous occasions since the promulgation of the Department's 1975 rules recognizing the exemption of companionship and/or live-in employees of third party employers. *See, e.g.*, Act of Dec. 9, 1999, Pub. L. No. 106-151, § 1, 113 Stat. 1731; Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 2105(a),

- 12 -

110 Stat. 1755, 1929. (JA 28-29).  Congress has chosen not to amend the home care exemptions during that time period and has otherwise expressed no disagreement with the Department's current and longstanding interpretation of either the companionship or live-in statutory exemptions.

To the contrary, since the *Coke* ruling in 2007, Congress has specifically considered and rejected legislation seeking to overrule the Supreme Court's decision by expressly excluding third party employers from the FLSA home care exemptions. *See* "The Fair Home Health Care Act of 2007, H.R. 3582 and S. 2062 (110th Cong. 2007); "The Direct Care Job Quality Improvement Act of 2011," H.R. 2341 and S. 1273 (112th Cong. 2011); and "The Direct Care Workforce Empowerment Act of 2013," H.R. 5902 and S. 3696 (113th Cong. 2013). The proposed legislation also sought to narrow the definition of companionship services by excluding certain activities recognized as exempt by the Department's 1975 rules. As pointed out by the district court, none of these bills had sufficient Congressional support to reach a vote on the floor of either house. (JA 31).

## F.    The Department's New Rule

Notwithstanding the above described judicial and legislative endorsement of the 1975 rules as being consistent with the 1974 FLSA amendments, the Department published a Notice of Proposed Rulemaking (NPRM) in the Federal

Register on December 27, 2011, proposing to exclude third party employers for the first time from availing themselves of the companionship employee exemption. 76 Fed. Reg. 81190 (Dec. 27, 2011). The NPRM relied on essentially the same grounds that the Supreme Court had so recently rejected, *i.e.*, the erroneous claim that Congress did not intend to exempt employees of such third party employers from the coverage of the Act. *Id*. at 60455, 60482. The NPRM further proposed to exclude third party employers from availing themselves of the separate exemption for domestic live-in employees (13(b)(21), an issue not addressed in the *Coke* case. Finally, the NPRM proposed to redefine the companionship services covered by Section 13(a)(15) so as to exclude from that exemption for the first time any "care" services exceeding 20 percent of working hours, regardless of the caregiver's employer.

Each of the Plaintiffs and many other entities filed comments in opposition to the proposed Rule.[10] These comments provided substantial evidence that the

---

[10] *See, e.g.,* Administrative Record Comments of the National Private Duty Association (subsequently renamed the Home Care Association of America) dated March 21, 2012 (JA 328); Comments of the International Franchise Association dated March 20, 2012 (JA 293); and Comments of the National Association for Home Care & Hospice dated March 21, 2012 (JA 335). In addition, Plaintiffs funded and submitted detailed economic analyses of the proposed Rule demonstrating the Rule's likely adverse impact on the elderly and disabled, many companion and live-in employees, and many small business employers. *See*

new Rule was contrary to Congress's intent and would adversely impact elderly and disabled consumers by making home care less affordable and increasing the turnover of home care companions due to shorter work shifts, without increasing employee wages. *Id.* The caregiving industry provided detailed and specific evidence establishing that the most likely result of the proposed Rule would be increased institutionalization of elderly and infirm individuals, and/or more expensive, lower quality home care, exactly the opposite of what Congress intended in the statutory exemptions. *Id.* The industry comments further explained that the proposed restriction on the provision of "care" in the new Rule would be utterly impracticable, in as much as the services newly defined by the Department as "incidental" are at the core of companionship in the overwhelming number of home care settings. *Id.*

Nevertheless, the Department proceeded to issue the Final Rule on October 1, 2013, with little change from the proposed Rule. (JA 185) 78 Fed. Reg. 60454 (Oct. 13, 2013). Most pertinent to the present challenge, the Department made final its proposal stating that "[t]hird party employers of employees engaged in companionship services with the meaning of Section 552.6 may not avail

"Companionship Services Exemption Survey," Navigant International (Jan. 11, 2012) (JA 395); and "Economic Impact of Eliminating the FLSA Exemption for Companionship Services," HIS Global Insight (Feb. 21, 2012).

themselves of the minimum wage and overtime exemption provided by section 13(a)(15) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services." Section 552.109(a). The Final Rule further declared that "[t]hird party employers of employees engaged in live-in domestic service employment within the meaning of Section 552.102 may not avail themselves of the overtime exemption provided by section 13(b)(21) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services." Section 552.109(c).

Significantly, the Department did not purport to change the definition of "employee" or any other term appearing in the statutory exemptions in order to achieve the result of excluding employees of third party employers from the Act's exemptions. *Id*. In other words, under the plain language of the statute as interpreted by the new Rule, employees of third party employers falling within the provisions of Section 213(a)(15) and 213(b)(21) remain exempt from the overtime requirements of Section 207 of the FLSA, but under the new Rule their employers may not "avail themselves" of these exemptions.

The Department's new Rule did change the definition of "companionship services," albeit with slight differences from the original redefinition proposed in the NPRM. Specifically, the new Rule changed Section 552.6 to redefine

- 16 -

companionship services so as to exclude from that exemption for the first time any "care" services exceeding 20 percent of working hours, regardless of the caregiver's employer. *Id*., at 552.6 (b).  The 20 percent limitation expressly applies to any assistance with "activities of daily living" and/or "instrumental activities of daily living, *i.e.*, the activities which the Administrative Record indicates are the essential elements of companionship care for the overwhelming majority of elderly and disabled consumers. *Id*.

### G.    Proceedings Before the District Court

As noted above, the new Rule was scheduled to go into effect on January 1, 2015.  Plaintiffs filed their complaint challenging the new Rule in June 2014.  (JA 10). Pertinent to this appeal, Plaintiffs' complaint challenged both the third party employer exclusion of Section 552.109 and the definitional exclusion of most "care" functions from the definition of companionship in Section 552.6.  (*Id*.).

In July 2014, the parties agreed by stipulation to file expedited partial cross-motions for summary judgment on the third party employer issue alone. (Dist. Ct. Dkt. #6). In October 2014, while these motions were pending before the district court, the Department issued an announcement in the Federal Register that, due to serious concerns expressed by Medicaid Directors and others regarding the lack of readiness to implement the new Rule, the Department would not seek to enforce

the new Rule for six months beyond the Rule's effective date of January 1, 2015. But the Department refused to delay the effective date of the new Rule, leaving employers exposed to private litigation. 79 Fed. Reg. 60,974-75; *see also* Dist. Ct. Dkt #19. (*See also* JA 32, n.6).

The district court proceeded to rule on the third party employer issue on December 22, 2014, granting Plaintiffs' motion and vacating Section 552.109 of the new Rule. (JA 44). The district court agreed with the plaintiffs that once the Department filled the "definitional gaps" in the statute as to the employee services covered by the exemptions, the plain language and legislative history of the FLSA amendments prohibited the Department from excluding employers from "availing themselves" of the exemptions. (JA 37).

The district court analyzed the legislative history discussed above, including comparison of the companionship exemption with other FLSA exemptions, noting the contrast between the "casual" babysitting exemption and the unrestricted companionship exemption, and relying on the Congressional intent to control the costs of home care for the benefit of elderly and infirm consumers. The district court further relied on the Congressional re-enactment of the FLSA and Congress's repeated amendment of other statutory exemptions without disturbing the Department's longstanding application of the third-party employer rule. The

- 18 -

district court also noted Congress's rejection of repeated efforts to enact legislation overruling the Department's third-party employee exemption subsequent to the *Coke* case (JA 37-39).

As to the *Coke* decision itself, the district court found that the Supreme Court's holding had found the Department's longstanding third-party employment rule to be "valid and binding" and that the Court had not considered the question presented by the present case:

> The Supreme Court did not consider the question with which I am presented by this new rule: whether the Department is authorized to craft a rule which prevents employers from "availing themselves" of the Act's statutory exemptions of their employees in a manner inconsistent with the plain language of Section 213? To the extent the Supreme Court analyzed the statutory language of the exemption (rather than how different regulations interacted with one another), the Court focused on the Department's authority to define statutory terms, which is not the method by which the Department promulgated the new third-party employer regulation here.

(JA 40). For each of the foregoing reasons, as more fully set forth in the court's opinion, the district court found that the Department's exclusion of employers from availing themselves of the Act's statutory exemption of their employees violated the plain language and legislative intent underlying both of the statutory exemptions, and vacated Section 552.109 of the Rule.

Following issuance of the district court's ruling on the third party employer issue, Plaintiffs filed an emergency motion to enjoin enforcement of the redefinition of companionship services contained in Section 552.6 of the new Rule. Section 552.6 was still scheduled to go into effect on January 1, 2015 and had not yet been addressed by the court.  The district court issued a temporary restraining order against implementing Section 552.6 on December 31, 2014 (JA 45) and, following further briefing and argument, granted summary judgment vacating the companionship redefinition as well on January 14, 2015. (JA 61).

As to Section 552.6, the district court found that Congress explicitly delegated authority to the Department to define the term "companionship services;" "but that does not grant it a blank check to do so in a way that contradicts the Act itself." (JA 56). The court further found that "the Department is attempting to issue a regulation that would write out of the exemption the very "care" the elderly and disabled need, unless it were drastically limited in the quantity provided so as to be of little practical use." (*Id*.).  The court therefore found that the new Rule was foreclosed by *Chevron* Step I, though the court alternatively held that the same result would be reached under *Chevron* Step II. (JA 56-57, n.5).

- 20 -

Again, the court reviewed the legislative history, including the fact that Congress repeatedly amended other provisions of the FLSA without disturbing the Department's longstanding definition of companionship. The court further took issue with the Department's selection of 20 percent as the limit on "care" activities under the new Rule "because it had used that number as a limit in other FLSA regulations, 78 Fed. Reg. 60,467-68 – not because of any relationship to clients' needs or the way services are provided." (JA 57, n.6).  Accordingly, the district court vacated the Department's "regulation defining 'companionship services'…." (JA 60, 61).

## V.    SUMMARY OF ARGUMENT

The district court properly vacated the challenged provisions of the new Rule.  The Department's exclusion of third party employers from "availing themselves" of statutory exemptions that apply to their employees is contrary to the plain language of the FLSA and Congressional intent. Congress clearly did not intend to allow the Department to exclude more than 90 percent of eligible employees from the companionship and live-in exemptions. Both the unprecedented method chosen by the Department to achieve its exclusionary objective and the substantive result achieved would, if allowed to stand, arrogate unlawful authority to the Department to rewrite the FLSA's exemptions.

The Department's heavy reliance on *dicta* in the Supreme Court's *Coke* decision is misplaced.  Contrary to the Department's argument, the Court's actual holding in *Coke* was limited to finding "valid and binding" the Department's 1975 rule *exempting* employees of third party employers.  The Supreme Court did not consider or address a rule that for the first time in the history of the FLSA prevents employers from "availing themselves" of a statutory exemption that otherwise applies to their employees.  In addition, the *Coke* Court considered and rejected the contention that Congress intended to exclude all but "casual" companionship caregivers.  The Department's Brief ignores the fact that the statutory exemption limits only babysitters to "casual" employment, while the companionship exemption contains no such limitation.

As the district court and other courts have properly held, Congress's primary objective in creating the companionship exemption was to keep the costs of long term home care affordable for elderly and infirm consumers.  Contrary to the Department's Brief and those of its *amici*, substantial evidence in the Administrative Record demonstrates that the Rule will increase the unfunded costs of home care and/or increase the amount of turnover among caregivers, as their employers are compelled to reduce the length of available shifts in order to avoid paying overtime.  Employee wages will likely be negatively impacted by the

reduction of work hours or by the unwillingness of consumers to pay the increased costs of overtime. Ultimately, more elderly and disabled individuals will be compelled to rely on institutionalized care under the new Rule, frustrating Congress's intent in passing the companionship exemption. For the foregoing reasons, Section 552.109 of the new Rule should also be vacated on the alternative ground that it is arbitrary, capricious, or manifestly contrary to the statute.

The district court also correctly vacated Section 552.6 of the new Rule, which purported to redefine companionship services covered by the statutory exemption, without regard to the caregivers' employers. As the district court held, the Department's delegated authority to define the statute's terms does not grant the Department "a blank check to do so in a way that contradicts the Act itself." (JA 56). The new definition adopted by the Department is again inconsistent with Congressional intent and virtually guarantees that no companionship providers are eligible for the exemption that Congress wrote to remove them from overtime coverage. Finally, the Department fails to defend the arbitrary selection of 20 percent as the limit on "care" activities under the new Rule. As the district court properly held, the number selected by the Department, by the Department's own admission, bears no relationship whatsoever to clients' needs or to the way services are actually provided in the homes of the elderly and infirm.

- 23 -

## VI.    STANDARD OF REVIEW

The Department's new Rule is subject to review under the standards set forth in *Chevron USA, Inc. v. NRDC*, 467 U.S. 837 (1984).  Under *Chevron* Step I, the Court asks "whether Congress has directly spoken to the precise question at issue." *Id*. at 842.  If Congress has spoken, then that is the end of the analysis, and the Court "must give effect to the unambiguously expressed intent of Congress." No deference is shown to the governmental Defendants under this Step.  *Id*.

In applying *Chevron* Step I, this Court has long held that Congressional silence as to a particular delegation of power does not allow a court to "presume a delegation of power" to a federal agency.  *See Railway Lab. Executives Assn. v. National Mediation Board*, 29 F. 3d 655 (D.C. Cir. 1994 (*en banc*) (warning against "presum[ing] a delegation of power from the absence of an express withholding of such power."). *See also American Petroleum Institute v. Environmental Protection Agency,* 706 F. 3d 474 (D.C. Cir. 2013); *Echostar Satellite LLC v. Federal Communications Comm'n,* 704 F. 3d 992 (D.C. Cir. 2013); *American Bar Ass'n v. FTC*, 430 F. 3d 457 (D.C. Cir. 2005).[11]

---

[11] The foregoing citations are merely representative of a long line of authority adhering to this Court's *en banc* refusal to presume a delegation of authority in the *Railway Labor Executives'* case.

As this Court has further observed:  "General rulemaking authority," although facially broad, "does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *Colorado River Indian Tribes v. National Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006). An agency is "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.' " *Id*. at 139-40 (quoting *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994)). *See also National Association of Manufacturers v. NLRB*, 717 F. 3d 947, 966 (D.C. Cir. 2013) (majority concurring opinion).

Under *Chevron* Step II, the Court may defer to the agency's application of the statute, but only if it is a permissible and reasonable construction of the law. 467 U.S. at 844; *see also Public Citizen, Inc. v. HHS*, 332 F.3d 654, 659 (D.C. Cir. 2003) (deference is owed to an agency only if its construction is "reasonable" in light of the statutory text, history, and purpose).

Finally, it is important to note that the challenged rule in this case reverses an agency's interpretation of FLSA exemptions that has been in place for nearly 40 years. In such circumstances the Supreme Court has held that the agency bears the burden to explain and justify its reversal of policy. *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co*., 463 U.S. 29, 41 (1983)

("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."); *see also FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 503 (2009) (requiring agency reversing course to demonstrate to a court's satisfaction that the new policy is "permissible under the statute," that there are good reasons for it," and that "the agency believes it to be better [than the old policy]").[12]

---

[12] In the *Fox* case, the Court held that an agency bears an even higher burden of justification where the reversal "rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." 556 U.S. at 515-16. *See also Perez v. Mortgage Bankers Ass'n*, __ U.S. __ (2015) (reaffirming this holding). As further discussed below, such contradictory facts and reliance interests are present in this case, heightening the agency's burden of justifying its reversal of longstanding policy.

## VII.  ARGUMENT

### A.  THE DISTRICT COURT PROPERLY HELD THAT THE DEPARTMENT'S EXCLUSION OF THIRD PARTY EMPLOYERS FROM "AVAILING THEMSELVES" OF THE STATUTORY EXEMPTIONS EXCEEDS THE DEPART-MENT'S STATUTORY AUTHORITY UNDER THE FLSA.

#### 1.  Contrary To The Department's Brief, The New Rule Conflicts With The Plain Language Of The FLSA.

The district court properly found that the third-party employer exclusion provision of the Department's new Rule, Section 552.109, is in direct conflict with the plain language of the FLSA. There is no statutory authority whatsoever for the Department to deny employers the right to "avail themselves" of exemptions from the Act's overtime requirements that are plainly applicable to the employers' employees.

As noted above, the sole obligation of employers to pay overtime for hours worked over 40 in a week by any of their employees is set forth in 29 U.S.C. § 207. That obligation is unequivocally nullified by Section 213 of Title 29, with respect to "any employee" listed in the exemption provisions thereof.  Therefore, once an employee is identified by the statute as exempt from overtime under

- 27 -

Section 213, no employer of such an employee can be required by the Department to pay overtime to that employee under the provisions of section 207.[13]

In the absence of further Congressional action, the Department does not have any authority to restrict a class of employers from "availing themselves" of an exemption listed in Section 213. Indeed, the word "avail" does not appear anywhere in the FLSA and certainly does not modify any class of employers to whom Section 207 (or 213) applies. Because Section 213 cancels Section 207 in its entirety as to all employers whose employees fall within Section 213's exemptions, employers simply do not have any obligations to pay overtime to any employees who fall within the express provisions of Section 213.

It is true that the exemption of companionship service employees in Section 213(a)(15), though not the live-in exemption under Section 213(b)(21), authorizes the Department to "define and delimit" the terms of the Section.[14] But Section 552.109 of the new Rule does not define or delimit the term "any employee" or

---

[13] As correctly stated by the district court: "If an employee's work is encompassed within the statutory terms as defined by the regulations, the employer is not obligated to pay overtime and/or minimum wage." (JA 37).

[14] The Department claims that its new Rule is an exercise of the authority delegated by this provision of Section 213(a)(15), while ignoring the absence of any such authority in Section 213(b)(21). 78 Fed. Reg. at 60481.

any other term used in Section 213(a)(15).  As the district court properly held, the Department was only authorized to define the statutory terms contained in the exemptions, and that is "not the method by which the Department promulgated the new third-party regulation here." (JA 15).

As this Court has further held, an agency is "bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *Colorado Indian River Tribes, supra*, 466 F.3d at 139; *see also Hearth, Patio & Barbecue v. U.S. Dept. of Energy*, 706 F. 3d 499, 506-7 (D.C. Cir. 2013) ("Congress employed specific statutory mechanisms to circumscribe [the agency's] authority....[The agency] cannot now escape these limits through "linguistic jujitsu."). The Department's Brief cites no precedent for its attempt to exclude a category of employers from availing themselves of access to any statutory exemption without express Congressional authorization under the FLSA.[15]  The means by which the Department is attempting to exclude employers from the exemption in the new Rule therefore

---

[15] As noted above and in the district court's decision (JA 37-38), the only instances in which categories of employers have been excluded from coverage in the past, under any of the exemptions in Section 213, have occurred through express statutory language.  *See* 29 U.S.C. 213(a)(3), 29 U.S.C. 213(b)(3), 29 U.S.C. 207(i).

appears to be unprecedented in the 76-year history of the FLSA, a fact which should cast further doubt on the Department's claim of statutory authorization for its new Rule.

The issue presented by the Department's faulty Rule is one of substance, as the district court properly found. If the Department is allowed to start choosing categories of employers who can be prevented from availing themselves of the Act's exemptions without Congressional authorization, the careful balance of exemptions established by Congress under the Act will be destabilized, and the authority of the Department will know no limits. *See Railway Executives, supra*, 29 F. 3d at 671 (holding that allowing agencies to "enjoy virtually limitless hegemony" is "a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well").

As further explained below, even if the Department had attempted to redefine the statutory term "any employee" to exclude employees of third party employers, the Rule would have violated the plain language of the Act. But the Court need not reach that question because the Department attempted an unprecedented "end run" around the statute that cannot be permitted of any administrative agency. The district court's order should therefore be affirmed on this ground alone.

- 30 -

## 2.     The Department's Reliance On The Supreme Court's *Coke* Decision Is Misplaced.

The Department's claim of broad authority to exclude third party employers from the Act's home care exemptions relies heavily on *dicta* from the Supreme Court's decision in *Long Island Care at Home Ltd. v. Coke*, 551 U.S. 158 (2007). In so relying on the Court's ruling in *Coke*, however, the Department in effect turns on its head the actual holding in the case.  As stated at the outset of the Court's opinion: "The question before us is whether, in light of the statute's text and history, … the Department's [then-current] regulation is valid and binding. We conclude that it is."  The Court thus only considered the validity and binding nature of the previous, current rule, *i.e.*, the rule that <u>included</u> employees of third party employers within the statutory definition of companion employees under Section 213(a)(15).  The Court found this rule to be both valid and binding. *Id*.

As noted by the district court, the Supreme Court in *Coke* was <u>not</u> asked to review, and did not consider, the question presented by the new Rule, which is whether the Department is authorized to issue a rule that prevents employers from availing themselves of the Act's statutory exemptions of their employees in a manner inconsistent with the plain language of Sections 207 and 213 of the Act. The *Coke* Court's discussion of the "gaps" in the statutory language, in the limited circumstances of that case, does not bear the weight ascribed to it by the

- 31 -

Department. All of the Court's comments were made in the context of reviewing the regulation that was before it - a regulation that exclusively defined the scope of the exemption of employees under 213(a)(15).

In that limited context, the Court declared that the statutory language of that provision "instructs the agency to work out the details" of the broad definitions of employees covered by the exemption. *Id.* at 167. The Court added: "And whether to include workers paid by third parties within the scope of the definitions is one of those details" and asked a series of rhetorical questions that the Department could consider in defining the scope of covered employees. *Id.* Again, by this language, the Court remained focused on the inclusion of *employees* under the statutory exemption; the Court did <u>not</u> consider or authorize the Department to exclude *employers* from availing themselves of a statutory exemption that otherwise applies to their employees.

It is also significant that the *Coke* case did not address at all the exemption for live-in domestic employees in Section 213(b)(21), nor did the Department's explanation for the new Rule cite any statutory authorization for excluding employers from availing themselves of this entirely separate exemption of their employees. 78 Fed. Reg. 60454 (JA 185). The Department's Brief offers no explanation for the live-in employer exclusion either.  But in any event it is well

- 32 -

settled that agency rules must be reviewed solely on the basis of the explanations that the agency itself has provided in the rulemaking, not the *post hoc* rationalizations of agency counsel. *See Hearth, Patio & Barbecue Assn. v. United States Dept. of Energy*, 706 F. 3d 499, 509 (D.C. Cir. 2013) (rejecting explanation of agency counsel not proffered by the agency during the rulemaking process); *Consumer Federation of America v. Dept. of Health and Human Services*, 83 F. 3d 1497, 1507 (D.C. Cir. 1996). Having provided no explanation for departing from the plain language of Section 13(b)(21), the Department's exclusion of third party employers from availing themselves of access to this exemption must certainly be vacated, as the district court properly held.

> **3.     The New Rule Conflicts With The Legislative History Of The FLSA.**

As the district court also correctly found, Congress well understood what language was needed to exclude application of the exemption to third-party employment; yet Congress chose <u>not</u> to exclude any employers from the exemption in the Act. By contrast, in several other exemption provisions of Section 213, Congress limited the classes of employers whose employees could fall within the exemption. *See, e.g.*, 29 U.S.C. § 213(a)(3) (exemption for "any employee employed by an establishment which is amusement or recreational establishment, organized camp, or religious or non-profit education conference center"); 29

- 33 -

U.S.C. § 213(b)(3) ("any employee of a carrier by air"); 29 U.S.C. 207(i) ("any employee of a retail or service establishment"). Again, Congress included no similar restriction of the class of employers whose employees are exempt under Section 213(a)(15) or 213(b)(21).

Contrary to the Department's Brief and those of its *amici*, Congress did not similarly limit the scope of the companionship services or live-in domestic services exemptions because the purpose of these exemptions was to keep such services affordable for the families of the elderly and disabled, regardless of the identity of the employer of the service providers. Numerous statements in the Congressional Record establish this Congressional intent. *See* 119 Cong. Rec. 24,797 (1973) (statement of Sen. Dominick); *Id*. at 24,798 (statement of Sen. Johnston); *Id*. at 24,801 (statement of Sen. Burdick). Conversely, there were <u>no</u> statements in the Congressional record that the issue of affordability was limited to situations where caregiving was paid for directly to the employee rather than through a third party employer. Thus, the legislative history of the companionship exemption shows that Congress created it in order "to enable guardians of the elderly and disabled to financially afford to have their wards cared for in their own private homes as opposed to institutionalizing them." *See Welding v. Bios Corp*., 353 F. 3d 1214, 1217 (10th Cir. 2004).

- 34 -

Contrary to its current position, the Department itself has acknowledged that eliminating the exemption for third party employers will "dramatically increase" the cost of companionship services. *See Long Island Care at Home Ltd. v. Coke*, Brief for the United States as *Amicus Curiae*, Docket No. 06-593 (U.S. 2007) (citing public statements of the Small Business Administration and the Department of Health and Human Services). In the same Supreme Court brief, the Department declared that excluding third party employers from the overtime exemption would disrupt service to the elderly and disabled due to the increased need of providers to limit workers to 40 hours of work each week in order to control costs. "Such difficulties would lead to increased institutionalization, which is contrary to government policy." *Id*. Finally, the Department's Supreme Court *amicus* brief observed that requiring third party employers to pay overtime to companionship employees would in effect eliminate the exemption for the overwhelming majority of employees previously covered by the exemption – as high as 98%. *Id*.[16] Such a drastic reduction in the scope of the exemption is again inconsistent with Congressional intent as the district court properly held.

---

[16] In the district court proceeding, the Department conceded that more than 90% of all home care employees would be removed from their previously exempt status by the new Rule. (JA 41).

- 35 -

These and similar arguments persuaded the Supreme Court in *Coke* that the legislative history did not support the Department's current claim that Congress somehow intended to limit the exemption to exclude those employees who are employed by third parties or that the industry had so significantly changed from its 1975 form as to depart from Congress's original intent. As noted above, Supreme Court Respondent Evelyn Coke made almost exactly the same arguments regarding the legislative history that the Department is now making in support of the new Rule. [17]   But the Supreme Court rejected Coke's (and now the Department's) reading of legislative history, flatly stating: "We do not find these arguments convincing." *Id*., 127 S. Ct. at 2346.

Finally, as the district court found, it is significant that Congress has amended the FLSA on numerous occasions since the promulgation of the Department's longstanding rules recognizing the exemption of companionship and/or live-in employees of third party employers. *See, e.g*., Act of Dec. 9, 1999,

---

[17] Respondent Coke's Supreme Court filings pointed to the supposed overall purpose of the 1974 Amendments to extend FLSA coverage, and that the FLSA previously covered companionship workers employed by third party employers large enough to qualify as "enterprises." *Id*. 127 S. Ct. at 2346-7.  Coke likewise highlighted statements made by some members of Congress distinguishing between "professional domestics" and mere family members or neighbors, as well as language in a different statute (the Social Security Act) which defines "domestic service employment" differently from the FLSA.  Each of these arguments has been repeated by the Department as its primary justification for the new Rule.

Pub. L. No. 106-151, § 1, 113 Stat. 1731; Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 2105(a), 110 Stat. 1755, 1929. (JA 35). Notwithstanding such amendments, during the past four decades Congress has never expressed any disagreement with the Department's previous rules, even when the third party exemptions gained heightened visibility after the Supreme Court's approval of them in the *Coke* case. Since that ruling, as the district court further noted, Congress has specifically considered and rejected legislation seeking to overrule the Supreme Court's decision by excluding third party employers from the FLSA home care exemptions. *See* "The Fair Home Health Care Act of 2007, H.R. 3582 and S. 2062 (110th Cong. 2007); "The Direct Care Job Quality Improvement Act of 2011," H.R. 2341 and S. 1273 (112th Cong. 2011); and "The Direct Care Workforce Empowerment Act of 2013," H.R. 5902 and S. 3696 (113th Cong. 2013). [18]

---

[18] The Congressional *amici* supporting the Department disingenuously claim that Congress's rejection of the repeated efforts to legislative overturn the Department's longstanding rule after Coke should not be interpreted as endorsing the rule itself but should be read only as an endorsement of delegating authority to the Department to decide which employees should be exempt under the Act. Cong. *Amici* Br. at 13. The plain language of the bills that Congress refused to pass, which would have excluded third party employers from access to the companionship exemption, plainly belies such a limited purpose.

Both the Supreme Court and the D.C. Circuit have repeatedly held that Congressional re-enactment of a statute without pertinent change to an agency's longstanding interpretation of it is "persuasive evidence that the interpretation is the one intended by Congress."  JA 41-42, citing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986), quoting *NLRB v. Bell Aerospace v. NLRB*, 416 U.S.267, 274-75 (1974).  *See also Sebelius v. Auburn Regional Med. Ctr.,* 133 S. Ct. 817, 827 (2013); *Altman v. SEC*, 666 F. 3d 1322, 1326 (D.C. Cir. 2011); *Creekstone Farms Premium Beef, LLC v. Department of Agriculture*, 539 F. 3d 492 (D.C. Cir. 2008).

The Department's Brief does not challenge the applicability of the cases cited by the district court, which must therefore be deemed to be conceded. Instead, the Department relies on a <u>dissenting opinion</u> (without properly identifying the opinion as such) in the case of *Schweiker v. Chilicky*, 487 U.S. 412, 440 (1988), for the proposition that congressional inaction is a poor indication of congressional intent. (Dept. Br. at 33).[19]  In any event, the present case involves Congressional *action*, not mere inaction, both in amending other provisions of the FLSA numerous times since 1974 and in specifically rejecting efforts to overturn

---

[19] The majority holding in *Schweiker* actually supports the district court's decision here, as it counsels "judicial deference to indications that congressional inaction has not been inadvertent." 487 U.S. at 423.

the longstanding Department rule since 2007. As the district court held, such action

constitutes persuasive evidence of Congressional intent. [20]  For this reason as well,

the Department's previous and still-current rule allowing employees of third party

employers to be exempt from overtime under the FLSA must be deemed to reflect

Congressional intent, and the Department's new Rule must be set aside as contrary

to that intent.

### 4. The New Third-Party Employer Exclusion Also Fails To Survive Scrutiny Under *Chevron* Step II Or The Arbitrary and Capricious Standard.

Even if the new Section 552.109 could be found to be consistent with the

plain language and legislative intent underlying the FLSA, which it cannot, the

Rule should still be set aside under *Chevron* Step II and/or the arbitrary and

capricious standard of the APA.  Specifically, the total exclusion of third party

employers from availing themselves of access to the companionship and live-in

---

[20] Some of the *amici* mistakenly rely on occasional decisions of this Court that have failed to find Congressional ratification of prior agency rulings. *See, e.g.*, Cong. *Amici* Br. at 14.  Such cases are distinguishable on their facts, and typically involve instances where Congress has not revisited a statute after the agency's initial ruling, or has not rejected specific legislation relating to the agency ruling, or where the agency has not issued an express ruling on the issue at all. All of these facts are present here, compelling application of the above cited rulings of the Supreme Court and this Court which strongly support the district court's finding of legislative intent.

exemptions cannot be a permissible construction of the Act; and the Department has also failed to provide an adequate justification for reversing four decades of policy interpreting the Act, as required by the Supreme Court's holdings in *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983).[21]

As further noted above, the Supreme Court has held federal agencies to a higher burden of justifying reversals of longstanding policies where such reversals "rest upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. In such cases, … a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox TV Stations, Inc.*, 556 U.S. at 515-6. In the present case, the Department's reversal of policy certainly rests upon factual findings regarding Congressional intent that are inconsistent with Departmental findings underlying

---

[21] Under *State Farm*, an agency action is deemed to be arbitrary and capricious if any of the following are met: (1) the agency relied on factors which Congress has not intended it to consider; (2) the agency entirely failed to consider an important aspect of the problem; (3) the agency offered an explanation for its decision that runs counter to the evidence; or (4) the agency's explanation is so implausible that it could not be ascribed to agency expertise. *See Association of Private Colleges v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012). Here, all of these factors support a finding of arbitrary and capricious agency action.

- 40 -

the current rules. Also inconsistent are the Department's findings of supposed changes in the home care industry.  In addition, numerous industry comments in the Record, including those of the Plaintiffs, attest to the substantial reliance by home care businesses on the longstanding overtime exemptions which the new Rule has arbitrarily discarded after four decades. (JA 293, 328, 335, 395). Therefore, the Department was required to do more to justify its policy reversal in this case than occurred in the presently challenged rulemaking.

The primary justification given by the Department for the change is that the current regulations somehow "no longer align with Congress's intent when it extended FLSA protections to domestic service employees" as a result of "changes to the home care services industry, the home care services workforce, and the scope of home care services provided" since 1974. 78 Federal Register at 60455. There are thus two components to the Department's purported justification for the new Rule: (1) the claim that Congress did not intend to exempt employees of third party providers when it exempted companionship and live-in services from domestic services covered by the FLSA in 1974; and (2) the claim that the industry has changed so much since 1974 that Congress's previous intent is somehow no longer binding on the Department.  Neither claim can withstand scrutiny.

- 41 -

First, the Department's claim that Congress did not intend to exempt employees of third party employers when it enacted the 1974 amendments, as explained above, is essentially a re-argument of the losing position at the U.S. Supreme Court in the *Coke* case. The Supreme Court has already rejected the Department's arguments on Congressional intent, and no purpose is served by revisiting those arguments here. It is important to recognize, however, the false premise on which the Department's overall justification for the new Rule is based: the idea that the 1974 amendments were intended by Congress to exempt only those employees whose performance of companionship services was not a "vocation." 78 Fed. Reg. at 60481. Again, the Supreme Court rejected that reading of Congressional intent, and it is impermissible for the Department to rely on that erroneous and judicially rejected view of Congressional intent as its primary basis to change the Rule. *State Farm*, 463 U.S. at 41.

In addition, it must be recalled that the Supreme Court issued its decision in *Coke* in 2007, a mere four years before the Department issued its NPRM proposing to change the rule that the Supreme Court had just approved, and a mere six years before the Department's adoption of the Final Rule. Though the Department and its *amici* argue at some length that the home care industry has changed in the four decades since the 1974 amendments to the FLSA, the Department nowhere claims

in the Final Rule that the industry has changed in any significant way since the Supreme Court issued its 2007 ruling in *Coke*. This is significant because the Court *rejected* the claim that Congress did not intend its exemption to apply to the home care industry notwithstanding Ms. Coke's and her *amici's* arguments that the industry had undergone its supposed transformation between 1974 and 2007. 551 U.S. at 159. For this reason alone, the new Rule must be deemed to be arbitrary and capricious and set aside.

But even if it were deemed to be acceptable for the Department to consider changes to the home care industry that occurred before the Supreme Court's 2007 decision, the industry changes identified by the Department do not justify the radical decision to exclude all third party employers from availing themselves of the statutory exemption for companionship and live-in domestic employees. Indeed, the industry changes that are decried by the Department in the new Rule are precisely those that Congress intended, *i.e.*, the reduction in institutionalization of the elderly and disabled in favor of increased demand for long-term home care services. 78 Fed. Reg. at 60458.

This shift away from institutionalization has been made possible to a significant extent by the cost controls resulting from the FLSA overtime exemptions. It is irrational for the Department to eliminate the overtime exemption

- 43 -

for the vast majority of all companionship and live-in domestic workers when the evidence in the Administrative Record strongly indicates that this change will make home care less affordable and create a perverse incentive for re-institutionalization of the elderly and disabled.[22] These views were expressed not only by the overwhelming majority of employers commenting on the proposed rule but also by the overwhelming majority of disabled consumers of home care.[23]

The Department and several of its *amici* claim without support that the new Rule will reduce employee turnover due to higher wages. (Dept. Br. at 40-41). But both the Department and its *amici* improperly confuse the issue of overtime with

---

[22] *See* Comments of NAHCH at 11 (JA 345); Comments of NPDA at 5 (JA 332); Comments of IFA at 3 (JA 295); *see also* Navigant Report at 49 (JA 443) ("It is certain … that the demand for institutional care will increase, perhaps substantially."); *See also* the Companionship Exemption Survey Report jointly conducted by NPDA and NAHC, Attached as App. 1 to the Comments filed by NAHC (Reporting that more than 80% of home care providers predict significant cost increases to consumers as a result of the new Rule). (JA 364).

[23] *See, e.g.*, A.R. Comments filed by ADAPT and the National Council on Independent Living (NCIL), the leading national organizations representing the rights of the disabled to live freely and independently. ("[I]t is clear that, although well-intentioned, these changes will have a significant negative impact on people with disabilities and most seriously affect people who have the most significant disabilities, particularly those who rely on Medicaid home and community based services to be independent.").

- 44 -

the issue of wage rates. [24]  Nothing in the new Rule purports to increase employee wage rates, and the claim that the Rule will in any way fulfill that objective is clearly erroneous.

The Department and its *amici* also improperly minimize the *increased* turnover that will result from reduced work hours per shift. Under the new Rule, employers of more than 90% of companionship caregivers will be compelled to cut short the hours worked by their employees in order to avoid overtime costs.[25]  The reduction of work hours that will accompany employer efforts to avoid incurring unfunded overtime costs will necessarily *reduce* employee wages, not increase them.[26]

The new Rule also discriminates against those who need the overtime exemption the most: the elderly and infirm who do not have family members or neighbors available to care for them and are not capable of employing qualified

---

[24] *See* State *Amici* Br. at 9-11; AFL-CIO *Amici* Br. at 12-14; AARP Amicus Br. at 9-14.

[25] *See* Companionship Exemption Survey Report, at p.13. (JA 335).

[26] The Department and some of its *amici* briefs assert without support that "groups" of care workers working shorter shifts will not hurt consumers and/or will reduce Medicaid costs under the new Rule. *See* State *Amici* Br. at 20. These claims fly in the face of the repeatedly expressed demands of disabled consumers, and particularly those families dealing with the need for continuity of care in dementia cases. *See* A.R. Comments of ADAPT and NCIL.

- 45 -

companionship caregivers on their own.  Under the new Rule, such individuals will be compelled to seek institutional care because they will be less likely to find third party employers who can provide them with home care on an affordable basis.

In ignoring the substantial evidence of adverse impact that will befall vulnerable consumers of home care services under the new Rule, the Department and some of its *amici* have heavily relied on the absence of data showing such increased institutionalization in the few states that currently require overtime payments to home care employees under their state laws. (Dept. Br. at 19-20, 40).  *See also* 78 Fed. Reg. at 60842-43.  According to the Department's Brief, there are 15 states that currently require "minimum wage and overtime protections to all or most third party-employed home care workers." *Id*. at 19-20, citing 78 Fed. Reg. 60842.  But this claim is incorrect. Only four of the states listed (Maine, Maryland, Massachusetts, and New Jersey) already require payment of overtime to both companion employees and live-in domestic employees.  Other states relied on by the Department either currently make exemptions for live-in caregivers employed by third parties (who the Department's new Rule does <u>not</u> exempt), or else such states impose much less onerous overtime requirements generally.  These less onerous states include Michigan, which appears to be the only state reporting

actual impact data. It was clear error for the Department to rely on that state's small sample in claiming no adverse impact from the new Rule.[27]

Finally, the arbitrary nature of the new Rule is exemplified by the failure of the Department to insure that adequate funding will be available from such sources as Medicaid to avoid disruption of essential services to elderly and disabled consumers. The Department and its *amici* acknowledge that Medicaid is a vital source of funding without which many consumers cannot afford home care; and that states currently save more than $50 billion annually by providing Medicaid services through home care rather than institutional treatment.[28] In a majority of states, however, no provision has been made to increase Medicaid funding to cover the increased costs associated with the new Rule, as the Department acknowledged

---

[27] *See* Michigan Compiled Laws Section 408.420(2)(a) (contrary to the Department's finding, Michigan continues to exempt live-in domestic employees from its state overtime requirements). The Department also ignored testimony in the Administrative Record from an actual third party home care provider who testified to the numerous adverse impacts of the Michigan law. Statement of Wynn Esterline Before the House Committee on Education and the Workforce, March 20, 2012, attached as Exhibit to A.R. Comments of Husch Blackwell dated March 21, 2012. It should also be noted that Michigan already has one of the highest ratios of institutionalized to home cared populations in the country, making it a poor test for the impact of the new Rule. http://centerondisability.org/ada_parc .

[28] State *Amici* Br. at 20.

in its October 14, 2014 announcement delaying enforcement of the new Rule. (JA 32).[29]

The Department and its *amici* blithely assert that the unresolved Medicaid funding problem is not at issue in the present case; but they are wrong. The failure of the Department to insure that state Medicaid funding is available to cover the increased costs of the new Rule, so as to prevent the disruption of services intended by Congress to be kept affordable to consumers, compels a finding that the new Rule is arbitrary and capricious. *State Farm*, 463 U.S. at 41 (failure of the agency to address an important aspect of the problem).

Thus, the new Rule's asserted justifications for overturning the Department's longstanding policy exempting employees of third party employers, notwithstanding Congress's intent to cover such employees and the chaos that will result in an industry that has performed a valued service to consumers who greatly

---

[29] As noted above, the National Association of Medicaid Directors (NAMD) wrote to the Department requesting postponement of the effective date of the new Rule by an additional 18 months. 79 Fed. Reg. 60,974-75. The Department agreed to delay enforcement, but arbitrarily refused to delay the effective date of the Rule. The issues raised by the NAMD and various state agencies and consumer groups have not been addressed during the intervening time period and little if any provision has been made to increase state funding of the increased costs that will result from the new Rule. *See* Dist Ct. Dkt. #23, Ex. 6 (Aff. Of Kansas Secy. of Dept. For Aging And Disability Services).

need it, violates the Supreme Court's arbitrary and capricious standards. The new Rule should be vacated for the additional reasons set forth above.

## B.     THE DISTRICT COURT ALSO PROPERLY HELD THAT THE DEPARTMENT'S  REDEFINITION OF COMPANION-SHIP SERVICES EFFECTIVELY REPEALS THE STATUTORY EXEMPTION.

The district court properly recognized that Congress delegated to the Department the authority to "define and delimit" companionship services, unlike the exclusion of third party employers addressed in the previous discussion above. Nevertheless, as the district court also correctly found, the Department's purported redefinition of companionship services in Section 552.6 so far exceeds the scope of Congressional authority and legislative intent as to violate the Act's plain language under *Chevron* Step I.   Alternatively, the Department's radical change to the definition of companionship services in Section 552.6 is not a permissible construction of the Act under *Chevron* Step II and is arbitrary and capricious within the meaning of the APA.   Simply put, Congressional authorization to an agency to "define and delimit" statutory terms does not constitute Congressional license to do away with the statutory language altogether.   That is what has occurred in the new Rule.

- 49 -

### 1.     The New Definition Of Companionship Services Violates The Act's Plain Language And Legislative Intent

As discussed above and in the district court's opinion, the FLSA makes clear that the companionship exemption in Section 213(a)(15) applies to: "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) ***are unable to care for themselves***…." (emphasis added).   Contrary to the Department's Brief, the exemption's express inclusion of "care" as a core purpose of companionship services directly conflicts with the Department's mischaracterization of care as merely "incidental" activity, and specifically conflicts with the Department's arbitrary narrowing the exemption of caregiving to 20 percent of caregivers' working hours in the new Section 552.6.

The legislative history confirms that "care" for those who are "unable to care for themselves" was an integral part of what was contemplated in creating the companionship exemption.   As Senator Burdick stated during the debates on the exemption: "When the Senator uses the word "companion," the Senator does not mean that in the ordinarily accepted sense that they are there to make them feel good.  **They are there to take care of them**, he means when he uses the word "companion."119 Cong. Rec. 24,801 (emphasis added).  *See also, e.g., Sayler v.*

*Ohio Bureau of Workers' Comp*., 83 F. 3d 784, 787 (6th Cir. 1996) (holding that a worker who helps an infirm individual dress, bathe, and get around the home is providing companionship services); *Cook v. Diana Hays and Options, Inc*., 212 F. Appx., 295, 296-7 (5th Cir. 2006) (holding that a direct care worker who assisted in the home with "eating, baths, and teeth brushing, and accompanied the client to doctors and grocery stores was providing exempt services); *see also McCune v. Oregon Senior Servs. Div*., 894 F. 2d 1107, 1108-09 (9th Cir. 1990); *Fowler v. Incor*, 279 F. App'x 590, 596 (10th Cir. 2008).

According to the Department's new definition, the types of "care" that exempt companionship caregivers will now be restricted from providing will be all those services necessary to assist the person with "activities of daily living" and "instrumental activities of daily living." 29 C.F.R. 552.6 (b). These are the precise types of services that the vast majority of caregivers are employed to provide to elderly and disabled individuals in their homes on a regular basis, far in excess of 20 percent of the time. As such, according to substantial evidence in the Administrative Record, the Department's modified definition of companionship will eradicate the application of the statutory exemption for an overwhelming percentage of the workers in the home care industry, including those employed

directly by families who are least able to afford to pay for overtime.[30]   The Department's Brief does not contest the district court's finding that the types of care now relegated to incidental status by the new Rule are services that most elderly and disabled consumers need most, far in excess of 20 percent of the time. (JA 57).

In attempting to justify its new definition of companionship, the Department's Brief mischaracterizes the legislative history of the exemption in a variety of ways.   First, the Department's Brief conflates legislative references to incidental "household work" with the unrelated core requirement of "care." Indeed, in virtually every instance in which a legislator or committee report referred to an activity as "incidental," the activity described is "household work" and not the "care" which has long been understood to be a core function of companionship services.   119 Cong. Rec. 24,797 (Statement of Sen. Dominick); 119 Cong. Rec. 24,801 (statement of Sen. Williams)).[31]

---

[30] *See, e.g.*, IFA Comments at 9-10 (JA 301-302) (Explaining that the excluded tasks as re-defined by the Department "are so broad that they render the exemption useless for any type of employer, even for individuals employing companions to care for their loved ones (or themselves)").

[31] This distinction is evident in the colloquy between Senators Burdick and Williams. Senator Burdick asks Senator Williams to confirm that "companions"

Other instances of legislative history relied on by the Department's Brief and those of its *amici* fail to support the revised definition of Section 552.6, because they deal only with Congressional intent not to exempt services performed by "trained personnel such as nurses." (Dept. Br. at 8, citing Senate Report at 20). This is not the issue Plaintiffs are challenging in this case. Nowhere does the Department's Brief cite a statement by any Congressman treating as non-exempt any caregiver who is providing <u>non</u>-professional home "care." Moreover, trained nurses do not normally perform the core functions of companionship. Certainly, the ADLs of "dressing, grooming, feeding, bathing, toileting, and transferring" are not typically performed by nurses, and nursing activities are simply not at issue in the challenged provision of the new Rule.

It should also be noted that the district court correctly applied the legislative reenactment doctrine to the new Section 552.6, just as he did in vacating Section 552.109. (JA 58-59).  Congress's repeated amendment of the FLSA, combined with its refusal to pass bills expressly excluding the same types of care from the exemption as the new Rule would exclude now, makes an equally compelling case of Congressional intent to preserve the Department's longstanding previous

---

are "to take care of" [the infirm].  To which Senator Williams responds that they are not there to do "housework."  119 Cong. Rec. 24,801.

interpretation of the exempt job duties for companionship services, including caregiving. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275 (1974) (Congressional action in the face of longstanding agency interpretation constitutes persuasive evidence of Congressional intent).

### 2.     The New Companionship Definition Is Arbitrary And Capricious

The Department cannot (and does not) deny that its new definition of companionship constitutes a drastic reversal of longstanding recognition of ADL and IADL caregiving as a core element of companionship. Under the Supreme Court's holdings in *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 41 (1983); and *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 503 (2009), such a reversal can only be upheld if the Department meets a heightened standard of justification for changing positions.[32]

---

[32] This is particularly so because the Department's reversal "rests upon factual findings that contradict those which underlay its prior policy;" and because the Department's prior policy has engendered serious reliance interest that must be taken into account." "In such cases,…a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox TV*, 556 U.S. at 515-16.

Under *State Farm*, as discussed above, an agency action is deemed to be arbitrary and capricious if any of the following are met: (1) the agency relied on factors which Congress has not intended it to consider; (2) the agency entirely failed to consider an important aspect of the problem; (3) the agency offered an explanation for its decision that runs counter to the evidence; or (4) the agency's explanation is so implausible that it could not be ascribed to agency expertise. *See Association of Private Colleges v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012). Here, all of these factors support a finding that the Department's exclusion of 80% of home caregivers' non-professional "care" activities from the definition of companionship constitutes arbitrary and capricious agency action.

In the present case, the Department's reversal of policy certainly rests upon factors that Congress did not intend the Department to consider, specifically the erroneous and now discredited claim that Congress intended all along to limit the exemption to "casual" companions who did not make caregiving their "vocation." The Department makes no significant findings that caregiver job duties have changed under the previous rule. And if the Department truly felt that caregivers activities had become overly professionalized, then the Department should have focused the new restrictions on those "professional" activities, not the broader ADL and IADL activities that the Rule so severely restricts without any

- 55 -

justification at all. The Department's attempt to remove the exemption from the core, <u>non</u>-professional duties that caregivers have always performed, and that Congress intended to exempt from overtime, thus runs "counter to the evidence" within the meaning of *State Farm*.[33]

The Department does not contest the district court's finding that the Department's selection of a 20 percent limit was unrelated to any finding as to the actual amount of time caregivers spend performing ADL and IADL services in the home. (Dept. Br. at 46-48).[34] The new Rule instead applies an arbitrarily selected percentage limitation solely because the same number was used for totally different purposes and/or for unrelated FLSA regulations. As the district court properly held, it is inherently arbitrary for the Department to impose a numerical limitation on caregiving without any analysis of the actual percentage of time that caregivers

---

[33] The Department's Brief (at p. 46) contends that "it does not matter that many workers in the modern home care industry devote more than 20% of their time to tasks that, under the amended regulation, are not companionship services." The Department thereby ignores the fact that these non-professional care services have *always* been provided by employees considered to be exempt under the statute since 1974.

[34] As the district court found: "The Department, apparently, chose 20 percent as the limit because it hadused that number as a limit in other FLSA regulations, 78 Fed. Reg. 60,467-68-not because of any relationship to clients' needs or he way services are provided." (JA 57).

must spend in assisting the elderly and infirm with their vital ADL and IADL needs.[35]

The Department claims that its radical narrowing of the companionship definition is justified by the growth of the home care industry that "neither Congress nor the Department predicted." (Dept. Br. at 47).   Ignored in the Department's Brief is that the growth of home care and reduced institutionalization was exactly what Congress intended in passing the companionship exemption, with the stated goal of keeping home care affordable for elderly and infirm consumers. At a time when all interested parties concede that the growth of the home care industry is serving the best interests of consumers, the Department has given no adequate justification for attempting to destroy the industry's successful caregiving model, which is what the new Rule threatens to do.

Also contrary to the Department's Brief, the job duties of home care service providers are largely the same today as they were in 1974 (and 2007). Regardless of their hours of work, home care and live-in employees continue to provide "fellowship, care, and protection" for people who are physically or mentally

---

[35] *See also National Ass'n of Clean Water Agencies v. EPA,* 734 F. 3d 1115, 1153 (D.C. Cir. 2013) ("[A]n agency is not allowed to pluck a number out of thin air when it promulgates rules in which percentage terms play a critical role.").

infirm, just as they always have. There is thus no rational connection between the asserted justification for the new Rule (growth in the home care industry) and the Rule itself (excluding the vast majority of caregiving companions from the companionship overtime exemptions).

The district court was absolutely right in finding that the Department looked at only "one side of the coin" in promulgating its new Section 552.6. The court also correctly held that the Department's evident policy disagreement with Congress is an improper ground to allow the agency to administratively rewrite a statutory exemption. The new Rule is both an impermissible construction of the Act and is arbitrary and capricious and should be vacated on these grounds, should it somehow be found to pass muster under *Chevron* Step I.

## VIII. CONCLUSION

For all the foregoing reasons, as well as those set forth in the district court's opinions vacating the new Rule, the district court's decision should be affirmed and the challenged provisions of the new Rule should be vacated.


Respectfully submitted,


*/s Maurice Baskin*


Maurice Baskin
LITTLER MENDELSON, P.C.
1150 17th Street N.W.
Suite 900
Washington, DC  20036
202.842.3400
mbaskin@littler.com

William Dombi
Center for Health Care Law
228 Seventh St., S.E.
Washington, D.C. 20003
202.547.5262
wad@nahc.org


Attorneys for Plaintiffs-Appellees

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman font.  I further certify that this brief complies with the type-volume limitations set forth in Fed. R. App. 32(a)(7)(B), because it contains 13,252 words, excluding exempt material according to the count of Microsoft Word.

*/s/ Maurice Baskin*

Attorney for Plaintiffs-Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2015, a copy of the foregoing Brief has been filed electronically on the Court's CM/ECF system.  I understand that notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system.

*/s/Maurice Baskin*

Attorney for Plaintiffs-Appellees

# STATUTORY AND REGULATORY ADDENDUM*

A-2    Fair Labor Standards Act Provisions

A-3    1975 (Current) Rules Implementing the Home Care Exemptions

A-4    The New Rule

**\*        Pertinent excerpts of provisions cited in the foregoing brief**

## Fair Labor Standards Act Provisions

**29 U.S.C. § 207(a)**

No employer shall employ any of his employees [engaged in commerce] … for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

**29 U.S.C. § 207(*l*)**

(*l*) Employment in domestic service in one or more households

No employer shall employ any employee in domestic service in one or more households for a workweek longer than forty hours unless such employee receives compensation for such employment in accordance with subsection (a) of this section.

**29 U.S.C. § 213(a)(15)**

(a) Minimum wage and maximum hour requirements

The provisions of section 206 (except subsection (d) in the case of paragraph (1) of this subsection) and section 207 of this title shall not apply with respect to—
***
(15) any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary); ….

**29 U.S.C. § 213(b)(21)**

(b) Maximum hour requirements

The provisions of section 207 of this title shall not apply with respect to--***

(21) any employee who is employed in domestic service in a household and who resides in such household; ….

**Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 29(b), 88 Stat. 55, 76**

[O]n and after the date of the enactment of this Act the Secretary of Labor is authorized to prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act.

### 1975 (Current) Rules Implementing the Home Care Exemptions

### § 552.6 Companionship services for the aged or infirm.

As used in section 13(a)(15) of the Act, the term *companionship services* shall mean those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work: *Provided, however,* That such work is incidental, *i.e.,* does not exceed 20 percent of the total weekly hours worked. The term "companionship services" does not include services relating to the care and protection of the aged or infirm which require and are performed by trained personnel, such as a registered or practical nurse. While such trained personnel do not qualify as companions, this fact does not remove them from the category of covered domestic service employees when employed in or about a private household.

### § 552.109 Third party employment.

**(a)** Employees who are engaged in providing companionship services, as defined in § 552.6, and who are employed by an employer or agency other than the family or household using their services, are exempt from the Act's minimum wage and overtime pay requirements by virtue of section 13(a)(15). Assigning such an employee to more than one household or family in the same workweek would not defeat the exemption for that workweek, provided that the services rendered during each assignment come within the definition of companionship services.

- 3 -

**(b)** Employees who are engaged in providing babysitting services and who are employed by an employer or agency other than the family or household using their services are not employed on a "casual basis" for purposes of the section 13(a)(15) exemption. Such employees are engaged in this occupation as a vocation.

**(c)** Live-in domestic service employees who are employed by an employer or agency other than the family or household using their services are exempt from the Act's overtime requirements by virtue of section 13(b)(21). This exemption, however, will not apply where the employee works only temporarily for any one family or household, since that employee would not be "residing" on the premises of such family or household.


**The New Rule**

**29 C.F.R. 552.6 Companionship services**

(a) As used in section 13(a)(15) of the Act, the term companionship services means the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself. The provision of fellowship means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events. The provision of protection means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being.

(b) The term companionship services also includes the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek. The provision of care means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care).

- 4 -

(c) The term companionship services does not include domestic services performed primarily for the benefit of other members of the household.

(d) The term companionship services does not include the performance of medically related services provided for the person. The determination of whether services are medically related is based on whether the services typically require and are performed by trained personnel, such as registered nurses, licensed practical nurses, or certified nursing assistants; the determination is not based on the actual training or occupational title of the individual performing the services.

## 29 C.F.R. § 552.109 Third party employment

(a) Third party employers of employees engaged in companionship services within the meaning of § 552.6 may not avail themselves of the minimum wage and overtime exemption provided by section 13(a)(15) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption, if the employee meets all of the requirements of § 552.6.

(b) Employees who are engaged in providing babysitting services and who are employed by an employer or agency other than the family or household using their services are not employed on a "casual basis" for purposes of the section 13(a)(15) exemption. Such employees are engaged in this occupation as a vocation.

(c) Third party employers of employees engaged in live-in domestic service employment within the meaning of § 552.102 may not avail themselves of the overtime exemption provided by section 13(b)(21) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption.