[Oral Argument scheduled for May 7, 2015]

**Case No. 15-5018**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Home Care Association of America, *et al.*,
*Plaintiffs-Appellees*

v.

David Weil, Administrator, Wage & Hour Division, *et al.*,
*Defendants-Appellants*

---

**BRIEF OF THE STATES OF KANSAS, ARIZONA, GEORGIA,
MICHIGAN, NEVADA, NORTH DAKOTA, TENNESSEE, TEXAS AND
WISCONSIN IN SUPPORT OF AFFIRMING THE DISTRICT COURT**

---

On Appeal from the United States District Court
for the District of Columbia (Case No. 1:14-cv-00967-RJL)

---

DEREK SCHMIDT
Kansas Attorney General
JEFFREY A. CHANAY
Chief Deputy Attorney General
DWIGHT R. CARSWELL
Assistant Solicitor General
TOBY CROUSE
Special Assistant Attorney General
*Counsel of Record*
Memorial Hall
120 SW 10th, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Email: jeff.chanay@ag.ks.gov
Email: dwight.carswell@ag.ks.gov
Email: tcrouse@foulston.com
**Counsel for Amicus Curiae**

[Additional counsel listed on inside cover]

# ADDITIONAL COUNSEL

**MARK BRNOVICH**
Attorney General of Arizona

**SAMUEL S. OLENS**
Attorney General of Georgia

**BILL SCHUETTE**
Attorney General of Michigan

**ADAM PAUL LAXALT**
Attorney General of Nevada

**WAYNE STENEHJEM**
Attorney General of North Dakota

**HERBERT H. SLATERY III**
Attorney General of Tennessee

**KEN PAXTON**
Attorney General of Texas

**BRAD D. SCHIMEL**
Attorney General of Wisconsin

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

*Amici* States certify as follows:

A.     Parties and *Amici*

All parties appearing before the District Court and in this Court are listed in the Brief of Appellants filed on February 20, 2015 and the Brief of Appellees filed on March 30, 2015.  There were no *amici* in the District Court.

B.     Rulings Under Review

References to the rulings at issue appear in the Brief of Appellants.

C.     Related Cases

This case was not previously before this Court or any other court, and there are no related cases within the meaning of D.C. Cir. R. 28(a)(1)(C) of which *Amici* States are aware.

  /s/ *Toby Crouse*
TOBY CROUSE
**Counsel for Amicus Curiae**

# TABLE OF CONTENTS

ADDITIONAL COUNSEL ........................................................................i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...... ii

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES .................................................................v

    United States Supreme Court Cases ............................................. v

    United States Court Of Appeals For The District Of Columbia Circuit
    Cases ...................................................................................vi

    United States Constitution, Code, Rule, Or Regulation .............................. vii

    Cases From Other Jurisdictions .................................................. viii

    Other Authorities ................................................................. viii

GLOSSARY.....................................................................................x

STATUTES AND REGULATIONS .......................................................xi

IDENTITY AND INTERESTS OF *AMICUS CURIAE* .......................................1

SUMMARY OF ARGUMENT..................................................................3

ARGUMENT AND AUTHORITIES.........................................................5

I.    The Department's new regulations contradict congressional
    intent. ......................................................................................6

        A.    Congress excluded "any employee" providing domestic service
            or companionship services to the aged or infirm from overtime
            coverage.................................................................................6

        B.    The Department lacks authority to undermine the exemption
            Congress enacted under the guise of regulatory
            superintendence. ....................................................................9

II.  **The Department's new regulations impermissibly restructure the States' relationship with the federal government. ....................................13**

    A.    The federal government and States have struck an agreement to provide home care services to the aged and infirm under Medicaid. ............................................................................................14

    B.    The Department's new regulations raise several constitutional concerns with regard to the States' relationship to the federal government. ........................................................................................17

III.  **The Department's new regulations undermine the means Congress chose to provide care to the aged and infirm. ..........................20**

    A.    The Department's new definition of companionship services eliminates "care" from the services that Congress intended. ..............21

    B.    Eliminating "care" from the definition of companionship services ignores the interest of those Congress sought to protect. .............................................................................................22

**CONCLUSION ..............................................................................................29**

**CERTIFICATE OF COMPLIANCE .................................................................30**

**CERTIFICATE OF SERVICE .........................................................................31**

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT CASES

*Abramski v. United States*, 134 S. Ct. 2259 (2014) .............................................3, 12

*Alden v. Maine*, 527 U.S. 706 (1999) ........................................................4, 17, 20

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291
(2006).........................................................................................................18

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984).................................................................................5, 11

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833
(1986).........................................................................................................3, 12

*Dean v. United States*, 556 U.S. 568 (2009)..........................................................10

*Department of Homeland Security v. MacLean*, 135 S. Ct. 913
(2015)..........................................................................................................3, 11

*Federal Maritime Comm'n v. South Carolina State Ports Auth.*, 535
U.S. 743 (2002)..............................................................................................15

*Harris v. McRae*, 448 U.S. 297 (1980).................................................................14

*Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007) ....................ix, 9, 12

*MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218 (1994) ........................................4, 5

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983)....................................................................................11, 12

---

\*    The authorities with an asterisk are those upon which the *Amici* States
chiefly rely.

*National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005) .........................................11

*National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012)..............................................................4, 19, 20

*\*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981)...............4, 18, 19

*Perez v. Mortgage Bankers Ass'n*, ___ S. Ct. ___, 2015 U.S. LEXIS 1740 (March 9, 2015) ................................................................6, 7

*Republic of Iraq v. Beaty*, 556 U.S. 848 (2009)....................................3, 10

*Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817 (2013) ...................12

*Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159 (2001) ....................................13

*United States v. Gonzales*, 520 U.S. 1 (1997)......................................10

*United States v. Pennsylvania Indus. Chemical Corp.*, 411 U.S. 655 (1973)................................................................................19

*Wisconsin Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473 (2002)................................................................................14

*Yates v. United States*, ___ S. Ct. ___, 2015 U.S. LEXIS 1503 (Feb. 25, 2015) ................................................................................11

## UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT CASES

*Creekstone Farms Premium Beef, L.L.C. v. Department of Agric.*, 539 F.3d 492 (D.C. Cir. 2008)....................................................12

## UNITED STATES CONSTITUTION, CODE, RULE, OR REGULATION

U.S. Const. art. I, § 8 ...................................................................18, 19, 29

Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* ................................6, 17

Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, 88
    Stat. 55 .............................................................................................7

29 U.S.C. § 206 ...............................................................................6, 7

29 U.S.C. § 207 ........................................................................6, 7, 8, 10

*29 U.S.C. § 213 ....................................... 1, 3, 5, 7, 8, 10, 12, 20, 21, 22

*42 U.S.C. § 1396n .....................................................................14, 15

42 C.F.R. § 1396n ..............................................................................15

40 Fed. Reg. 7405 .............................................................................21

40 Fed. Reg. 7407 ..............................................................................8

Final Rule, Application of the Fair Labor Standards Act to Domestic
    Service, 78 Fed. Reg. 60454 (Oct. 1, 2013) ...................................................x

78 Fed. Reg. 60,557 .....................................................................1, 21, 22

78 Fed. Reg. 60,485 ...........................................................................23

Fed. R. App. P. 25 ..............................................................................31

Fed. R. App. P. 29 ...........................................................................1, 30

Fed. R. App. P. 30 ..............................................................................23

Fed. R. App. P. 32 ..............................................................................30

### CASES FROM OTHER JURISDICTIONS

*Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722 (6th Cir. 2013) .......................13

*Hernandez-Carrera v. Carlson*, 547 F.3d 1237 (10th Cir. 2008) ..........................13

*Home Care Ass'n of Am. v. Weil*, Case No. 14-cv-967, 2014 U.S. Dist. LEXIS 176307 (D. D.C. Dec. 22, 2014) ................................................9

*Sanchez v. Johnson*, 416 F.3d 1051 (9th Cir. 2005) ................................................14

*Welding v. Bios Corp.*, 353 F.3d 1214 (10th Cir. 2004)....................................8, 11


### OTHER AUTHORITIES

D.C. Cir. R. 28 .............................................................................................. ii, x

D.C. Cir. R. 29 ...................................................................................................1

D.C. Cir. R. 30 .................................................................................................23

D.C. Cir. R. 32 .................................................................................................30

K.S.A. 39-7,100 .........................................................................................16, 18

Peggie R. Smith, *Aging and Caring in the Home: Regulating Paid Domesticity in the Twenty-First Century*, 92 Iowa L. Rev. 1835 (2007).....................................................................................................7

Brief of the United States as *Amicus Curiae* in Support of Petitioners in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007), 2007 U.S. S. Ct. Briefs LEXIS 150 (Feb. 20, 2007) ........................9

Brief of the City of New York and New York State Association of
    Counties as *Amicus Curiae* in Support of Petitioners in *Long
    Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007), 2007
    U.S. S. Ct. Briefs LEXIS 94 (Feb. 20, 2007) .........................................27, 28

Kansas Department for Children & Families, Prevention and
    Protection Services – Adult Protective Services,
    http://www.dcf.ks.gov/services/PPS/Pages/APS/AdultProtecti
    veServices.aspx (last visited March 11, 2015)..............................................27

Kansas Department for Aging & Disability Services, Community
    Services and Programs Commission – Self-Direction,
    http://www.kdads.ks.gov/commissions/csp/home-community-
    based-services-(hcbs)/hcbs-about-page/consumer-self-
    direction  (last visited March 25, 2015).........................................................16

United States Department of Health and Human Services, Centers
    for Medicare and Medicaid Services,  Information Bulletin
    (July 3, 2014), http://www.medicaid.gov/Federal-Policy-
    Guidance/Downloads/CIB-07-03-2014.pdf (last visited March
    31, 2015) .............................................................................................16, 17

United States Department of Labor, Administrator's Interpretation
    No. 2014-2 (June 19, 2014),
    http://www.dol.gov/WHD/opinion/adminIntrprtn/FLSA/2014/
    FLSAAI2014_2.pdf (last visited March 31, 2015) ......................................16

# **GLOSSARY**

*Amici* States, pursuant to D.C. Cir. R. 28(a)(3), have prepared the following glossary of the terms and citation conventions used in this Brief:

***Amici* States:**  The States of Kansas, Arizona, Georgia, Michigan, Nevada, North Dakota, Tennessee, Texas, and Wisconsin.

**Congressional *Amici*:** Senators Patty Murray, Tammy Baldwin, Richard Blumenthal, Sherrod Brown, Benjamin L. Cardin, Robert P. Casey, Jr., Al Franken, Mazie K. Hirono, Edward J. Markey, Jeff Merkley, Barbara A. Mikulski, Bernard Sanders, Brian Schatz, Sheldon Whitehouse and Ron Wyden and Representatives Robert C. "Bobby" Scott, Alma S. Adams, Suzanne Bonamici, Judy Chu, Katherine M. Clark, Joe Courtney, Susan A. Davis, Rosa L. DeLauro, Mark DeSaulnier, Keith Ellison, Sam Farr, Chaka Fattah, Lois Frankel, Marcia L. Fudge, Raúl M. Grijalva, Alan Grayson, Luis V. Gutierrez, Alcee L. Hastings, Michael M. Honda, Hakeem S. Jeffries, Henry C. "Hank" Johnson, Jr., Marcy Kaptur, John Lewis, David Loebsack, Stephen F. Lynch, Jim McDermott, Grace F. Napolitano, Mark Pocan, Jared Polis, Charles B. Rangel, Lucille Roybal-Allard, Linda T. Sánchez, Janice D. Schawkowsky, Mark Takano and Frederica S. Wilson.

**Department**:  The United States Department of Labor.

**New Regulations:**  The United States Department of Labor's Final Rule, Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60454 (Oct. 1, 2013).

**New York *Amici*:**  The States of New York, Connecticut, Illinois, Iowa, Maryland, Massachusetts, Minnesota, and New Mexico.  New York *Amici* filed its Corrected Amicus Brief on March 16, 2015.

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are contained in the Statutory & Regulatory Addendum to Appellant's Opening Brief and Appellees' Response Brief.

## IDENTITY AND INTERESTS OF *AMICUS CURIAE*

*Amici* States support Plaintiffs-Appellees and request that this Court affirm the District Court's ruling.[1] A contrary ruling will harm the *Amici* States' residents who rely upon publicly funded, home care workers to avoid institutionalization.

Many of the *Amici* States urged the Department of Labor not to alter the historical administration of the overtime exemption Congress passed in 1974. Unbowed, the Department issued new regulations concerning overtime pay for workers who care for "individuals who (because of age or infirmity) are unable to care for themselves." 29 U.S.C. § 213(a)(15); *see also id.* at (b)(21).

The Department's new regulations undermine congressional intent in two ways that *Amici* States oppose. First, the new regulations preclude third-party employers, which likely includes States, from "avail[ing] themselves of" the exclusion from overtime coverage in Section 213(a)(15) or (b)(21). *See* 78 Fed. Reg. 60,557. Second, the new regulations effectively preclude home care workers from providing care. *See* 78 Fed. Reg. 60,557.

---

[1] Fed. R. App. P. 29(a) authorizes States to "file an amicus-curiae brief without the consent of the parties or leave of court." *See also* D.C. Cir. R. 29(b). Further, this Court's rule requiring *amici* on the same side to join in a single brief "does not apply to a governmental entity," such as the States. D.C. Cir. R. 29(d).

The Department's new regulations, had they not been struck down, would have harmed both *Amici* States and their citizens.  In Kansas alone, almost 11,000 individuals rely upon a Medicaid-funded program to provide the care they need to live independently.  The new regulations, however, threaten the operational viability of this program, both in letter and spirit.  Moreover, the regulations significantly alter the cooperative federalism that the States relied upon when agreeing to participate in the Medicaid program by exposing *Amici* States to liability in contravention of their sovereign interests and impose an unfunded liability upon the States.  *Amici* States, on behalf of themselves and the citizens they serve, therefore believe that the Department's new regulations are contrary to congressional intent and, as such, should be struck down.

## SUMMARY OF ARGUMENT

The Department's new regulations are invalid because they are contrary to the expressed intent of Congress and the means that Congress chose to attain its goal. *Amici* States, therefore, respectfully request that this Court affirm the District Court's conclusion that the Department's new regulations are invalid.

**I.** The Department's new regulations are contrary to the language Congress used to create the exemption from overtime coverage. Utilizing the standard and typical rules of statutory construction, the District Court properly determined that Congress specifically and intentionally chose to exclude "any employee" providing home care services to the aged and infirm from overtime coverage. Congress's utilization of such a broad term, *see Republic of Iraq v. Beaty*, 556 U.S. 848, 856 (2009), demonstrated ability to exclude certain classes of employees in another portion of the Act when it wanted to do so, *see Department of Homeland Security v. MacLean*, 135 S. Ct. 913, 921 (2015), focus upon the unique marketplace surrounding home-care providers for the aged and infirm, *see Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014), and repeated rejection of attempts to change the Department's historical guidance on the meaning of the exclusion, *see Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986), confirm that Congress did not give the Department the power to amend the overtime exclusions in 29 U.S.C. §§ 213(a)(15) and (b)(21).

**II.**     In addition, the Department's new regulations fundamentally alter the federal-state relationship in two ways that Congress did not intend and lacks the power to accomplish.   In particular, the Department's new regulations subject States to overtime liability for participating in the Medicaid program, *but see Alden v. Maine*, 527 U.S. 706, 712 (1999), impose post-acceptance conditions upon the agreement the States struck with the federal government concerning the Medicaid programs for the aged and infirm, *but see Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), and extract new policy concessions unrelated to the original agreement with the federal government, *but see National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566, 2604 (2012).

**III.**     Finally, the new regulations undermine the means that Congress chose to attain its goal of allowing the aged and infirm to avoid institutionalization. Congress chose to exempt from overtime coverage "any employee" that provided care to "individuals who (because of age or infirmity) are unable to care for themselves," but the Department's new regulations effectively prevent these individuals from receiving the care that they need.   The Department has no authority to undermine the means that Congress has chosen to implement its goal of reducing institutionalization of those unable to care for themselves.   *See MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 n.4 (1994).

## ARGUMENT AND AUTHORITIES

This is a dispute about congressional intent. Congress enacted a law directing that overtime obligations "shall not apply" to "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves." 29 U.S.C. § 213(a)(15). The Department's new regulations, however, reverse this congressional command.

The New York *Amici* have no objection to the Department's new regulations. They applaud the new regulations for responding to (and, in some cases, anticipating the coming) transformation of the home health-care industry and regurgitate the Department's policy justifications for extending overtime compensation to home care workers. Regardless of how gratifying these progressive changes are to the New York *Amici*, they presuppose regulatory authority to make these sweeping changes. That authority is lacking here.

When Congress has spoken and its intentions are clear, there is no room for an agency to issue rules with a contrary policy judgment. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Nor may an agency overturn the means in which Congress has chosen to accomplish its goal. *See MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 & n.4 (1994). But the Department's new regulations eviscerate the goal Congress established and the

manner in which Congress chose to meet this goal. The District Court correctly struck down this executive overreach.

## I.    The Department's new regulations contradict congressional intent.

The Department's new regulations are inconsistent with the statutory command of Congress. Whereas Congress excluded "any employee" providing home care services to the aged or infirm from overtime coverage, the Department seeks to preclude third-party employers from availing themselves of this exclusion. That result is inconsistent with the broad language of the exclusion, ignores Congress's demonstrated ability to exclude third-party employers as it did in other portions of the Act, repudiates Congress's focus on providing low-cost services as part of a government-funded program to aid the low-income aged and infirm, and negates Congress's repeated refusal to adopt the very change the Department's new regulations seek.

### A.    Congress excluded "any employee" providing domestic service or companionship services to the aged or infirm from overtime coverage.

The Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201 *et seq.*, generally entitles employees to a minimum wage and, for hours of work exceeding 40 in a work week, overtime compensation at a rate of one-and-one-half times an employee's regular rate of pay. *See* 29 U.S.C. §§ 206(a), 207(a)(1). "Certain classes of employees, however, are exempt from these provisions." *Perez v.*

*Mortgage Bankers Ass'n*, 2015 U.S. LEXIS 1740, at *8 (March 9, 2015). The Department's new regulations overturn one of these classes of employees that Congress expressly exempted.

In 1974, Congress amended FLSA, Pub. L. No. 93-259, 88 Stat. 55, to extend minimum wage and overtime requirements to "domestic service" employees. *See* 29 U.S.C. §§ 206(f), 207(l). At the same time, however, Congress specifically exempted a subset of domestic service employees who provide "companionship services" and "live-in" domestic services to individuals who (because of age or infirmity) are unable to care for themselves. *See* 29 U.S.C. §§ 213(a)(15), (b)(21).

Congress differentiated between domestic service workers based upon who they served and who was responsible for their compensation. Whereas traditional domestic service staff may cook, clean, garden, and/or provide chauffeur services to a single family at that family's sole expense, home care service providers for the aged and infirm are largely funded by government programs. *See generally* Peggie R. Smith, *Aging and Caring in the Home: Regulating Paid Domesticity in the Twenty-First Century*, 92 Iowa L. Rev. 1835, 1840 & n.16 (2007). The former is an incident of convenience to those able to afford it; the latter is necessary to keep individuals who cannot afford private care out of the more costly and restrictive

institutions when it is not necessary.  *See generally Welding v. Bios Corp.*, 353 F.3d 1214, 1217 (10th Cir. 2004).

Congress was also aware that both categories of domestic service workers are typically affiliated with a third-party agency that may try to avoid overtime obligations using creative work assignments.  As to the traditional domestic service employees, Congress expressly precluded third-party employers from avoiding overtime obligations by assigning the worker to multiple households.  *See* 29 U.S.C. § 207(l).  But, in contrast, Congress fully exempted domestic service employees providing home care services to the aged or infirm from overtime coverage:  the overtime provisions "shall not apply with respect to . . . ***any employee*** employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves."  29 U.S.C. § 213(a)(15) (emphasis added).

The Department immediately identified the intent of Congress.  In 1975, the Department confirmed that the companion and live-in service exemption applied to those workers employed by an employer or agency other than the family or household using their services.  *See* 40 Fed. Reg. 7407.  In 2007, the United States Solicitor General told the Supreme Court that this rule, despite the changed employment landscape, remained sound:  "there is no legal or policy justification for treating employees providing companionship services differently under the

FLSA based upon the identity of the employer." *See* Brief of the United States as *Amicus Curiae* in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007), 2007 U.S. S. Ct. Briefs LEXIS 150, at *42 (Feb. 20, 2007) (explaining the exemption was supported by the text and history of FLSA, Congress's intent, and other Department of Labor regulations). When the Supreme Court upheld this interpretation, *see Coke*, 551 U.S. 158, several bills were introduced in the 110th, 111th, and 112th Congress to abolish the exemption, but none of them ever generated enough support to get out of committee and to the floor of either house. *See Home Care Ass'n of Am. v. Weil*, Case No. 14-cv-967, 2014 U.S. Dist. LEXIS 176307, at *7-8 & n.5 (D.D.C. Dec. 22, 2014).

## B. The Department lacks authority to undermine the exemption Congress enacted under the guise of regulatory superintendence.

The Department's new regulations impermissibly violate the letter and spirit of the exclusion Congress drafted. There are at least four pieces of evidence that demonstrate the incongruity between the overtime exemption Congress enacted and the new regulations the Department unilaterally announced.

**1.** Congress enacted a law that applied to "any employee." But, the Department's new regulations make that exemption available to only a certain subset – some say less than 10% – of domestic service employees. When Congress uses the phrase "any employee," there is no basis for courts (or agencies) to limit its application to employees based upon their affiliation with one or more

9

employer. *See Republic of Iraq v. Beaty*, 556 U.S. 848, 856 (2009) (the word "any" in phrase "any other provision of law" was no warrant to limit the class of provisions of law); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("any other term of imprisonment" cannot be limited to only federal incarcerations). The Department's new regulations run afoul of this well-established cannon of statutory interpretation.

    **2.**    Congress also demonstrated that it knew how to make third-party employers liable for overtime payments. Congress expressly imposed an overtime requirement upon an employer who "employ[s] any employee in domestic service in one or more households for a workweek." 29 U.S.C. § 207(l). Congress did not similarly limit the applicability of the exclusion for those providing government-funded services to the aged and infirm, extending it instead to "any employee," 29 U.S.C. § 213(a)(15). This differing treatment is compelling evidence of congressional intent: Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acted intentionally and purposefully in the disparate inclusion or exclusion. *See Department of Homeland Security v. MacLean*, 135 S. Ct. 913, 921 (2015); *Dean v. United States*, 556 U.S. 568, 573 (2009). The Department lacks authority to reach a different conclusion.

**3.**     Context further demonstrates that Congress had a good reason for this differing treatment. "Congress created the companionship services exemption to enable guardians of the elderly and disabled to financially afford to have their wards cared for in their own private homes as opposed to institutionalizing them." *Welding*, 353 F.3d at 1217. In addition, Congress knew that, unlike traditional domestic services, government monies would be the primary payment method for home care services being delivered to the aged and infirm. The Department's new regulations are infirm because they virtually repeal the core provision of the exemption that Congress created for the benefit of the aged and infirm. *See Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014); *see also Yates v. United States*, 2015 U.S. LEXIS 1503, at \*15 (Feb. 25, 2015) (opinion of Ginsburg, J.) (context aids in construction).

**4.**     Finally, the forty-year history between the Department and Congress confirms the former rule reflected Congress's intent. Although "[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework," *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967, 981 (2005), an agency may not ignore statutory standards or congressional intent when carrying out its regulatory functions, *see Chevron*, 467 U.S. at 842-43 & n.9. *See also Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 59 &

n.\* (1983) (Rehnquist, J., concurring in part and dissenting in part) ("Of course, a new administration may not refuse to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its regulatory functions.").  This is especially true where, as here, Congress has repeatedly revisited the exemptions in 29 U.S.C. §§ 213(a)(15) and (b)(21) following *Coke* and refused to make a change: "when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive that the interpretation is the one intended by Congress." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (internal quotation omitted).[2]

Agencies tasked with implementing laws have discretion in implementing those laws based upon agency expertise.  But, the agency may not override the express will of Congress nor the manner Congress chose to reach that goal.  *Amici*

---

[2]    Congressional *Amici* argue (at pp. 6-7, 10-11) that it is irrelevant that Congress has (repeatedly) declined to adopt the policy choice that the Department's new regulations seek to impose by diktat.  Not so.  The Supreme Court and this Court have frequently and recently relied upon congressional inaction to identify congressional intent.  *See Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 827-28 (2013) (deferring to agency's 40-year policy and Congress's six amendments that failed to overturn the policy); *Creekstone Farms Premium Beef, L.L.C. v. Department of Agric.*, 539 F.3d 492, 500 (D.C. Cir. 2008) (Congress's decision to leave a regulation undisturbed is persuasive evidence that the regulation was consistent with congressional intent).

States urge this Court to affirm the District Court's decision because that is precisely what the Department's new regulations seek to do.

## II.    The Department's new regulations impermissibly restructure the States' relationship with the federal government.

The underlying dispute has focused upon the Department's efforts to make certain home care workers eligible for overtime benefits.  But the Department's new regulations have a wider, more constitutionally dangerous impact that has not been previously addressed:  they expose *Amici* States (and other states) to overtime liability for serving as the conduit of government monies that fund the majority of home care services provided to the elderly and disabled.  In addition, they impose post-hoc conditions and policy choices to the agreement between the federal and state governments.   This Court should, therefore, reject the Department's regulations as inconsistent with congressional intent because of the significant constitutional concerns they implicate.  *See generally Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001); *see also Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 731 (6th Cir. 2013) (Sutton, J., concurring) (agency cannot ignore the purpose of statute to arrive at a position Congress did not intend); *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1250 (10th Cir. 2008) ("Congress does not typically intend to authorize agencies to fill in statutory gaps in a manner raising substantial constitutional doubts").

**A. The federal government and States have struck an agreement to provide home care services to the aged and infirm under Medicaid.**

The Department's new regulations affect the States' fiscal interests primarily as a result of their operation of home care programs under Medicaid. Generally speaking, Medicaid is a joint effort in which "the federal government distributes funds to participating states to help them provide health care services for the poor and needy." *Sanchez v. Johnson*, 416 F.3d 1051, 1054 (9th Cir. 2005). "The cornerstone of Medicaid is financial contribution by both the Federal Government and the participating State" to serve those in need. *Harris v. McRae*, 448 U.S. 297, 308 (1980). This partnership between the federal government and the States advances cooperative federalism. *Cf. Wisconsin Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 495 (2002).

In 1981, Congress recognized that many individuals capable of living independently with minimal care were instead being treated in costly, long-term, Medicaid-funded institutions. *See generally Sanchez*, 416 F.3d at 1054. Congress remedied this situation by creating a waiver program – known as a Section 1915(c) waiver – in which those needing care could obtain Medicaid funding to help them live independently if the State certifies that the cost of serving that individual at home will be less than or equal to the cost of institutional care. *See generally* 42 U.S.C. § 1396n(c).

The State of Kansas participates in the Section 1915(c) waiver programs. In particular, it "provides assurances" to the federal government that "necessary safeguards (including adequate standards for provider participation) have been taken to protect the health and welfare of individuals provided services under the waiver and to assure financial accountability for funds expended with respect to such services." 42 U.S.C. § 1396n(c)(2). These safeguards include setting a minimum age for service providers, minimum training requirements, electronic visit verification systems, background checks, and similar endeavors. All told, Kansas operates seven Section 1915(c) programs that provide assistance with critical activities of daily living to 25,000 Kansans.

In Kansas and elsewhere, participants in the Section 1915(c) waiver program may choose one of two delivery models of care. One is for agency-directed services, where a provider agency is responsible for managing the individual's care and caregiver; the other is for self-directed services, in which the individual or his or her guardian can "self-direct" his or her care and hire his or her own care-givers. *See* 42 C.F.R. § 1396n(i)(G))(iii). The Department's new regulations primarily impact the States' administration of the self-directed care program.

Consumers choosing the self-directed care model exercise significant discretion in choosing their care providers and carry the burden of making sure their care is appropriate. In Kansas, for example, Section 1915(c) participants

"shall have the right to choose the option to make decisions about, direct the provisions of and control the attendant care services received by such individuals including, but not limited to, selecting, training, managing, paying, and dismissing of an attendant." K.S.A. 39-7,100(b)(2).[3] Frequently, the recipient contracts with a third-party to handle administrative tasks, such as payroll and processing of timesheets, maintaining employment records, and other clerical and administrative duties.

Given the cooperative federalism backdrop to these Medicaid programs, one may reasonably have assumed that States would remain immune from overtime liability. After all, States discharge those duties that Medicaid requires and defers to the discretion of the recipients as to how their care will be implemented. That assumption would be wrong. The Department issued an Administrator's Interpretation declaring that most public entities administering self-directed Section 1915(c) programs would be considered third-party joint employers of home care workers. *See* U.S. Dep't of Labor, Administrator's Interpretation No. 2014-2, (June 19, 2014), *available at* http://www.dol.gov/WHD/opinion/adminIntrprtn/FLSA/2014/FLSAAI2014_2.pdf; *see also* U.S. Dep't of Health &

---

[3]     *See also* http://www.kdads.ks.gov/commissions/csp/home-community-based-services-(hcbs)/hcbs-about-page/consumer-self-direction (last visited March 25, 2015).

Human Servs, CMCS Information Bulletin (July 3, 2014), *available at* http://www.medicaid.gov/Federal-Policy-Guidance/Downloads/CIB-07-03-2014.pdf (warning States that they will likely be considered to be a third-party employer in the self-direction programs they administer). In short, the Department's new regulations expose States to an unfunded liability for overtime wages under the FLSA.

**B.    The Department's new regulations raise several constitutional concerns with regard to the States' relationship to the federal government.**

**1.**    The most obvious constitutional concern raised by the Department's new regulations is that they subject States to overtime liability in contravention of their sovereign immunity. In 1999, the Supreme Court ruled that Congress lacked the authority to make the States liable for FLSA violations. *See Alden v. Maine*, 527 U.S. 706, 712 (1999). That, however, is precisely what the Department's new regulations purport to do. The Department cannot use its regulatory authority in a manner that exceeds the power that Congress lacks. *Cf. Federal Maritime Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 760-61 (2002) (Congress cannot use Article I to abrogate sovereign immunity in Article I tribunals). Congress surely did not authorize the Department to issue rules in contravention of the States' sovereign interests.

**2.** The Department's new regulations impermissibly seek to rewrite the terms of the Medicaid agreement that the States struck with the federal government. Spending Clause programs are quasi-contractual in nature: the federal government describes the programs and conditions, allowing the States to accept or reject the offer. *See generally Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). "[T]he legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract' . . . There can, of course, be no knowing acceptance if a State is unaware of the conditions . . . ." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

The Department's new regulations seek to do what even Congress cannot do. Prior to the new regulations, Congress passed the Medicaid provisions, offering the State funding if it chose to accept the conditions imposed by the Department of Health and Human Services, and the States accepted that offer. Indeed, the States have built up a super-structure of statutory and regulatory regimes to implement these Medicaid objectives. *See generally* K.S.A. 39-7,100. But now, the Department of Labor's new work force regulations attempt to restructure the Medicaid agreement by imposing a new, unfunded overtime condition upon the States' pre-existing obligations under Medicaid. This violates the States' sovereign interests embodied in Spending Clause jurisprudence. No

State agreed to accept this as a condition of operating the Medicaid programs. If neither Congress nor the Department of Health and Human Services can impose post-acceptance conditions on the Section 1915(c) waiver program, the interloping Department of Labor may not do so either. *See Pennhurst*, 451 U.S. at 25 (Congress may not impose post-acceptance conditions); *cf. also United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973) ("traditional notions of fairness" prevent government from misleading those it knows will rely upon regulatory guidance).

3.      Not only are the new regulations an impermissible restructuring of the Medicaid agreement previously struck, they impermissibly seek to extract a policy choice that is unrelated to the Medicaid program. In *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012), the Supreme Court rejected Congress's attempt to use Spending Clause legislation to compel the States to adopt federal policy because the behavior sought (adopting the Medicaid expansion going forward) was unrelated to the penalty for failing to adopt the policy (withholding all Medicaid funds previously provided). *Id.* at 2602-04. In other words, Congress may not require policy concessions that are unrelated to the original grant of federal monies.

The Department's new regulations seek to do what the Court in *NFIB* precluded. The new regulations purport to require States to pay overtime

compensation when the States have not previously agreed to do so. And, many States have good reason to believe that is not the proper policy to pursue. The Department cannot extract these policy concessions as a cost of continuing to participate in the cooperative federalism program under Medicaid. *See id.*; *see also Alden*, 527 U.S. at 749 (rejecting "plenary federal control of state governmental processes" as a "denigrat[ion of] the separate sovereignty of the States").

## III. The Department's new regulations undermine the means Congress chose to provide care to the aged and infirm.

Congress's exceptions and the Department's new definition of "companionship services" are akin to Longfellow's proverbial ships passing in the night. Sections 213(a)(15) and (b)(21) reflect Congress's intent to ensure that those "who (because of age or infirmity) are unable to care for themselves" can procure low-cost home care services and remain independent. The Department's new definition of "companionship services," however, effectively eliminates "care" from the concept of companionship services in a way that endangers the independence of the aged and infirm so that the workers can enjoy the illusion of overtime compensation. This incongruence – exemplified by the Kansas experience – confirms that the new regulations are not the result Congress sought.

**A.     The Department's new definition of companionship services eliminates "care" from the services that Congress intended.**

The Department's second, related attack upon Congress's exclusions of 29 U.S.C. §§ 213(a)(15) and (b)(21) concerns its new definition of "companionship services." This definition violates the intent of Congress by effectively eliminating care as a service and threatening the ability of those in need of care to remain independent.

Congress wrote the overtime exclusion so that those "unable to care for themselves" could receive care that would permit them to remain independent. In 1975, the Department stated that "the term 'companionship services' shall mean those services which ***provide fellowship, care, and protection*** for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs." 40 Fed. Reg. 7405 (emphasis added). These services included "household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services." *Id.* For forty years, this definition remained unchanged.

The Department's new regulation significantly narrows the definition of "companionship services" in two critical respects. First, the term *care* is completely removed: "companionship services" is defined to mean only "provision of fellowship and protection." 78 Fed. Reg. 60,557. Second, care may be provided on two conditions: (i) it must be "provided attendant to and in

conjunction with the provision of fellowship and protection," ***and*** (ii) it cannot "exceed 20 percent of the total hours worked per person and per workweek." *Id.* As a result, no worker may spend more than 8 hours per week "assist[ing] the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care)." *Id.*

### B. Eliminating "care" from the definition of companionship services ignores the interest of those Congress sought to protect.

Congress drafted the overtime exemption to help "individuals who (because of age or infirmity) are unable to care for themselves" avoid institutionalization. 29 U.S.C. § 213(a)(15). But the Department's new definition of companionship services effectively prohibits the provision of "care" that is necessary to attain relative independence. This evisceration has significant consequences to Kansans that rely upon these companionship services to remain independent.

**1.** First, continuity of care will be practically impossible to obtain for Kansans, especially those living in rural Kansas. Prior to the new regulations, there was a critical shortage of workers able and willing to provide companionship services: too many hours of coverage and too few workers to meet this need. *See*

ECF No. 23-6, ¶23;[4] ECF No. 23-4, ¶5; ECF No. 23-5, ¶7.C.; *see also* New York *Amici* Br., at p. 15 & n.39. Requiring overtime compensation for home care workers has forced many agencies (to the shock of no one) to prohibit their employees from working more than 40 hours per week. ECF No. 23-4, Ex. A; ECF No. 28-3, ¶7. And, as a result, the work force has shrunk, leaving fewer workers to fill an even greater employment need. *See* ECF No. 23-4, ¶4.c.-d.; ECF No. 28-3, ¶7. This labor shortage, as even the Department's findings recognized, will likely force many disabled and infirm citizens into institutional settings against their will.[5] 78 Fed. Reg. 60,485-487. The impact of these regulations is especially catastrophic in sparsely populated, rural communities (in Kansas and beyond) where the supply of qualified care workers is even tighter. *See* ECF No. 23-6, ¶23; ECF No. 23-5, ¶7.F. This is not the result Congress sought.

---

[4]     *Amici* States citation to the pleadings below, pursuant to Fed. R. App. P. 30(a)(2) and D.C. Cir. R. 30(b), refers to the docket number assigned by CM/ECF system.

[5]     New York *Amici* acknowledge (at p. 23 n.60) that services will be disrupted and limited by the Department's new regulations, stating that they do not wish for the new regulations to "***unnecessarily*** disrupt services for current home-care recipients or otherwise ***inappropriately*** limit or change programs that recipients rely upon." (emphasis added). *Amici* States assert that ***any*** disruption of services or change to these programs is incompatible with the intent of Congress, especially when those "unable to care for themselves" suffer so that the politically connected can be eligible for the mirage of overtime pay. This is a case of the regulatory tail wagging the statutory dog.

**2.**     In addition, many services necessary to independent living will no longer be considered companionship services.  Almost 11,000 Kansans, otherwise "unable to care for themselves," rely upon personal care workers to accomplish simple, daily activities that allow them to remain independent, including help getting to and from the restroom safely, supervision and assistance in clothing choices and related efforts to get dressed for the day, making certain that healthy meals are prepared in a safe manner, helping to ensure bathing occurs safely, and double-checking that prescribed medications are being taken appropriately.  All of these basic tasks permit Kansans to live independently and with dignity.  But all of them are undermined by the Department's new definition of companionship care.

Sleep-cycle support is an especially critical component for independent living that will not be covered by the Department's new definition of companionship services.  Sleep-cycle support provides non-nursing physical assistance or supervision in the consumer's home during normal sleep hours in the event of a medical emergency, to aid in using the restroom, and/or to assist the consumer in the event of a fire, tornadic activity, or intruder.[6]  ECF No. 23-6, ¶17. This change alone "threaten[s] to undo a decade's worth of effort by the State [of

---

[6]     Sleep-cycle support helps 1,400 Kansans remain in their homes.  Kansas estimates that it will cost over $30 million (or $21,428 per consumer) to maintain existing sleep-cycle services under the Department's new regulations.  ECF No. 23-6, ¶ 17.

Kansas] to maintain disabled individuals in the least restrictive environment necessary to meet their needs."  ECF No. 23-6, ¶18.

This is no idle concern.  For example, imagine the dilemma facing a twenty-five year-old Kansas woman afflicted with the progressive, nuero-muscular disease of Friedreich's Ataxia.  With sleep-cycle support, she can live independently in her home:  the care worker is present in the event the woman needs to escape the home to avoid a fire, to alert authorities if an intruder breaks into the home, and, most frequently, to help her use the restroom overnight.  Without it, she is physically helpless and at the mercy of fate.  She is helped to her bed and left for the night – praying that her sleep is not interrupted by a life-threatening emergency and hoping that her care worker arrives early the next day so she can get out of her soiled undergarments.  Congress surely did not intend this result.

**3.**     The narrowed definition of "companionship services" will also make it more difficult for Kansans to obtain the care that they rely upon to remain independent.  On average, each Kansas consumer currently relies upon fewer than two home care workers to maintain his or her independence.  ECF No. 23-6, ¶22.  If each home care worker is precluded from providing more than 8 hours of care per week, that number will have to increase exponentially.  *See id.*  For example, every Kansan relying upon sleep-cycle support to remain independent (all 1,400 of

them) will be required to locate and pay up to seven different companions to stay in their home throughout the week to meet their assessed needs.

Hiring additional workers will impose an onerous task upon those Congress sought to aid. Kansans that have chosen self-directed care will need to interview, screen, select, train, manage, pay, and schedule a cadre of new workers because the Department has changed course. *See id.* at ¶23. Such a task, standing alone, is daunting. But, it is made all the more difficult because it is being done by (or on behalf of) individuals with intellectual, developmental, or physical disabilities and/or the frail elderly. Kansans who rely upon their care workers to remain independent have vociferously objected to this notion, but the Department has ignored their concerns. *See id.* at ¶19. Surely this is not what Congress envisioned.

Forcing additional workers into the home of those "unable to care for themselves" also threatens these Kansans' safety, security, and privacy. The disabled and/or frail elderly necessarily develop a bond of trust with the small number of individuals they allow in their home: these workers aid with toileting, bathing, intimate personal hygiene, and, in some cases, remain in the home overnight to provide sleep-cycle support. Requiring a parade of new workers into these intimate, private settings will diminish the quality of care provided and increase the health and safety risks to those who rely upon this care. Industry

experience teaches that consumers are unwilling to accept alternative providers, preferring to suffer the lack of care (and the attendant health and security risks) to the option of inviting countless strangers into their home. *See*, *e.g.*, Brief of the City of New York *et al.* as *Amicus Curiae* in in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007), 2007 U.S. S. Ct. Briefs LEXIS 94, at *39 (Feb. 20, 2007). That choice is not entirely irrational: the aged and infirm are at the greatest risk of physical, financial, and emotional abuse. *See generally* ECF No. 23-4, ¶4.f.; *see also* http://www.dcf.ks.gov/services/PPS/Pages/APS/AdultProtective Services.aspx (last visited March 11, 2015).

4.    The Department's new regulations, ironically, are likely to harm the very workers they are designed to assist. New York *Amici* explain (at pp. 4-16) how difficult it is for the home care worker to make a career out of providing companionship services and how simply paying these workers overtime will ease their lives.[7] Ironically, the Department's new regulations will harm the home care workers, too.

---

[7]    Congress crafted the overtime exemption to aid those "unable to care for themselves" aware that many providers are close friends or family members. Although this work force is a critical component of the Medicaid program, the Department's new regulations impermissibly place the financial interests of workers above those Congress sought to protect.

Forcing overtime payment obligations on this niche workforce will cap the income of home care workers that Kansans (and the Medicaid program) depend upon. Unlike traditional domestic staff serving the wealthy, the wages of home care workers providing care to those "unable to care for themselves" due to age or disability are inelastic. ECF No. 23-4, ¶6. The government-funded employers will cap their employees' hours at 40 per week, leaving a gaping income hole that workers previously filled with additional hours. ECF No. 23-4, ¶4.b.-d. (predicting a 40% loss of income); ECF No. 23-5, ¶7.B., F.; Brief of the City of New York *et al.*, 2007 U.S. S. Ct. Briefs LEXIS 94, at *39. As a result, home care workers have already fled their care-giving role, leaving those that rely upon their services without care. ECF No. 23-4, ¶4.c.-d. In other words, the Department's actions have harmed both those who receive and those who provide the care that Congress exempted.

## CONCLUSION

The Departments new regulations are focused upon the interests of the workers who provide care to "individuals who (because of age or infirmity) are unable to care for themselves." The Department is not free to undo congressional commands, especially when doing so harms the interests of those Congress sought to protect and exposes sovereign governments to potential liability and uncertain regulatory control that is inconsistent with Spending Clause programs. *Amici* States therefore urge this Court to affirm the District Court's decision.

Dated: April 6, 2015            Respectfully submitted,

                                     DEREK SCHMIDT
Kansas Attorney General
JEFFREY A. CHANAY
Chief Deputy Attorney General
DWIGHT R. CARSWELL
Assistant Solicitor General

 /s/ *Toby Crouse*
TOBY CROUSE
Special Assistant Attorney General
          *Counsel of Record*
Memorial Hall
120 SW 10th, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Email: jeff.chanay@ag.ks.gov
Email: dwight.carswell@ag.ks.gov
Email: tcrouse@foulston.com

**Counsel for Amicus Curiae**

29

## CERTIFICATE OF COMPLIANCE

**1.**    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and Fed. R. App. P. 29(d) because it contains 6,688 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. R. 32(a)(1), as calculated by the word-counting function of Microsoft Word 2010.

**2.**    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface—14-point Times New Roman—using Microsoft Word.

**3.**    This brief has been scanned for viruses using McAfee VirusScan Enterprises (version 8.8.0), and no viruses were detected.

**4.**    The hard copies of this brief submitted to the Court this day are exact copies of the version submitted electronically.

 /s/ *Toby Crouse*                            
TOBY CROUSE
**Counsel for Amicus Curiae**

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d), I hereby certify that on this 6th day of April, 2015, the foregoing Brief of *Amici* States as *Amici Curiae* in Support of Affirmance was electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that I caused an original and eight paper copies to be hand-delivered by courier to the Clerk's Office.

 /s/ *Toby Crouse*
TOBY CROUSE
**Counsel for Amicus Curiae**