ORAL ARGUMENT UNSCHEDULED

# 15-5018

# United States Court of Appeals
# for the District of Columbia Circuit

HOME CARE ASSOCIATION OF AMERICA, et al.,

Plaintiffs-Appellees

v.

DAVID WEIL, sued in his official capacity,
Administrator, Wage & Hour Division, et al.,

Defendants-Appellants

_____

On Appeal from the
United States District Court for the District of Columbia

_____

## AMICUS CURIAE BRIEF OF THE CONSUMER DIRECTED PERSONAL ASSISTANCE ASSOCIATION OF NEW YORK STATE SUBMITTED IN SUPPORT OF THE PLAINTIFFS/APPELLEES
_____

BOND, SCHOENECK & KING, PLLC
22 Corporate Woods Boulevard, Suite 501
Albany, New York 12211
(518) 533-3236

Of Counsel:
    Michael Billok, Esq.
    Hermes Fernandez, Esq.

339131.2 4/6/2015

## TABLE OF CONTENTS

                                                                                        **Page**

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ................................................................................ ii

GLOSSARY ........................................................................................................ v

CORPORATE DISCLOSURE STATEMENT .................................................... 1

STATEMENT OF THE IDENTITY, INTEREST, SOURCE OF AUTHORITY

TO FILE THE AMICUS BRIEF, AND SUMMARY OF ARGUMENT ............... 1

OTHER STATEMENTS REQUIRED BY RULE 29(c): ..................................... 3

ARGUMENT ...................................................................................................... 3

  **POINT 1: The Historical Record Does Not Support the Department's**

  **Action** .............................................................................................................. 3

  **POINT 2: DOL's Action Threatens the Existence of the Consumer Directed**

  **Personal Assistance Program**......................................................................... 7

  **POINT 3: The Decision of the Lower Court Should Be Affirmed**............... 17

CONCLUSION .................................................................................................. 17

CERTIFICATE OF COMPLIANCE ................................................................. 18

CERTIFICATE OF SERVICE............................................................................ 19

339131.2 4/6/2015

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Statutes**

42 U.S.C. § 1396n(k) ..................................................................7

Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, §
13601(a)(5), 107 Stat. 312, 613 (1993) ...............................5

National Health Planning and Resources Development Act, Pub. L.
93-641, 88 Stat. 2225 (1975)................................................6

Social Security Act of 1965, Pub. L. No. 89-97, §§ 1834, 1861, 79
Stat. 286, 303, 319-320 (1965)............................................5

Social Security Act of 1967, Pub. L. 90-248, § 224, 81 Stat. 821, 902
(1967) ...................................................................................5

Social Security Act § 1905(a)(24), 42 U.S.C. § 1396d (a)(24) (1993)....................5

**State Statutes**

N.Y. PUBLIC HEALTH LAW § 3613 ........................................15

N.Y. SOCIAL SERVICES LAW § 61 ......................................7, 8

N.Y. SOCIAL SERVICES LAW § 365-f ..............................2, 7, 8

N.Y. WORKERS' COMPENSATION LAW §§ 2, 3 .......................9

**Rules**

Rule 29(c) of the Federal Rules of Appellate Procedure..........................................3

Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.............................18

Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure.............................18

**Federal Regulations**

29 C.F.R. pt. 552....................................................................4, 17

*Authorities upon which we chiefly rely are marked with asterisks.

40 Fed. Reg. 7404 (Feb. 20, 1975)............................................................................4

76 Fed. Reg. 10736 (Feb. 25, 2011)..................................................................7, 12

*78 Fed. Reg. 60454, 60454 (Oct. 1, 2013)............................................................4

*78 Fed. Reg. 60454, 60456, 60468 (Oct. 1, 2013).............................................14

*78 Fed. Reg. 60454, 60465-60466 (Oct. 1, 2013) ................................................8

*78 Fed. Reg. 60454, 60483 (Oct. 1, 2013).....................................................12, 13

*78 Fed. Reg. 60454, 60484 (Oct. 1, 2013)...........................................................12

*78 Fed. Reg. 60454, 60486-60487 (Oct. 1, 2013) ..............................................16

*78 Fed. Reg. 60454, 60515-60517 (Oct. 1, 2013) ..............................................10

**New York State Regulations**

10 N.Y.C.R.R. § 763.4...........................................................................................11

18 N.Y.C.R.R. § 505.14...........................................................................................8

18 N.Y.C.R.R. § 505.14(a)(6)................................................................................12

18 N.Y.C.R.R. § 505.14(e) .....................................................................................11

18 N.Y.C.R.R. § 505.23(b)(1)................................................................................11

18 N.Y.C.R.R. § 505.28(b)(3)..........................................................................12, 15

18 N.Y.C.R.R. § 505.28(c)(5)..................................................................................8

18 N.Y.C.R.R. § 505.28(d) ......................................................................................8

18 N.Y.C.R.R. § 505.28(g) ...............................................................................9, 15

18 N.Y.C.R.R. § 505.28(i) ......................................................................................9

**New York Legislation**

Chapter 487 of the Laws of 1987 .............................................................................2

Chapter 81 of the Laws of 1995 ...............................................................................2

339131.2 4/6/2015

## Other Authorities

U.S. DEPARTMENT OF COMMERCE, STATISTICAL ABSTRACT OF THE
UNITED STATES 1974,
http://www2.census.gov/prod2/statcomp/documents/1974-02.pdf ....................6

UNDERSTANDING MEDICAID HOME AND COMMUNITY SERVICES: A
PRIMER (2000), http://www.aspe.hhs.gov/daltcp/reports/primer.pdf.........5, 9, 10

BUREAU OF LABOR STATISTICS, OCCUPATIONAL OUTLOOK HANDBOOK:
HOME HEALTH AIDES (2014), www.bls.gov/ooh/healthcare/home-
health-aides.htm...................................................................................................5

BUREAU OF LABOR STATISTICS, OCCUPATIONAL OUTLOOK HANDBOOK:
PERSONAL CARE AIDES (2014),
www.bls.gov/ooh/healthcare/personal-care-aides.htm .......................................5

LETTER TO COLLEAGUE FROM U.S. DEPARTMENT OF JUSTICE & U.S.
DEPARTMENT OF HEALTH AND HUMAN SERVICES (Dec. 15, 2014),
http://www.hhs.gov/ocr/civilrights/resources/specialtopics/commu
nity/2014hhsdojdearcolleagueletter.pdf ..........................................................16

N.Y.S. EXECUTIVE BUDGET: HEALTH AND MENTAL HYGIENE ARTICLE
VII LEGISLATION 11 (Jan. 20, 2013),
https://www.budget.ny.gov/pubs/archive/fy1314archive/eBudget13
14/fy1314artVIIbills/HMH_ArticleVII.pdf ......................................................16

TESTIMONY OF CDPAANYS ON 2014-15 STATE FISCAL YEAR
EXECUTIVE BUDGET (Feb. 3, 2014),
http://assembly.state.ny.us/write/upload/files/testimony/20140203_
health/20140203-Health&Medicaid-Caputo.pdf ..............................................17

TESTIMONY OF CDPAANYS ON 2015-2016 STATE FISCAL YEAR
EXECUTIVE BUDGET (Feb. 2, 2015),
http://www.nysenate.gov/files/Consumer%20Directed%20Personal
%20Assistance%20Association%20of%20NY.pdf ....................................16, 17

PINNOCK HOME CARE, HISTORY OF HOME CARE (2007),
www.pinnaclehomecare.net/homecarehis.html ...................................................4

339131.2 4/6/2015

VISITING NURSE SERVICE OF NEW YORK, 100 YEARS IN THE
    COMMUNITY (2015), www.vnsny.org/community/our-history/100-
    years-in-the-community ................................................................................... 4

339131.2 4/6/2015

# GLOSSARY

CDPAP – Consumer Directed Personal Assistance Program

DOL – Department of Labor

339131.2 4/6/2015

## CORPORATE DISCLOSURE STATEMENT

The Consumer Directed Personal Assistance Association of New York State, Inc. is a not-for-profit corporation organized under the laws of the State of New York.  As such, there is no stock or ownership thereof.  There is no parent corporation.

## STATEMENT OF THE IDENTITY, INTEREST,
## SOURCE OF AUTHORITY TO FILE THE AMICUS BRIEF, AND
## SUMMARY OF ARGUMENT

The membership of the Consumer Directed Personal Assistance Association is made up of entities that deliver Consumer Directed Personal Assistance Services in New York State.  Approximately 14,000 individuals in New York State receive Consumer Directed Personal Assistance Services.  Members of the Association serve approximately 75% of those individuals.  The Association was formed in 2000, specifically to support the delivery of Consumer Directed Personal Assistance Services and the independence of individuals with disabilities.

Consumer Directed Personal Assistance Services are a unique form of home care.  Individuals, who are referred to as Consumers, are responsible for selecting, hiring, training, scheduling and terminating their own home care aides, referred to as Personal Assistants.  The program is open only to New York Medicaid beneficiaries, and is wholly paid for through Medicaid funds.   Fiscal Intermediaries interact with the State's Medicaid program, billing the program for

services delivered by the Personal Assistants to Consumers, and monitoring Consumers' compliance with Medicaid rules.  The wages paid to Consumers are a function of the Medicaid rate established by the State for each Fiscal Intermediary, or negotiated with a Medicaid managed care plan.

Consumer Directed Personal Assistance Services itself developed from the efforts of individuals with disabilities to take control of their own lives.  In 1980, the first Consumer Directed Program was begun in New York State, serving four individuals.  By the end of the year, one hundred were being served.  By 1985, the State Legislature had enacted § 365-f of the Social Services Law, establishing a "Patient Managed Home Care Program."  Chapter 487 of the Laws of 1987.  In 1995, the State Legislature enacted the current § 365-f, establishing the Consumer Directed Personal Assistance Program.  Chapter 81 of the Laws of 1995, § 77.  The purpose of the Program is "to permit chronically ill and/or physically disabled individuals . . . greater flexibility and freedom of choice in obtaining [home care] services.  NY Soc. Serv. Law § 365-f(1) (McKinney 2010).

This appeal involves the Department of Labor's revised regulation regarding the "companionship exemption."  Personal Assistants delivering care in the Consumer Directed program have fallen within the existing definitions of the "companionship exemption."  The Department's revised regulation will remove Personal Assistants from that exemption.  Since that exemption was first adopted,

2

the amount of home care, as Congress intended, has grown.  The nature of home

care, however, has remained the same.  Although the Department's stated purpose

is to raise the income of home care workers, in the Consumer Directed Program,

the Department's new definition will have the opposite effect.  It will reduce the

income of Personal Assistants.  It will also have an impact upon the ability of

Consumers to direct and manage their own care, thus undermining the very

foundation of the Consumer Directed Program.

Counsel for the Appellants and the Appellees have each consented to the

filing of this amicus brief.

## OTHER STATEMENTS REQUIRED BY RULE 29(c):

No party's counsel authored this brief in whole or in part.

Neither a party nor a party's counsel contributed money that was intended to

fund the preparation or submission of this brief.

No person, other than the amicus curiae, contributed money that was

intended to fund preparation or submission of this brief.

## ARGUMENT

## POINT 1

## The Historical Record Does Not Support the Department's Action

This case challenges the Department of Labor's ("DOL") practical reversal

of a forty-year-old regulation known as the Companionship Exemption.  *See*

3

*generally* 29 C.F.R. Part 552; Application of the Fair Labor Standards Act to

Domestic Service, 40 Fed. Reg. 7404 (Feb. 20, 1975). DOL explains that the

reason for this startling change in policy after forty years is the changes to the

home care industry and workforce since 1975. *See* Application of the Fair Labor

Standards Act to Domestic Service, 78 Fed. Reg. 60454, 60454 (Oct. 1, 2013).

That is a thin reed on which to base such a significant change. Home care has

changed over forty years, but the primary change has been in the amount of home

care, not its nature.

Home care has longed played a significant role in the delivery of health care,

a role that predates the creation of Medicare and Medicaid in 1965. More than a

century ago, in 1905, there were 171 associations providing home care. *See*

PINNOCK HOME CARE, HISTORY OF HOME CARE (2007),

www.pinnaclehomecare.net/homecarehis.html. In 1910, the Visiting Nurse

Service of New York (then part of the Henry Street Settlement) made 145,389

home visits. *See* VISITING NURSE SERVICE OF NEW YORK, 100 YEARS IN THE

COMMUNITY (2015), www.vnsny.org/community/our-history/100-years-in-the-

community. By 1933, that number had increased to 550,000. *Id.* In 1911,

Metropolitan Life Insurance Co. offered visiting nurse service coverage to its

policy holders. *See* www.pinnaclehomecare.net/homecarehis.html. Upon its

enactment in 1965, Medicare included home care benefits among its covered

339131.2 4/6/2015

services.  *See* Social Security Amendments of 1965, Pub. L. No. 89-97, §§ 1834,

1861, 79 Stat. 286, 303, 319-320 (1965).  Medicare coverage specifically included

home health aides.  *See generally* Social Security Amendments of 1965 § 1861;

UNDERSTANDING MEDICAID HOME AND COMMUNITY SERVICES: A PRIMER 11

(2000), http://www.aspe.hhs.gov/daltcp/reports/primer.pdf.  Home care was

established as an optional Medicaid benefit.  *See* Social Security Amendments of

1965 § 1861.  In 1970, home health coverage for those who otherwise qualified for

nursing home services became a mandatory Medicaid benefit.  *See* Social Security

Amendments of 1967, Pub. L. 90-248, § 224, 81 Stat. 821, 902 (1967).  Home

health services included not just nurses, but home health aides.  *See* Social Security

Amendments of 1965 § 1861.  Personal care services were added as an optional

service in the mid-1970s[1].  *See* UNDERSTANDING MEDICAID HOME AND

COMMUNITY SERVICES: A PRIMER 25 (2000),

http://www.aspe.hhs.gov/daltcp/reports/primer.pdf.  Apart from Medicare and

Medicaid, a significant portion of the population had private health insurance that

included private duty nursing and/or visiting nurse service.  In 1965, 56 million

---

[1] Congress codified personal care services coverage in 1993.  *See* Omnibus Budget
Reconciliation Act of 1993, Pub. L. 103-66, § 13601(a)(5), 107 Stat. 312, 613
(1993); Social Security Act § 1905(a)(24), 42 U.S.C. § 1396d (a)(24) (1993).  For
a description of the difference between home health aides and personal care aides,
*see* BUREAU OF LABOR STATISTICS, OCCUPATIONAL OUTLOOK HANDBOOK: HOME
HEALTH AIDES (2014), www.bls.gov/ooh/healthcare/home-health-aides.htm;
BUREAU OF LABOR STATISTICS, OCCUPATIONAL OUTLOOK HANDBOOK: PERSONAL
CARE AIDES (2014), www.bls.gov/ooh/healthcare/personal-care-aides.htm.

339131.2 4/6/2015

Americans had coverage for private duty nursing and 60.1 million had coverage for
visiting nurse services, 29% and 31% of the nation's population, respectively.  *See*
U.S. DEPARTMENT OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES
1974 71, Chart No. 103 (1974),
http://www2.census.gov/prod2/statcomp/documents/1974-02.pdf.  By 1972, those
numbers had risen to 108,959,000 and 115,904,000, 52.6% and 55.9% of the
nation's population, respectively.  *Id.*

By the time that the DOL adopted the "companionship exemption," health
care policy makers were working to de-emphasize institutional care.  The National
Health Planning and Resources Development Act, among other things, sought to
divert health care away from hospitals towards alternative levels of care.  *See* Pub.
L. 93-641, 88 Stat. 2225 (1975).  That the DOL adopted the companionship
exemption as Congress acted to encourage the use of home care suggests that the
DOL had acted in 1974 fully in accord with the intention of Congress.  When the
DOL adopted the companionship exemption, home care was expected to grow, at
the encouragement of the federal government.

The purpose of home care, and, largely, the delivery of home care has
remained the same over that forty-year period.  In 1974, as today, nurses,
therapists, paraprofessionals, and aides delivered home care to the disabled, frail,
and elderly who were unable to care for themselves.  In 1974, as today, home care

339131.2 4/6/2015

was a benefit covered by Medicare, and, at least in New York, Medicaid.  In 1974, as today, a beneficiary needed to be eligible to receive care in an institution in order to qualify to receive home care as a Medicare benefit.  The companionship exemption has been in place through forty years and seven presidents.  It cannot be reversed simply because home care, as the federal government encouraged and expected, is larger now than it was in 1974.[2]

## POINT 2

### DOL's Action Threatens the Existence of the Consumer Directed Personal Assistance Program

The impact upon the Consumer Directed Personal Assistance Program ("CDPAP") of this revised regulation will be particularly harsh.  The revised regulation threatens the philosophical underpinnings of CDPAP, and ultimately the program itself.

In New York, CDPAP is available only to Medicaid recipients.  *See* N.Y. SOC. SERV. LAW § 365-f (McKinney 2010).  New York has joint state/local administration of Medicaid, with local administration at the county level.  Each county is designated as a Social Services District.  *See id.* at § 61(2).  In New York

_____

[2] Ironically, as a part of the Affordable Care Act, Congress took further steps to encourage the growth of home care, creating the Community First Choice option. The option provides an additional 6% in federal financial participation for states that expand home care options, including Consumer Directed Services.  See generally 42 U.S.C. § 1396n(k); Medicaid Program; Community First Choice Option, 76 Fed. Reg. 10736 *et seq.* (Feb. 25, 2011).

City, the five boroughs are treated as one Social Services District.  *See id.* at §

61(1).  Once an individual Medicaid recipient is deemed home care eligible, the

District must offer the individual the option to enroll in CDPAP.  *See id.* at § 365-f

(2).  If the individual chooses CDPAP, the District makes a determination of how

many hours of Consumer Directed Services the individual needs.  *See* N.Y. COMP.

CODES R. & REGS. TIT. 18, § 505.28(d) (2014).  Like all Medicaid recipients in

need of home care, CDPAP participants need help with, in the bureaucratic jargon

of Medicaid, the "activities of daily living."  *See* 78 Fed. Reg. 60454, 60465-60466

(Oct. 1, 2013).  They need help with getting in and out of bed, with taking a bath,

with dressing.  They may need help with their medications.  They may have other

health-related needs.  *See* N.Y. COMP. CODES R. & REGS. TIT. 18, § 505.28(c)(5)

(2014).

     Once that assessment is completed and the consumer's total hours of service

are set, the individual, now referred to as the Consumer[3], selects a Fiscal

Intermediary[4] to assist the Consumer with program implementation.  The

---

[3] N.B., individuals are referred to as consumers, not patients.  This is different than
other forms of home care, such as personal care services, where the individuals are
referred to as "patients."  *Compare* N.Y. COMP. CODES R. & REGS. TIT. 18, §
505.14 *against* § 505.28.  This is not just a change in words.  This reflects the
philosophy of the program.  A "patient" receives care; a patient is told you need
this, I will do this for you.  A "Consumer" determines how the Consumer's care is
delivered.
[4] New York is transitioning the CDPAP to managed care.  Some of the
responsibilities of the Social Services Districts are being transferred to Medicaid

respective responsibilities of the Consumer and Fiscal Intermediary are set in regulation, and through a Memorandum of Understanding between them. *See* N.Y. COMP. CODES R. & REGS. TIT. 18, §§ 505.28(g), (i) (2014). As a CDPAP participant, the Medicaid recipient is able to recruit, hire, train, direct, and schedule their own aides, referred to as Personal Assistants. *See* 18 N.Y. COMP. CODES R. & REGS. TIT. 18, § 505.28(g)(1) (2014). The Fiscal Intermediary handles administrative functions. *See* N.Y. COMP. CODES R. & REGS. TIT. 18, § 505.28(i) (2014). It collects Personal Assistant time sheets from consumers, reviews them for Medicaid compliance, and bills and collects for those services from Medicaid. *See* N.Y. COMP. CODES R. & REGS. TIT. 18, § 505.28(i)(1)(j) (2014). The Fiscal Intermediary has no clinical responsibilities. The fiscal intermediary also handles payroll, withholding taxes, and Workers' Compensation and Disability premiums[5]. *See* N.Y. COMP. CODES R. & REGS. TIT. 18, § 505.28(i)(1)(i).

The *sine qua non* of the CDPAP is, as the name states, consumer direction. The CDPAP grew out of the disability rights movement. It is a unique program. The CDPAP allows the individual to take control of his or her own care and thereby take control of his or her own life. *See* UNDERSTANDING MEDICAID HOME

---

Managed Care insurers. Although that transition presents certain issues, none of those transitional issues are relevant to the analysis here.

[5] New York State requires most employers to participate in its statutory disability insurance program. See generally N.Y. WORKERS' COMP. LAW §§ 2, 3 (McKinney 2010).

339131.2 4/6/2015

AND COMMUNITY SERVICES: A PRIMER 115, 118 (2000),

http://www.aspe.hhs.gov/daltcp/reports/primer.pdf.  An agency does not send an

aide.  The Consumer recruits his or her own aide.  An agency does not say "our

aide will be to your home between the hours of 8 and 12."  The Consumer decides

when the Consumer's own Personal Assistant will work, within the authorized

hours, and according to what works best for the Consumer.

    The CDPAP is the gem of the Medicaid program.  It is quintessentially

American.  It is about liberty.  In the CDPAP, the individual, not the agency,

decides when to get up, when to take a bath, when to get dressed, and when to go

to bed.  The individual decides who to let in to his or her own home.  The

individual decides how services are delivered.  The individual decides who can

touch his or her body.  The individual is in charge of his or her own life.

    This radically revised regulation affects the CDPAP in a very different way

than other home care providers.  The DOL, in the commentary accompanying the

Notice of Adoption, recognized the unique impact the changed regulation can have

upon the CDPAP.  *See generally* 78 Fed. Reg. 60454, 60515-60517 (Oct. 1, 2013).

The impact is different because of the split in duties between the fiscal

intermediary and the Consumer.  The Consumer hires, fires, trains and schedules.

Those are all employer duties.  The fiscal intermediary, however, writes the check.

The fiscal intermediary may set the hourly wage.  For purposes of unemployment

insurance and Workers' Compensation and Disability Benefits, the fiscal intermediary is regarded as the employer.

These split duties raise the question of who is the employer, the Consumer or the fiscal intermediary, or are they joint employers under the Fair Labor Standards Act? This question does not arise in other home care settings. In the more usual agency setting, the home care agency is the employer. The agency hires, fires, sets job descriptions, trains, supervises, and pays the home care workers, and is responsible for their actions. *See, e.g.,* N.Y. COMP. CODES R. & REGS. TIT. 18, § 505.14(e) (2014); N.Y. COMP. CODES R. & REGS. TIT. 18, § 505.23(b)(1) (2014); N.Y. COMP. CODES R. & REGS. TIT. 10, § 763.4 (2014). DOL's dramatically changed regulation may add to a home care agency's costs, but it does not alter the relationship between the aide and the home care agency as employer.

The employer question, though, is of singular importance to the CDPAP. DOL, in its commentary adopting this revised regulation, acknowledged as much:

> [A]n individual who hires a direct care worker . . . to provide services pursuant to a Medicaid-funded consumer directed program may be a joint employer with the state agency that administers the program. Generally, where a joint employment relationship exists, "all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act." [29 C.F.R.] § 791.2(a). . . . The third party employer will not be able to claim that exemption.

339131.2 4/6/2015

> Determinations about the existence of an employment or joint employment relationship are made by examining all the facts in a particular case and assessing the "economic realities" . . . . Factors to consider may include whether an employer has the power to direct, control, or supervise the worker(s) or the work performed; . . . the power to hire or fire, modify the employment conditions or determine the pay rates . . . .

78 Fed. Reg. 60454, 60483 (Oct. 1, 2013). "Any change in the specific facts . . . may lead to a different conclusion regarding the employer status of the fiscal/employer agent." 78 Fed. Reg. 60454, 60484 (Oct. 1, 2013).

The radically revised regulation does not change any of the standards regarding who is the employer. *See generally* 78 Fed. Reg. 60454 *et seq.* (Oct. 1, 2013). The new regulation, however, changes the dynamic. In virtually every circumstance under New York's Consumer Protection Program, more than 20% of the Personal Assistant's time will be spent on tasks that do not meet the new regulatory definition.[6] This means that under the new regulation, each Consumer Directed Personal Assistant will be deemed outside of the Companionship Exemption. Each Personal Assistant will then be eligible for overtime and travel time between consumers even though the Fiscal Intermediaries do not schedule.

---

[6] In New York, the Consumer Directed Program is considered a form of Personal Care Services. *See* N.Y. COMP. CODES R. & REGS. TIT. 18, § 505.28(b)(3) (2014). Personal care is divided into Level 1 and Level 2. *See* N.Y. COMP. CODES R. & REGS. TIT. 18, § 505.14(a)(6) (2014). Arguably, Level 1 services will continue to fall within the exemption. Level 1 services, though, are limited to eight hours per week. *See id.* at § 505.14(a)(6)(i)(b). Few, if any, Consumer Directed Program participants are limited to eight hours per week.

339131.2 4/6/2015

By changing the dynamic, DOL forces Consumer Directed Fiscal Intermediaries into decisions that could impact whether they would be regarded as joint employers.

Fiscal Intermediaries risk losing control of their budgets. If a Consumer schedules a Personal Assistant for fifty hours, the Fiscal Intermediary will have to pay ten hours of overtime. If a Personal Assistant works for more than one Consumer who utilizes the same Fiscal Intermediary, and both Consumers schedule the Personal Assistant for thirty hours, the Fiscal Intermediary will have to pay twenty hours of overtime. In addition, the Fiscal Intermediary, even though it had nothing to do with the scheduling or the selection of the Personal Assistants, will be required to pay for travel time, adding further to the overtime costs.

Consumer Directed Fiscal Intermediaries will face a Hobson's Choice between uncontrolled costs or limitations on Consumers' scheduling decisions. Decisions that affect scheduling are a factor in the determination of joint employment. *See* 78 Fed. Reg. 60454, 60483 (Oct. 1, 2013). If a Consumer Directed Fiscal Intermediary's decision tips the balance towards joint employment, a vicious cycle begins. The Fiscal Intermediary, having crossed over to joint employer, would then need to manage the employment relationship. The Consumer would lose autonomy. The Consumer would lose the ability to direct his or her own care.

339131.2 4/6/2015

This is not some esoteric concern. Many, many consumers receive more than forty hours per week of Consumer Directed care. Many, many Personal Assistants work for more than one Consumer using the same Fiscal Intermediary. These costs cannot be offset from other sources. Since the New York Consumer Directed Program is limited to Medicaid beneficiaries, program funds are limited to Medicaid dollars. What Personal Assistants can be paid is a function of the Medicaid reimbursement rate.

The DOL is sanguine about this problem. DOL says there will be less turnover, patient care will improve, and home care workers will earn more. *See* 78 Fed. Reg. 60454, 60456, 60468 (Oct. 1, 2013). None of that is true in the Consumer Directed program. If home care hours are limited, Consumer Directed Personal Assistants will earn less, not more. If a Consumer Directed Fiscal Intermediary were to ban overtime, the Personal Assistant who formerly worked and was paid for fifty hours would be limited to forty hours. Less. The Personal Assistant who worked sixty hours between two Consumers would be limited to forty hours. Less.

This will also have an effect on Consumers. Not only will they have less control of scheduling decisions, they will also have to recruit and train more Personal Assistants. For many Consumers, recruitment is the most difficult feature of the CDPAP. Since fiscal intermediaries do not involve themselves in the hiring

14

process, they do not participate in recruiting.[7]  Consumers do that on their own, using what resources they have—the web, want-ads, postings at local markets and word-of-mouth.  Once recruited, the Consumer must train the Personal Assistant.  *See* N.Y. COMP. CODES R. & REGS. TIT 18, § 505.28(g) (2014).  Individuals do not come pre-trained, as they would from a home care agency.  *See generally* N.Y. PUBLIC HEALTH LAW § 3613(2).  Some number of new hires will not work out.  Consumers may begin to question why they should participate in the CDPAP at all, when a home care agency can handle these things for them.

Consumers may feel the impact of this reversed regulation in another way.  In the New York Consumer Directed Program, outside of mother, father, spouse, and authorized representative, there are few limitations on who may act as a Personal Assistant.  *See* N.Y. COMP. CODES R. & REGS. TIT. 18, § 505.28(b)(3) (2014).  This means that many Consumers and Personal Assistants have pre-existing, close relationships.  They may even reside with the Consumer.  They may have no interest in working for another Consumer.  When the income of the Personal Assistant is cut, in many instances that cut is felt by the Consumer.

There is a particular absurdity in all of this.  So much of home care is government financed that one wonders who is the target of this revised regulation.  Indeed, the Department of Health and Human Services has warned states that the

---

[7] Some fiscal intermediaries do maintain unreviewed lists of individuals who have expressed interest in working as a Personal Assistant.

15

implementation of the DOL regulation must not interfere with patient well-being.

*See* 78 Fed. Reg. 60454, 60486-60487 (Oct. 1, 2013); LETTER TO COLLEAGUE FROM U.S. DEPARTMENT OF JUSTICE & U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES 2-3 (Dec. 15, 2014),

http://www.hhs.gov/ocr/civilrights/resources/specialtopics/community/2014hhsdoj dearcolleagueletter.pdf.  The issue could be addressed so much more directly. Medicare reimbursement rates could support higher home care worker wage scales if only the federal government had the willingness to act.  At the State level, Medicaid rates could be raised.  Instead, in New York, four years ago, the State cut reimbursement rates to Consumer Directed Fiscal Intermediaries as home care rates were cut across-the-board.  *See* 2013-14 N.Y.S. EXECUTIVE BUDGET: HEALTH AND MENTAL HYGIENE ARTICLE VII LEGISLATION 11 (Jan. 20, 2013),

https://www.budget.ny.gov/pubs/archive/fy1314archive/eBudget1314/fy1314artVI Ibills/HMH_ArticleVII.pdf ("all Medicaid payments made for services provided on and after April 1, 2011, shall . . . be subject to a uniform two percent reduction"). Despite entreaties, rates have remained frozen.  CDPAANYS' legislative priority has been rate increases directly tied to higher Personal Assistant wages.  *See* TESTIMONY OF CDPAANYS ON 2015-2016 STATE FISCAL YEAR EXECUTIVE BUDGET (Feb. 2, 2015),

http://www.nysenate.gov/files/Consumer%20Directed%20Personal%20Assistance

[%20Association%20of%20NY.pdf](%20Association%20of%20NY.pdf); TESTIMONY OF CDPAANYS ON 2014-15

STATE FISCAL YEAR EXECUTIVE BUDGET (Feb. 3, 2014),

[http://assembly.state.ny.us/write/upload/files/testimony/20140203_health/2014020](http://assembly.state.ny.us/write/upload/files/testimony/20140203_health/20140203-Health&Medicaid-Caputo.pdf)

[3-Health&Medicaid-Caputo.pdf](http://assembly.state.ny.us/write/upload/files/testimony/20140203_health/20140203-Health&Medicaid-Caputo.pdf).  CDPAANYS wants Personal Assistants to earn

more.  The revised regulation means they will earn less.

## POINT 3

### <u>The Decision of the District Court Should Be Affirmed</u>

For all the reasons stated in the Appellee's brief, and for those reasons stated

in this brief, 29 C.F.R. Part 552, as revised, is contrary to Congressional intent, and

without a basis in law.  The Decision of the District Court should be affirmed.

## CONCLUSION

The decision of the district court should be affirmed.

Dated: April 6, 2015

BOND, SCHOENECK & KING, PLLC
Attorneys for Consumer Directed Personal
Assistance Association of New York State

By:    /s/ Michael Billok
        Michael Billok
        Hermes Fernandez
     22 Corporate Woods Boulevard, Suite 501
     Albany, New York 12211
     Telephone:  (518) 533-3236
     Facsimile:  (518) 533-3284

17                                      339131.2 4/6/2015

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, Michael Billok, an employee of Bond Schoeneck & King, PLLC, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 4,292 words and complies with the type-volume limitations of Rule 32(a)(7)(B).

/s/ Michael Billok
Michael Billok, Esq.
Bar Roll No. 54765

18

339131.2 4/6/2015

## CERTIFICATE OF SERVICE

I, Michael Billok, hereby certify that, on April 6, 2015, I electronically filed the foregoing brief with the Clerk of this Court by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Michael Billok
Michael Billok, Esq.
Bar Roll No. 54765

339131.2 4/6/2015