ORAL ARGUMENT SCHEDULED FOR MAY 7, 2015

No. 15-5018

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

HOME CARE ASSOCIATION OF AMERICA;
INTERNATIONAL FRANCHISE ASSOCIATION;
NATIONAL ASSOCIATION FOR HOME CARE & HOSPICE,

Plaintiffs-Appellees,

v.

DAVID WEIL, Administrator of the Wage and Hour Division,
U.S. Department of Labor; THOMAS E. PEREZ, Secretary of Labor;
U.S. DEPARTMENT OF LABOR,

Defendants-Appellants.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA (No. 14-cv-967) (Hon. Richard J. Leon)
_____

CORRECTED BRIEF FOR *AMICI CURIAE* MEMBERS
OF CONGRESS IN SUPPORT OF APPELLEES
_____

Michaelle L. Baumert, Esq.
Henry L. Wiedrich, Esq.
Husch Blackwell LLP
13330 California St., Suite 200
Omaha, NE  68154
Tel: (402) 964-5000
Fax: (402) 965-5050
michaelle.baumert@huschblackwell.com
henry.wiedrich@huschblackwell.com

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIR. R. 28(a)(1)

### A.     Parties and *Amici Curiae*

All parties, intervenors, and *amici* appearing in the District Court are listed in the Brief for Plaintiffs-Appellees.  Except for the *amici* Members of Congress listed herein, all parties and intervenors in this Court are listed in the Brief for Plaintiffs-Appellees.

### B.     Ruling under Review

Reference to the rulings at issue appears in the Brief for Plaintiffs-Appellees.

### C.     Related Cases

None known.

# TABLE OF CONTENTS

Page

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIR. R. 28(a)(1) ........................................ i

TABLE OF AUTHORITIES ................................................... iv

STATUTES AND REGULATIONS ....................................... 1

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY ...................... 2

CERTIFICATION OF NEED TO FILE SEPARATE BRIEF PURSUANT TO CIR. R. 29(d) ................................................. 4

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ................................................... 5

SUMMARY OF ARGUMENT ................................................ 6

ARGUMENT ................................................................. 8

     I.     NEITHER THE SUPREME COURT'S DECISION IN *COKE* NOR SUBSEQUENT ACTION BY CONGRESS SUPPORTS THE POSITION THAT THE COMPANIONSHIP EXEMPTION REMAINED UNCHANGED BECAUSE CONGRESS "LEFT THE ISSUE TO THE DOL TO DECIDE." ................................... 8

     II.     THE AMENDED REGULATIONS OF THE DEPARTMENT OF LABOR ("DOL") IMPERMISSIBLY EXCEED THE SCOPE OF THE DOL'S AUTHORITY AND SUBVERT CONGRESSIONAL INTENT ........................... 11

         A.     The Amended "Third Party Employer" Regulation Is Contrary to the FLSA's Plain Text ............................... 11

         B.     The New "Third Party Employer" Regulation Conflicts with the FLSA's Legislative History ..................... 14

C.    The Amended Companionship Exemption "Duties" Regulation Fails the *Chevron* Analysis Because It Is Contrary to the FLSA's Plain Text and Effectively Repeals the Exemption Without Congressional Action.......................................................................................16

D.    The Amended "Duties" Regulation Is Contrary to the Legislative History, and Thus Fails the *Chevron* Analysis....................................................................................19

III.    THE DOL'S REVISED REGULATIONS WILL HAVE DEVASTATING IMPACTS ON THE ELDERLY, THEIR FAMILIES, AND THEIR CAREGIVERS, ALL OF WHICH CONGRESS INTENDED TO AVOID IN ENACTING THIS EXEMPTION ....................................................................................21

**CONCLUSION**.......................................................................................**25**

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE** ...............................................................**27**

**CERTIFICATE OF SERVICE** ..............................................................**27**

# TABLE OF AUTHORITIES

<u>Page</u>

## FEDERAL CASES

\* *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ..................................................... 11, 14, 16, 19, 21

*Commodity Futures Trading Comm'n v. Schor,*
478 U.S. 833 (1986) ................................................................................9

*Holtville Alfalfa Mills, Inc. v. Wyatt,*
230 F.2d 398 (9th Cir. 1955) ...............................................................12

\* *Long Island Care at Home, Ltd. v. Coke,*
551 U.S. 158 (2007) ................................................ 6, 7, 8, 9, 10, 16, 25

*Neonatology Assocs., P.A. v. Comm'r of Internal Revenue,*
293 F.3d 128 (3d Cir. 2002) ...................................................................4

*NLRB v. Bell Aerospace Co.,*
416 U.S. 267 (1974) ................................................................................9

*U.S. v. Gonzales,*
520 U.S. 1 (1997) ..................................................................................12

## STATUTES

29 U.S.C. Sec. 207 ................................................................................13

\* 29 U.S.C. Sec. 213.................................................. 11, 12, 13, 14, 17, 18

## RULES

29 C.F.R. 552.109 ...................................................................................7

29 C.F.R. 552.6 .................................................................. 7, 16, 17, 19

\* = Authorities upon which we chiefly rely are marked with asterisks.

29 C.F.R. 552.6(b) (proposed) ...................................................................17

29 C.F.R. 780.303 ...................................................................................12

D.C. Cir. R. 28 ...........................................................................................i

D.C. Cir. R. 29 ...........................................................................................4

D.C. Cir. R. 32 ........................................................................................27

Fed. R. App. P. 29 ..............................................................................4, 27

Fed. R. App. P. 32 ..................................................................................27

## LEGISLATIVE MATERIALS

* 119 Cong. Rec. 24,797 (Sen. Dominick, discussing letter from
   Hilda R. Poppell).......................................................................................15

* 119 Cong. Rec. 24,801 (emphasis added) ............................................20

* 119 Cong. Rec. at 24,796 (Sen. Dominick)............................................15

* 188 Cong. Rec. 24,715 (July 20, 1972) .................................................15

* 188 Cong. Rec. 24,798 (Sen. Johnston).................................................15

* 188 Cong. Rec. 24,801 (Sen. Burdick) ..................................................15

Act of Dec. 9, 1999, Pub. L. No. 106-151, § 1, 113 Stat. 1731 ...................9

Fair Labor Standards Amendments of 1989, Pub. L. 101-157, 103
   Stat. 938 ...................................................................................................9

Fair Minimum Wage Act of 2007, Pub. L. 110-28, title VIII, 121 Stat.
   188 .............................................................................................................9

Minimum Wage Increase Act of 1996, Pub. L. 104-188, § 2104, 110
   Stat. 1928 .................................................................................................9

Testimony of Wynn Esterline before the House Committee on
   Education and the Workforce Concerning "Ensuring Regulations

Protect Access to Affordable and Quality Companion Care," March
20, 2012 ...............................................................................................22

## OTHER AUTHORITIES

*"Companionship Services Exemption Survey,"* conducted by the
National Association of Home Care and Hospice and the National
Private Duty Association, January 11, 2012...........................................22

*"Economic Impact of Eliminating the FLSA Exemption for
Companionship Services,"* IHS Global Insight, February 21, 2012.........22

XinQi Dong, MD, et al., Elder Self-Neglect and Abuse and Mortality
Risk in a Community-Dwelling Population, 302 JAMA 5 (Aug.
2009) .....................................................................................................24

## STATUTES AND REGULATIONS

All pertinent statutes and regulatory materials are contained in the brief for Plaintiffs-Appellees Home Care Association of America; International Franchise Association; and National Association for Home Care & Hospice.

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY

United States Senator Pat Roberts is a Member of the Committee on Health, Education, Labor, and Pensions.  Representative Tim Walberg, 7th Congressional District of Michigan, is a Member of the House Committee on Education and the Workforce.  In addition, the following Senators and Representatives[1] join Sen. Roberts and Rep. Walberg in supporting this brief:

**<u>Senators</u>**
Sen. Mitch McConnell
- Senate Majority Leader
- Member of Committee on Appropriations

Sen. Pat Roberts
- Member of Committee on Health, Education, Labor, and Pensions

Sen.  Lamar Alexander
- Chairman of Committee on Health, Education, Labor, and Pensions
- Member of Committee on Appropriations

Sen. Roy Blunt
- Member of Committee on Appropriations
- Chairman of Subcommittee on the Departments of Labor, Health and Human Services, Education, and Related Agencies

Sen. John Boozman
- Member of Committee on Appropriations

Sen. Mike Enzi
- Chairman of Committee on the Budget

---

[1] Only a portion of the *amici* Members of Congress' committee assignments are included herein.

- Member of Committee on Health, Education, Labor, and Pensions

Sen. Johnny Isakson
- Member of Committee on Health, Education, Labor, and Pensions

Sen. Marco Rubio
- Member of Committee on Small Business and Entrepreneurship

**Representatives**
Rep. Tim Walberg
- Member of the House Committee on Education and the Workforce

Rep. Lynn Jenkins
- Member of House Committee on Ways & Means

This case concerns the proper application, interpretation, and administration of the Fair Labor Standards Act by the Department of Labor, in accordance with the plain language of the statute and Congressional intent.  The Members of Congress have a distinctive interest in the proper interpretation of federal law.

Each Member of Congress supporting this *amicus curiae* brief is filing on her or his own authority as a duly elected and qualified member of the United States Congress.  Several Members, including Senator Roberts, Senator Alexander, Senator Blunt, Senator Enzi, Senator Isakson, and Representative Walberg, also hold positions on committees that oversee the FLSA, the Department of Labor, and its regulations.

## CERTIFICATION OF NEED TO FILE SEPARATE BRIEF
## PURSUANT TO CIR. R. 29(d)

Undersigned counsel certifies that this separate *amicus curiae* brief is necessary because the plain language of the FLSA and the intent of Congress in enacting such language are of pivotal importance to the proper resolution of the issues before the Court, and no other party or *amicus curiae* can better represent Congress's intentions and actions than Members of Congress.  The Members of Congress also have a distinctive interest in the proper interpretation and enforcement of federal law.  The distinctive voice of Members of Congress is both "desirable" and "relevant" to resolution of the issues before this Court. Fed. R. App. P. 29(b)(2); see also *Neonatology Assocs., P.A. v. Comm'r of Internal Revenue,* 293 F.3d 128, 132 (3d Cir. 2002) ("The criterion of desirability set out in Rule 29(b)(2) is open-ended, but a broad reading is prudent.").

4

**STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS**

This brief was authored by Husch Blackwell LLP, counsel for the Members of Congress listed supra.  No party or party's counsel authored this brief, in whole or in part.  No party or party's counsel contributed money that was intended to fund preparing or submitting the brief.  No person has contributed money that was intended to fund the preparation and submission of this brief.

## SUMMARY OF ARGUMENT

As the majority voice in Congress, we submit this *amicus curiae* brief to provide the Court insight into Congressional intent and action since the enactment of the companionship exemption in 1974 and, in more recent years, following the Supreme Court's ruling in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007).

Congress enacted the companionship exemption to the Fair Labor Standards Act ("FLSA") in 1974 to control the costs of necessary in-home care for individuals who wish to remain in their homes but, because of age or infirmity, would otherwise be unable to remain independent. The statutory language and legislative history of the FLSA companionship exemption clearly demonstrate that: (1) the companionship exemption and the live-in exemption apply to "any employee," regardless of the identity of the employer; and (2) care is a central purpose of companionship services as contemplated by the exemption.

Although the FLSA has been amended by Congress since 1974, Congress has not amended the companionship exemption and, until recently, the DOL applied it consistent with the statutory text and Congressional intent. There have been efforts by the now-minority in Congress to amend the companionship services exemption to make it

6

inapplicable to employees of third party employers and place a limit on the provision of care. However, these efforts were rejected by Congress.  What is evident is that Congress has fully intended for the companionship services exemption to apply to all employees, regardless of the identity of their employers, and that such services must include the provision of personal care services in a meaningful way—which is exactly how the exemption was applied from its inception, through *Coke*, and until the Department of Labor's ("DOL") recent amendment of the regulations.

The DOL's amended regulations relative to the companionship and live-in exemptions (29 C.F.R. 552.109, which prevents third-party employers from "availing themselves" of the companionship and live-in exemptions, and 29 C.F.R. 552.6, which limits the provision of care to just 20 percent of a companion's working time) ignore the plain statutory language and subvert Congressional intent, with potentially devastating effects to the aged and infirm and their families.  These are the exact effects Congress intended to avoid by enacting the companionship exemption and when choosing not to amend the exemption after *Coke*.

**ARGUMENT**

**I.    NEITHER THE SUPREME COURT'S DECISION IN *COKE* NOR SUBSEQUENT ACTION BY CONGRESS SUPPORTS THE POSITION THAT THE COMPANIONSHIP EXEMPTION REMAINED UNCHANGED BECAUSE CONGRESS "LEFT THE ISSUE TO THE DOL TO DECIDE."**

In their *amicus* brief supporting the DOL, the Congressional minority argues at length that the supposed "silence" of Congress since the enactment of the companionship exemption in 1974, even after the Supreme Court's decision in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007), fails to demonstrate Congress' support of how the exemption has always been interpreted and applied since enactment of the exemption.  Instead, they argue that Congress' failure to enact anything new since *Coke* shows "that Congress had already left the issue for the DOL to decide."  [Doc. No. 1540037, p. 11].  This position ignores the factual and legislative realities of Congressional action as to the companionship exemption since 1974, misconstrues the holding in *Coke*, and ignores established authority on statutory interpretation and legislative intent.

As noted by the District Court, "[i]t is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise

or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" [Dkt. 32, p. 12]; *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–275 (1974)). Here, multiple amendments[2] to the FLSA were enacted since 1974, none of which revised or repealed the companionship exemption. This evidences that Congress was not merely "silent," as alleged by the Congressional minority, but fully intended for the companionship services exemption to apply to all employees, regardless of the identity of their employer, and that such services must include the provision of care in a meaningful way. See [Doc. No. 1540037, p.10].

The combination of (1) actions to amend other parts of the FLSA; and (2) maintaining the status quo after *Coke* as to the companionship exemption demonstrate that the status quo was Congress' intent and

---

[2] *See, e.g.*, Fair Minimum Wage Act of 2007, Pub. L. 110-28, title VIII, 121 Stat. 188 (amending the FLSA to increase minimum wage rates); Act of Dec. 9, 1999, Pub. L. No. 106-151, § 1, 113 Stat. 1731 ("An act to amend the Fair Labor Standards Act of 1938 to clarify the overtime exemption for employees engaged in fire protection activities."); Minimum Wage Increase Act of 1996, Pub. L. 104-188, § 2104, 110 Stat. 1928 (amending the FLSA in various ways, including amending the computer professionals exemption); Fair Labor Standards Amendments of 1989, Pub. L. 101-157, 103 Stat. 938 (amending the FLSA in various respects but making no change to the companionship exemption).

consistent with the statutory text, not that Congress delegated the authority to the DOL.

Finally, the argument that the "issue had been left to the DOL" relies upon an unsupportable and incorrect reading of the holding in *Coke*. Distilled to its core, the Congressional minority's argument is that the companionship exemption left gaps to be filled by the DOL, Congress ceded all authority regarding interpretation and application of the exemption to the DOL, and therefore the DOL can ignore the plain language of the statute. [Doc. No. 1540037, pp. 11-12].  However, *Coke* did not grant the DOL carte blanche to implement whatever regulatory scheme it saw fit, independent of and disconnected from the statutory language.  In fact, *Coke* confirmed that the DOL must comply with the statutory language and Congressional intent. *See Coke*, 551 U.S. at 162 ("The question before us is whether, in light of the statute's text and history, and a different (apparently conflicting) regulation, the Department's regulation is valid and binding.").

Moreover, if such argument was accepted, it would necessarily tip the balance of power so far in favor of the Executive Branch (and against the Legislative Branch) so as to make Congress merely an advisory panel to the federal agencies.  Delegation of authority to fill gaps left in legislation is

not a blank check to rewrite legislation or repeal duly enacted exemptions entirely by regulatory fiat.

**II.** **THE AMENDED REGULATIONS OF THE DEPARTMENT OF LABOR ("DOL") IMPERMISSIBLY EXCEED THE SCOPE OF THE DOL'S AUTHORITY AND SUBVERT CONGRESSIONAL INTENT**.

**A.** **The Amended "Third Party Employer" Regulation Is Contrary to the FLSA's Plain Text.**

It is first necessary to examine the language of the statutory provision at issue itself when attempting to determine the meaning of a Congressional enactment. *See Chevron USA, Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984). This inquiry, Step One of the *Chevron* analysis, ends if the language is unambiguous and the intent of Congress is clear. *See Id.* at 842-844. Such is the case here.

Section 13(a)(5) of the FLSA specifically states that the FLSA minimum wage and overtime provisions shall not apply with respect to "**any** employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by the regulations of the Secretary)." 29 U.S.C. Sec. 213(a)(15) (emphasis added). Similarly, Section 213(b)(21) exempts "**any** employee who is employed in domestic service in a household and who resides in such household." 29 U.S.C. Sec. 213(b)(21) (emphasis added). The statutory

text clearly affirms that Congress intended to apply the companionship and live-in exemptions based on the duties and/or status of the employee, regardless of the identity of the employer.

Indeed, the use of the term "any" is expansive. *See, e.g., U.S. v. Gonzales,* 520 U.S. 1, at 5 (1997) (meaning "one or some indiscriminately of whatever kind . . ."). There is no ambiguity in the use of "any employee" in the applicable statutory language. The plain meaning of this term is that "any employee" providing companionship services is exempt, regardless of the identity of the employer. This fact is generally recognized by the DOL. For example, the FLSA provides exemptions for "any employee employed in agriculture" who meets certain enumerated qualifications. 29 U.S.C. Sec. 213(a)(6)(A). The DOL's regulations on that exemption recognize the significance of the language "any employee":

> Section 13(a)(6)(A) exempts 'any employee employed in agriculture * * * by an employer * * *.' It is clear from this language that it is the activities of the employee rather than those of his employer which determine the application of the exemption.

29 C.F.R. 780.303. *See also Holtville Alfalfa Mills, Inc. v. Wyatt,* 230 F.2d 398, 400, 401-402 (9th Cir. 1955).

If Congress intended in 1974 to limit the companionship or live-in exemptions based on the identity of the employer, it would have done so

expressly, as had been done with other FLSA exemptions. *See, e.g.*, 29 U.S.C. Sec. 213(a)(3) (exemption for "any employee employed by an establishment which is an amusement or recreational establishment, organized camp, or religious non-profit educational conference center"); 29 U.S.C. Sec. 213(b)(3) ("any employee of a carrier by air"); 29 U.S.C. Sec. 207(i)("any employee of a retail or service establishment"). The combination of the absence of such limiting language regarding the identity of the employer, coupled with the inclusionary language in referring to covered employees, leaves no doubt about Congressional intent on this issue. In short, there is no "gap" for the DOL to fill with regard to the identity of the employer.

Defendant-Appellants contend that the DOL's authority to prohibit application of the exemption based on employer identity is grounded in the statutory text of Section 213(a)(15), which authorizes the DOL to "define and delimit" the terms of the Section."[3] There is absolutely no basis for this contention. The new "third party employer" regulation does not "define or delimit" any statutory term found in Section 213(a)(15). Instead, it reaches

---

[3] It is important to note that this authority is not found anywhere in regard to the "live-in" exemption, Section 213(b)(21). The new "third party regulation," however, applies to employers of companions and of live-in employees to require them to pay their exempt employees differently than other employers.

beyond the statute to determine which employers may pay employees according to their exempt companion status, and which employers may not. In doing so, the DOL reaches far beyond any authority it was given to "define and delimit," to create an entirely new requirement not authorized in any way by the plain language of the statute.

The plain language of Sections 213(a)(15) and 213(b)(21) support the District Court's ruling that this regulation must be vacated. Accordingly, the *Chevron* analysis should end on the "third party" regulation at this point, at *Chevron* Step One, and the District Court's Order vacating this regulation should be upheld.

### B. The New "Third Party Employer" Regulation Conflicts with the FLSA's Legislative History.

Even if the statutory language on this issue were not clear and it were necessary to move on to *Chevron* Step Two, the analysis would demand the same result—upholding the District Court's December 22, 2014, Order vacating the "third party employer" regulation.

The following definition of a private household worker, written by the DOL in 1973, was read into the record during the Senate floor debate regarding the exemption:

> The term "private household workers" includes all
> workers 14 years and older who work for wages,
> including pay-in-kind, in or about a private residence

> and are employed by: (1) a member of the
> household occupying that residence or (2) by a
> household service business whose services have
> been requested by a member of the household
> occupying that residence.

119 Cong. Rec. at 24,796 (Sen. Dominick).

The full scope of the legislative history makes clear that Congress created the companionship exemption in order to ensure that working families could obtain companionship services for their elderly or infirm loved ones—a concern that has nothing to do with the identity of the companion's employer. In adopting the exemption, floor debate included several statements related to concerns about the ability of working families to afford companionship services for their loved ones and keep them out of institutionalized nursing home care if the FLSA's minimum wage and overtime obligations applied. *See* 119 Cong. Rec. 24,797 (Sen. Dominick, discussing letter from Hilda R. Poppell) (exemption was intended "to allow those in need of such services to find such assistance at a price they can afford"), 24,798 (Sen. Johnston), 24,801 (Sen. Burdick); 188 Cong. Rec. 24,715 (July 20, 1972) (statement of Senator Taft) (noting that certain domestic services are directed to caring for the elderly in their homes and avoiding nursing home placement).

There was no mention at any time in floor debate or otherwise that these concerns only existed if the wages were paid to the employee directly by the elderly or infirm person rather than through a third party employer. Affordability of companionship services was clearly the motivating factor in adopting this exemption—an issue that has no relationship to the identity of the employer. There is absolutely no support in the legislative history for the exclusion of otherwise exempt employees of third parties, nor for the assertion that Congress intended only to exempt those employees whose performance of companionship services was not a "vocation." In fact, these arguments have already been rejected by the Supreme Court in its ruling in *Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158 (2007) ("We do not find these arguments convincing.")

In short, the new "third party employer" regulation fails the *Chevron* Step One and Step Two analysis and the Order vacating that regulation should be upheld.

**C.    The Amended Companionship Exemption "Duties" Regulation Fails the *Chevron* Analysis Because It Is Contrary to the FLSA's Plain Text and Effectively Repeals the Exemption Without Congressional Action.**

The duties restrictions embodied in the new regulations at 29 C.F.R. 552.6 are also directly contrary to the plain meaning of the statutory language at issue. As such, Step One of the *Chevron* analysis ends here.

The statutory language regarding the companionship exemption provides that the FLSA's minimum wage and overtime obligations shall not apply to "any employee employed in domestic service employment **to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves** . . . ."  29 U.S.C. Sec. 213(a)(15) (emphasis added).

As the District Court noted in its Order of January 14, 2015, there is no ambiguity to this language.  It is clear that the exemption is meant to cover workers who provide services to those who need care, and the services required by such individuals are clearly "care" itself.

Since 1974, the DOL has recognized this obvious truth, applying a definition of "companionship services" that provides for necessary care to be administered to the aged or infirm individual.  *See* 29 C.F.R. 552.6. With the new regulations, however, the DOL has proposed to change those duties drastically, effectively gutting the exemption and eliminating it entirely without Congressional approval.  The DOL proposes to do this this by limiting necessary care to a mere 20 percent of work hours, and instead requiring that more than 80 percent of a worker's time be spent on fellowship (conversation, reading, games, crafts, etc.) and protection (being present with the aged or infirm person).  *See* 29 C.F.R. 552.6(b)

(proposed).  Indeed, of the three categories of duties the DOL has used to define the meaning of "companionship services," only one—*care*—is specifically named in the statutory language.  "*Fellowship and protection*" are DOL-created duties not found in the statute.  It is clear that the DOL exceeds its authority by focusing the entire exemption on the categories of "fellowship" and "protection," and relegating "care" to just 20 percent of the companion's time.[4]

To be sure, it would be the rare elderly or infirm individual who would choose to use his limited resources to pay someone to sit in his home to primarily play games and talk, when he is unable to care for himself by bathing, dressing, and eating on his own.  Relegating "care" to a minor 20 percent, as the DOL has done with the new regulations, ignores the plain meaning of the statutory language of Sec. 213(a)(15).[5]  As such, the new

---

[4] As the District Court noted in its January 14, 2015 Order, this 20 percent restriction is not based on any relationship to the needs of the elderly or infirm, or any study of the way such services are provided or how long they normally should take.  (JA 57).  The Defendants-Appellants have not contested that finding at all.

[5] The Defendants-Appellants regularly confuse references in the record to the provision of incidental "household work" with the provision of care in arguing that Congress never intended certain activities to be exempt.  Assistance with activities of daily living and other tasks related to the ability of the elderly or infirm person to remain independent have always been considered part of the employee's core duties.

"duties" regulation subverts the plain language of the statute and was appropriately vacated.

### D. The Amended "Duties" Regulation Is Contrary to the Legislative History, and Thus Fails the *Chevron* Analysis.

These drastic changes to the "duties" regulation found at the new 29 C.F.R. 552.6 are not only contrary to the plain statutory language of the exemption as stated above, but they are also contrary to the legislative history surrounding the enactment of the companionship exemption.

The legislative history provides that "care" for those who are "unable to care for themselves" is an integral part of what was contemplated in creating the companionship exemption:

> MR. BURDICK:  . . . . The Senator has used the word "companion" in the exception.  When the Senator uses the word "companion," the Senator does not mean that in the ordinarily accepted sense that they are there to make them feel good.  **They are there to take care of them,** he means when he uses the word "companion."  Is that correct?
>
> MR. WILLIAMS:  We use the situation in which people are in a household not to do household work but are there, first, as babysitters.  I think we all have the full meaning in mind of what a babysitter is there for—to watch the youngsters.
>
> "Companion," as we mean it, is in the same role—to be there and to watch an older person, in a sense.
>
> MR. BURDICK:  In other words, an elder sitter.

MR. WILLIAMS:  Exactly.

119 Cong. Rec. 24,801 (emphasis added).

The Defendants-Appellants and their supporters repeatedly state that companions today are "performing duties and working in circumstances that were not envisioned when the companionship services regulations were promulgated."  There is no support for this statement.  In fact, it is hard to imagine how the activities of daily living with which the elderly needed assistance in 1974 were different than those of today.  We may have made many technological advances in the ensuing years, but no one as yet has found a viable everyday substitute for eating, dressing, or bathing.  An elderly or infirm person incapable of caring for himself or herself in 1974 needed the same type of assistance with these activities that an elderly or infirm person needs today.

At no point in the legislative history is there any mention of the activities the DOL has identified as those that must comprise 80 percent of a companion's working time: conversation, reading, games, crafts, or accompanying the elderly or infirm person on walks, to appointments, to social events, or simply passively standing by to monitor the elderly or infirm person's safety and well-being.  It is overwhelmingly clear from the legislative history that in enacting the companionship exemption, Congress

sought to keep the elderly and infirm out of institutions, and that the exemption developed out of a concern over the ability of such individuals to pay for in-home care.

The Department's limitation of "care" in this manner subverts clear Congressional intent and alters the character of companionship services entirely.  Accordingly, the "duties" regulation fails the *Chevron* analysis and was appropriately vacated by the District Court.

## III.    THE DOL'S REVISED REGULATIONS WILL HAVE DEVASTATING IMPACTS ON THE ELDERLY, THEIR FAMILIES, AND THEIR CAREGIVERS, ALL OF WHICH CONGRESS INTENDED TO AVOID IN ENACTING THIS EXEMPTION.

The Defendants-Appellants and those that have submitted *amicus* briefs in support of the new regulations contend that the new regulations will enhance care in the home care services industry, because workers will be better paid and in turn provide better, more professional care to the elderly and infirm.  Unfortunately, quite the opposite will occur if the DOL regulation goes into effect. The proposed changes will make no real positive difference in compensation levels for employees who work as companions.  Companionship services are almost exclusively private pay or Medicaid.[6]  Both of these payment sources are tied to affordability and to

---

[6] *"Companionship Services Exemption Survey,"* conducted by the National Association of Home Care and Hospice and the National Private Duty

the resources of the elderly and infirm. Whether the services are paid directly from the pockets of our senior citizens or persons with disabilities or through the means-tested eligibility standards of state Medicaid programs, affordability is an essential factor.

As we have seen in the few states which have altered the applicability of the companionship exemption, employees will earn less, not more, under the new regulations, as those utilizing home care cannot afford to bear the increased cost—which results in institutionalization and job loss and/or limiting the hours of companions to minimize the overtime impact. *See,* Testimony of Wynn Esterline before the House Committee on Education and the Workforce Concerning "Ensuring Regulations Protect Access to Affordable and Quality Companion Care," March 20, 2012, attached as Exhibit to A.R. Comments of Husch Blackwell dated March 21, 2012.

Faced with these new regulations, businesses in this industry will respond to client needs and do what they can to limit overtime hours as much as possible, severely constricting the number of hours companions are allowed to provide services. Companions working in locations that currently do not have the companionship exemption often must work for

---

Association, January 11, 2012; *"Economic Impact of Eliminating the FLSA Exemption for Companionship Services,"* IHS Global Insight, February 21, 2012.

multiple businesses to earn as much as they had been earning previously. *Id.* Such would be the case across the country if these regulations are allowed to stand.

Meanwhile, the elderly and infirm will be left with the choices of paying much higher rates for in-home care with limited personal resources, accepting many more companions into their homes on a weekly basis to avoid overtime, or losing the ability to live independently. Where the elderly and infirm are currently able to limit full-time care to one to three individuals per week, they will be forced to accept likely at least five companions per week in order to avoid the astronomical overtime costs the revised regulations would require. Having so many workers in and out of these private homes, spending time completely alone with a vulnerable elderly or infirm client, drastically and adversely affects the quality of care, and can be extremely stressful and disruptive. Individuals who cannot control costs through scheduling multiple companions throughout a workweek, and who cannot afford the steep increase in cost, may need to forego home care.

If as a result of these new regulations the elderly and infirm are forced to cut back in obtaining help with these activities, it may have devastating effects on their health and well-being. Indeed, an individual

who has to go without meals is subject to malnutrition, which can slow wound healing and cause other complications. An elderly or infirm person who cannot get out of bed, bathe, or get dressed is at risk for depression. When a senior is no longer engaged in normal everyday activities, this is called "elder self-neglect." When a senior enters self-neglect, mortality within one year is to be expected.[7]

Moreover, there is no allowance in this fictional 20 percent "care" limitation for variables inherent in some elderly and infirm populations, including but not limited to the elderly and infirm living in rural areas. It is not hard to imagine, for instance, that an elderly adult could use up a great deal of his or her allotted 20 percent for one workweek in asking his companion to drive to just one doctor's appointment. Of course, the public transportation the DOL suggests to alleviate this burden is virtually nonexistent in many rural areas.

Should these regulations go into effect, and should the elderly and infirm be able to find affordable in-home care, they will likely be forced to hurry through their necessary activities of daily living. If the new "duties" regulation goes forward, it is not hard to imagine that the frail and elderly

---

[7] *See generally*, XinQi Dong, MD, et al., Elder Self-Neglect and Abuse and Mortality Risk in a Community-Dwelling Population, 302 JAMA 5 (Aug. 2009).

who benefit from these services will be hurried through eating their meals, forced to cancel necessary doctor's appointments, or told that they cannot have assistance in bathing or using to the toilet because their companion has already used up his or her 20 percent allotment of time on such activities.

Ultimately, the devastating effects of the new regulations will be swift and sure. The benefits to any group of individuals involved (the elderly and infirm, their companions, and their families) will be limited, at best, and most likely virtually non-existent. There are no "winners" to be found in this new regulatory scheme. The effects Congress clearly sought to avoid in 1974 by creating this limited exemption from the FLSA and in maintaining the status quo on the exemption after the decision in *Coke* in 2007— namely, increased costs and institutionalization of our elderly and infirm populations—will clearly be the end result if the District Court's Orders are overturned and these regulations are reinstated. These policy decisions have already been made by Congress, and the DOL cannot undo those decisions and substitute its own judgment in their place.

## CONCLUSION

For the above and foregoing reasons, the Orders of the District Court should be upheld and the new regulations should remain vacated.

Date: April 7, 2015.

_____s/ Henry L. Wiedrich_____
Michaelle L. Baumert, Esq.
Henry L. Wiedrich , Esq.
HUSCH BLACKWELL LLP
13330 California Street, Suite 200
Omaha, NE  68154
Telephone:  (402) 964-5000
Facsimile:  (402) 964-5050
michaelle.baumert@huschblackwell.com
henry.wiedrich@huschblackwell.com

**_Counsel for Amici Members of Congress_**

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 29(c), 32(a)(5) & (6), as it as has been prepared in 14-point Arial font, which is a proportionally spaced font.  I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(d), 32(a)(7)(B), and D.C. Cir. R. 32(a)(3), as it contains 5,254 words, excluding the parts of the brief exempted under Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. R. 32(a)(1).

*s/ Henry L. Wiedrich*

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2015, I electronically filed the foregoing document with the Clerk of the Court using the appellate CM/ECF system, which sent notice to the participants and parties in this case.

*s/ Henry L. Wiedrich*